# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

ANTHONY WAINWRIGHT,

        Petitioner,

    v.                                  Case No. 3:05-cv-00276-TJC

SECRETARY, FLORIDA DEPARTMENT      **CAPITAL CASE**
OF CORRECTIONS, et al.,

        Respondents.
_____/

## MOTION FOR RELIEF FROM JUDGMENT UNDER
## FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6)

Petitioner Anthony Wainwright moves for relief, pursuant to Federal Rule of Civil Procedure 60(b)(6), from the Court's March 2006 order granting summary judgment and dismissing his 28 U.S.C. § 2254 petition as time-barred. ECF Nos. 29, 30. This motion explains that Mr. Wainwright's federal habeas proceedings should be reopened under Rule 60(b)(6) based on new information regarding defects in the prior proceeding that were not available to the Court at the time of the original judgment denying equitable tolling and dismissing the petition. This motion also explains that there are independent grounds for granting Mr. Wainwright relief from his conviction and death sentence that are cognizable in this Rule 60(b)(6) motion by virtue of the actual innocence gateway. Even if the Court limits its consideration of this Rule 60(b)(6) motion to the time-bar issue, those same grounds show that Mr.

Wainwright has meritorious issues to raise in a reopened § 2254 proceeding. The Court should grant Rule 60(b)(6) relief.

## I.   INTRODUCTION

Mr. Wainwright is a death-sentenced individual on Florida's death row. In March 2005, his appointed attorney, Joseph Hobson, failed to timely file a federal habeas petition on Mr. Wainwright's behalf, despite having been paid more than $20,000, collected by a charity for indigent Mr. Wainwright, to do so. As this filing explains, during the course of the federal habeas proceedings, Mr. Hobson lied to Mr. Wainwright and made misrepresentations to this Court, resulting in Mr. Wainwright never receiving federal merits review of any issue in his capital case.

This motion also explains why the faulty dismissal of Mr. Wainwright's federal habeas proceeding on statute-of-limitations grounds was so devastating for the interests of justice in his case, which, free of procedural barriers, implicates multiple meritorious grounds for relief that were never presented by Mr. Hobson, or presented deficiently, during the original proceedings. Those grounds include not only constitutional violations by the state courts, but also evidence that Mr. Wainwright is actually innocent with respect to his conviction and death sentence.

This Court should consider these matters seriously in the context of this Rule 60(b)(6) motion. "Dismissal of a first habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely,

risking injury to an important interest in human liberty." *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996). This Court should be particularly concerned because this is a capital case, demanding heightened standards of reliability, as "[d]eath is a different kind of punishment from any other which may be imposed in this country . . . in both its severity and its finality." *Beck v. Alabama*, 447 U.S. 625, 637 (1980). As this motion explains, this Court has the authority under Rule 60(b)(6) to correct the injustice of the prior dismissal and finally afford Mr. Wainwright merits review.

## II.   MR. WAINWRIGHT'S BACKGROUND[1]

As will become clear, a consistent element of Mr. Hobson's botched representation during the original proceedings was his failure to adequately review the record, investigate the case, and provide the relevant details about Mr. Wainwright's background and the state proceedings to this Court. This motion attempts to fill that void by providing the following extended discussion of Mr.

---

[1]   Citations to the record on appeal compiled for Mr. Wainwright's direct appeal to the Florida Supreme Court in *Wainwright v. State*, 704 So. 2d 511 (Fla. 1997), will be referred to as "R. at [page]." Citations to the record on appeal compiled for Mr. Wainwright's initial state postconviction appeal in *Wainwright v. State, et. al*, 896 So. 2d 695 (Fla. 2004), will be referred to as "PCR. [volume number] at [page]." Citations to the record on appeal compiled for Mr. Hamilton's direct appeal to the Florida Supreme Court in *Hamilton v. State*, 703 So. 2d 1038 (Fla. 1997), will be referred to as "R-RH. at [page]."
Citations to the Appendix filed in support of the instant motion will be cited as App. at [page].

Wainwright's background and his case's procedural history. These details are also important to the Court's understanding of the Rule 60(b)(6) relief requested now.

Mr. Wainwright was born in 1970 in North Carolina to Kay and Ken Wainwright. He was their first child. Throughout Mr. Wainwright's early childhood, his parents sought medical and mental health care for him on several occasions. He suffered from persistent enuresis that would continue until his mid-teen years, App. at 175, which "could relate to sexual abuse trauma history." App. at 241. Mental health professionals noted that he was "immature and with poor impulse control" and provided his mother guidance on "developing appropriate child management techniques." App. at 186. "Family relationships were not particularly close; records noted several times that Mr. Wainwright felt alienated from his immediate family members, and multiple mental health providers recommended family treatment." App. at 240.

By the time Mr. Wainwright was eleven, he had already been referred for learning disability classes and attended mental health sessions to address problems with short attention span, hyperactivity, and low self-esteem. App. at 186. "[H]e had both learning/cognitive and behavioral problems that impacted his ability to function in educational environments." App. at 240.  That year, the trajectory of his life was substantially altered when an older man kidnapped, sexually molested, and threatened to kill Mr. Wainwright. "This was a harrowing experience. The attacker

4

had a weapon, and Mr. Wainwright thought the man was going to kill him. Mr. Wainwright was so terrified he urinated on himself and feared for his life." App. at 186. Mr. Wainwright was able to get away. His family contacted the police who investigated but were never able to make an arrest. *Id.*

After the assault, Mr. Wainwright began to experience dissociative episodes and other symptoms of post-traumatic stress disorder. He also began to self-medicate daily with alcohol and marijuana. *Id.* Both of his parents also abused alcohol and drank daily. App. at 242.

During his childhood, Mr. Wainwright showed "signs and symptoms of a severe neurodevelopmental disorder" as well as depression and anxiety. He developed learned helplessness and a tendency to be "easily embarrassed and suggestible." App. at 182.

Throughout his childhood and adolescence, Mr. Wainwright saw a series of mental health professionals. His "mental health history was remarkable for the complexity of his presentation and the early onset of his problems." App. at 242. The evaluating professionals noted Mr. Wainwright's potential suicidality, "decreased attention span and decreased school performance," continued enuresis, and low self-esteem. App. at 187. But few of them had information about the kidnapping and sexual assault Mr. Wainwright had endured. As a result, they struggled to effectively treat him. App. at 243.  Their struggles were compounded

by the reluctance of his parents to engage in family therapy or counseling sessions. App. at 202.

Records indicate that "Mr. Wainwright has had several head injuries and that at least two involved traumatic brain injuries (TBIs). He required medical attention for many of these injuries but did not seek help for others." App. at 180.

At the age of sixteen, Mr. Wainwright was described as having an "inhibition for of his intellectual life associated with a depression" and "posturing to buffer his denial and to compensate for undercurrents of bad feelings about himself." His "familial relationships" were considered, along with his low self-worth and learning disabilities, "key factor[s]" in his depression. App. at 189. He continued to obtain mental health services throughout his teen years. *Id.*

Early in his teen years, Mr. Wainwright began committing petty offenses, such as vandalism and shoplifting. This escalated to auto theft. App. at 188.  In 1987, when he was seventeen, Mr. Wainwright was arrested several times within a couple of months. One of his attorneys "described Mr. Wainwright as 'being depressed, being almost catatonic at times.' Mr. Wainwright reported that he was not sleeping, and was 'nervous and shaking at times.'" App. at 191. He was scared to be celled in a space with up to five adult men. *Id.*

Mr. Wainwright entered and exited correctional facilities several times as an adolescent. These incarcerations only worsened his depression and low self-esteem

and impeded his maturity. App. at 248-49.  He continued to suffer psychiatric symptoms during times when he was not in custody.

> In June 1991, Mr. Wainwright was admitted to Pitt County Memorial after a single-vehicle automobile collision. The vehicle flipped twice and received "severe damage." Notes reflect that alcohol was detected on Mr. Wainwright's breath. Mr. Wainwright later admitted that this collision was intentional and an attempt to kill himself.

App. at 192.

From the age of 15 until the offense at age 23, for all but about one year, Mr. Wainwright was incarcerated in one detention setting or another. This created opportunities for him to be victimized and for his brain development and maturity to be slowed. App. at 249.  Records from his "adolescent incarcerations suggest that [Mr. Wainwright] may have been exposed to violence or the threat of violence while incarcerated." App. at 243.

> [P]eer victimization is prevalent in these detention and residential treatment settings, introducing trauma and trauma-related symptoms to interact with the other harmful factors. This well-documented developmental sensitivity to peer influence, taken together with the repeated observations of mental health professionals that Mr. Wainwright was "easily intimidated" by peer pressure, that he "follow[ed]" other kids into trouble," and had a tendency to be a "follower," is relevant to the circumstances of the alleged offense because Mr. Wainwright was in the company of a[n] older antisocial peer (i.e., Richard Hamilton) at the time of the offense. It is also relevant with respect to understanding the likely influence of incarceration, hospitalization, and residential placement effects on Mr. Wainwright's functioning at the time of the crime.

App. at 248.

At the age of seventeen—weighing 152 pounds and standing five feet and eleven inches tall—Mr. Wainwright entered the North Carolina Department of Corrections (NC DOC). App. at 204-05. He was incarcerated in at least a dozen NC DOC facilities. *Id.* Mr. Wainwright also was placed in solitary confinement for an aggregate of 252 days while incarcerated in NC DOC, with one such episode lasting 81 days. App. at 249; 207. The majority of his time in restrictive housing was for non-disciplinary reasons. App. at 207.

It is not unusual for a younger inmate, like Mr. Wainwright, between the ages of 17 and 23, to end up in restrictive housing or protective custody at greater frequency than adult inmates. Younger inmates are often "more impulsive, naïve, immature, and more susceptible to intimidation and violence by other inmate populations that are older, more disruptive, and predatory." App. at 206. Despite its frequent use when Mr. Wainwright was in NC DOC custody, solitary confinement can cause "depression, anxiety, and psychosis," and "juveniles offenders are at particular risk of such adverse reactions." App. at 250.

On March 22, 1994, Mr. Wainwright was transferred from one NC DOC prison to another, Carteret Correctional Center, where he was assigned to work as a housing unit janitor. He was halfway through a six-year sentence for larceny and breaking and entering.

One month after his transfer, on April 24, 1994, Mr. Wainwright made a "spur of the moment" decision that would have devastating consequences. R. at 2618. He tagged along with Richard Hamilton, another inmate, when Mr. Hamilton escaped from Carteret. Mr. Hamilton had previously arranged for his girlfriend to pick him up outside of the prison and for two of his friends to rent a hotel room for him immediately after the escape. R. at 2618-19.

Over the course of the next couple of days, Mr. Hamilton directed the events, deciding who would drive and where. R. at 2624. Then, on April 27, 1994, Mr. Hamilton kidnapped the victim at gunpoint and instructed Mr. Wainwright to follow them in a separate vehicle. *Id.* Mr. Wainwright followed Mr. Hamilton to a nearby lumberyard, and then got into the vehicle with Mr. Hamilton and the victim. R. at 2624. As Mr. Wainwright drove, Mr. Hamilton got into the backseat and raped and assaulted the victim. R. at 2625. Mr. Hamilton told Mr. Wainwright to find a wooded area where they could "chill out." R. at 2625. Once in such an area, Mr. Wainwright exited the vehicle. Mr. Hamilton raped the victim again. R. at 2626. Mr. Hamilton then told Mr. Wainwright that they could not let the victim loose and instructed Mr. Wainwright to get a towel to place over the victim's head. R. at 2626-27. Mr. Wainwright refused and tried to convince Mr. Hamilton that a gun would make too much noise and that they should just leave the victim tied up. *Id.* Mr. Hamilton then shot the victim in the head. R. at 2627-28.

The following day, while on the run in Mississippi, Mr. Wainwright drove, while Mr. Hamilton directed him. A law enforcement officer spotted the vehicle, which had been reported as belonging to the victim, and attempted to pull the vehicle over. While Mr. Wainwright drove, Mr. Hamilton shot at the officer and the officer's vehicle multiple times. Both men were eventually apprehended. Mr. Wainwright did not shoot at police and was not found possessing a weapon. R. at 2030; 2056.

Spending much of his teenage years and early twenties in correctional institutions and having a substantial trauma history, Mr. Wainwright experienced delayed brain development. At the time of the offense, though 23 years old, Mr. Wainwright's brain functioned at the level of an adolescent. App. at 248-49.

> Mr. Wainwright very likely had substantial psychosocial immaturity, which effectively means that he was functioning more like a younger adolescent than a typical 23 year-old at the time of the crime in this case. Psychosocial maturity is a developmental process of transition from dependency of childhood/adolescence to the self-sufficiency of adulthood. It involves not only the brain systems described in the foregoing, but also the adolescent's sociocultural context and what they learn from their environment. Attaining psychosocial maturity includes accomplishing mastery and competence, developing stable social relationships, and creating a positive sense of self worth related to moral and responsible behavior even in the absence of external supervision.
>
> * * *
>
> There are factors that appear to predict delayed psychosocial maturity, such as disruptions in household stability, substance abuse, abuse and neglect, Attention Deficit Hyperactivity Disorder, and the presence of other psychiatric disorders. Mr. Wainwright's history included all of these risk factors, with the exception of disrupted household stability (though, placement in detention and inpatient could be conceptualized as disrupted household stability) and neglect. He did not have access to

10

the protective factors, such as prosocial peers, positive parent-child relationships, and nurturing school and extracurricular supports . . . .

*Id.*

At the time of the offense, "Mr. Wainwright was a psychosocially immature adolescent/young adult who had spent very little time in the community (and thus had impoverished community-living skills), had untreated complex mental illness and unaccommodated disabilities, and was unusually vulnerable to social pressure . . . ." App. at 251.

## III.   PROCEDURAL HISTORY

### A.   The Joint Trial of Anthony Wainwright and Richard Hamilton

Following the apprehension of Mr. Hamilton and Mr. Wainwright in Mississippi in April 1994, they were transported back to Florida. On May 10, 1994, attorney J. Victor Africano was appointed to represent Mr. Wainwright. R. at 23. Mr. Africano withdrew shortly thereafter, and attorney Clyde Taylor was appointed in June 1994 to represent Mr. Wainwright.

On July 15, 1994, Anthony Wainwright was indicted for first-degree murder, armed robbery, armed kidnapping, and armed sexual battery. R. at 1-2. On July 27, 1994, Mr. Taylor entered a notice of appearance as Mr. Wainwright's counsel and a written plea of not guilty on Mr. Wainwright's behalf. R. at 3. Trial was originally scheduled for December 1994, but was continued to March 27, 1995. R. at 182.

Three weeks before his scheduled trial date, on March 6, 1995, Mr. Wainwright wrote a letter to the trial court, noting that between Mr. Taylor's appointment in June 1994 and the date of the letter, Mr. Wainwright had only been able to speak with his attorney for no more than four hours in person. *See* R. at 638. Mr. Wainwright informed the court that Mr. Taylor "complain[ed] about the distance" between his office and the jail where Mr. Wainwright was detained and that Mr. Taylor did not want to make a "special trip" to see Mr. Wainwright unless he had to. *Id.* Mr. Wainwright pleaded with the court: "I'm scheduled for trial this month, March 27, and I don't even know what is going on." *Id.*

On March 13, 1995, two weeks before trial, Mr. Taylor, for the first time, moved for the appointment of a mental health expert for the defense. *See* R. at 1400 (oral motion); 691 (written motion). Mr. Taylor informed the court that he had discovered from Mr. Wainwright's family in North Carolina that "some medical records [] exist in North Carolina and [I] am trying to get up there to get those." *Id.* The trial court granted the motion and appointed Dr. Michael D'Errico. R. at 1400-01. Mr. Taylor later asked for a continuance of the March 27, 1995, trial date, noting that there was additional DNA testing being conducted by the State that the defense had not received, R. at 1438-39, that he was still trying to "track a lot of [Mr. Wainwright's records] down," R. at 1440, and that he was still planning a trip to North Carolina to investigate Mr. Wainwright's case, R. at 1441. Mr. Taylor then

noted that he had another trial in a federal case soon and that he was "really concerned." R. at 1452. The trial court denied the continuance. R. at 1451.

In that same hearing, on March 13, 1995, the trial court heard both a defense motion to sever the trials of Mr. Wainwright and Mr. Hamilton and the State's motion to conduct a trial before dual juries. R. at 1461. The State acknowledged that because "Wainwright says Hamilton pulled the trigger, and Hamilton says Wainwright pulled the trigger," it had a "problem under the *Bruton* [*v. United States*, 391 U.S. 123 (1968)] case." R. at 1462. The trial court granted the State's request to proceed to trial with two separate juries. R. at 1473.

On March 27, 1995, the joint trial of Richard Hamilton and Anthony Wainwright began in Hamilton County, Florida. Before jury selection, Mr. Taylor made another motion to continue the case. R. at 1481 (oral motion); 812 (written motion). Mr. Taylor and Mr. Hamilton's counsel, Jimmy Hunt, noted for the trial court that discovery was still ongoing and that critical DNA evidence had been disclosed only a few days prior. R. at 1481-82. Mr. Taylor specifically noted that this information was critical because, at this time, one of the two DNA labs being used by the State identified Mr. Wainwright in the critical DNA sample discussed, while the other lab did not at all identify Mr. Wainwright in that sample. *See* R. at 1483-84. The trial court denied the continuance. R. at 1503. Mr. Taylor, in response, noted, "I'll be announcing, Judge, that I'm not prepared to go forward with the trial.

13

I'll do that now instead of in front of the jury. I am not prepared to represent my client in this case." R. at 1503.

On March 27, 1995, after attempting to seat a jury in Hamilton County, it became apparent that the pretrial publicity in the small community would make a fair trial impossible; the trial court granted an unopposed motion for a change of venue. *See* R. at 1646-50 (oral motion and order); 831 (written order). In a March 30, 1995, hearing, the trial court informed the parties that the trial would be moved to Clay County, Florida. R. at 1654 (oral order); 831 (written order).

On May 15, 1995, jury selection in the joint trial began in Clay County. R. at 1668. After considering argument on whether both defense counsels should be present during the selection of each defendant's jury, the trial court ruled that both counsels should be present. R. at 1695-96. The jury panel was sworn. R. at 1698. Shortly thereafter, Mr. Taylor announced to the court, "[w]e understand there's going to be initial jury selection begun this afternoon in the Hamilton case. We do not need to be present." R. at 1700. The trial court then permitted Mr. Taylor and Mr. Wainwright to leave the courtroom, and Mr. Hamilton's jury selection proceeded without them. R. at 1701. On May 16, 1995, jury selection concluded for

Mr. Hamilton,[2] and Mr. Wainwright's jury selection began. R. at 1709. A jury was selected for Mr. Wainwright on May 17, 1995. R. at 1891.

On May 18, 1995, the guilt phase of the joint trial began. R. at 1907.

The State presented, to both juries, the testimony concerning the April 24, 1994, escape of Mr. Hamilton and Mr. Wainwright from the minimum security prison, Carteret Correctional Center, in North Carolina, R. at 1959-1967 (testimony of Michael Worseck), as well as testimony regarding the theft of a vehicle, guns, and other miscellaneous items, from two residences in rural North Carolina. R. at 1969-94(testimonies of John Taylor Jr. and Victor Henderson). The State also presented testimony that, on April 27, 1994, Carmen Gayheart went missing. R. at 1994-2016 (testimonies of Jennifer Smithhart and Carolyn Hosford). A missing person's report was filed. R. at 2016-20 (testimony of Officer Michael Sweat).

The State presented evidence that, on April 28, 1994, Mr. Hamilton and Mr. Wainwright were apprehended in a blue Ford Bronco belonging to the victim following a shootout with police in Brookhaven, Mississippi. R. at 2021-2122 (testimonies of Mississippi police John Leggett, Carl Brown, and Larry Foster). Mr. Wainwright was seen driving the Bronco, and Mr. Hamilton shot at police; Mr. Wainwright did not shoot at police and was not found possessing a weapon.

---

[2]     Mr. Wainwright's record on appeal does not include the transcripts for these proceedings, but they are in Mr. Hamilton's record, beginning at R-RH. at 2059.

Testimony concluded on May 18, 1995, with information about the forensic processing of the blue Bronco and the green Cadillac. R. at 2126-60 (testimony of Calvin Fenner, Jr.).

On May 19, 1995, the second day of the joint trial began. R. at 2169. The State presented testimony, to both juries, concerning forensic items collected during the apprehension of the codefendants in Mississippi, R. at 2198-2239 (testimonies of Eddie Sellars and Don Sumrall), and the forensic processing of the green Cadillac, which was found in Columbia County, Florida, R. at 2243-45 (testimony of Randall Roberts).

Then, to Mr. Hamilton's jury only, the State presented the testimony of investigator Russ Williams of the Columbia County Sheriff's Office, who detailed Mr. Hamilton's confession to the abduction and rape of the victim, and placed blame for her murder on Mr. Wainwright. R. at 2252-97. Still, before Mr. Hamilton's jury only, the State presented testimony concerning the May 1, 1994, discovery of the victim's body. R. at 2297-2302 (testimony of Leon Black).  Also, before Mr. Hamilton's jury only, the State presented testimony from Mississippi jailers concerning Mr. Hamilton's attempted escape from a Mississippi jail, during which a letter authored by Mr. Hamilton to Mr. Wainwright—discovered in Mr. Hamilton's cell—was read into the record. R. at 2307-26 (testimonies of jailer Johnny Thompson and Sheriff Lynn Boyte). Mr. Hamilton's letter detailed his plan for a

16

violent escape from the jail, and named individual guards that would have to be "taken out." R. at 2317-22.

After the jury for Mr. Wainwright was brought back into the courtroom, testimony concerning the discovery of the victim's body and Mr. Wainwright and Mr. Hamilton's incarceration in Mississippi was again presented (without information concerning the escape plan and letter by Mr. Hamilton). R. at 2335-46.

Although the defense case in chief had not yet begun, Mr. Taylor requested, and was granted permission, to present the testimony of Sheriff Lynn Boyte.  He then entered the letter concerning the escape plan authored by Mr. Hamilton. R. at 2347-62. Following this defense presentation, both juries returned to the courtroom, and the State presented testimony concerning the May 2, 1994, search for and discovery of the victim's body and the surrounding area. R. at 2363-85 (testimonies of Hamilton County Sheriff Harrell Reid and investigator Mallory Daniels).

On the third day of the joint trial, May 22, 1995, before the presentation of evidence began, the trial court ordered the jury and members of the public and press excluded from the courtroom, and the court announced its intention to hold an in-camera hearing. R. at 2392. After those individuals were excluded, the court addressed a written motion filed by Mr. Taylor on Mr. Wainwright's behalf, entitled "Defendant Wainwright's Ex-Parte Motion to See and Speak to the Trial Judge." *See* R. at 1073.

In the written motion, Mr. Taylor noted: "The Defendant believes his counsel is not acting in his best interest, and may in fact be working against him." R. at 1073. During the hearing with counsel for Mr. Wainwright and the State present, Mr. Wainwright addressed the court:

> Wednesday [May 17th] about one o'clock in the morning, an inmate slid me a note up under my door and informed me that I had a microphone in my room. And I asked him, you know, I asked him where. And he didn't know. So I started moving around. And up there on top of where the vents are, I found a little microphone. That's what it looked like, exactly. I told my attorney about it on Thursday, and he didn't never show up. Friday, I mean, I talked to him again. I was brought back to my cell Friday and it was taken down. But Tuesday I had a visit with my lawyer inside my cell, and I'm sure that was in there hearing our – I mean, listening to our conversation. I mean, that's exactly what the microphone looked like right there, about the same size and everything.

R. at 2394-95. Mr. Wainwright gave the trial court a drawing of the microphone, which was entered into the record. R. at 1075.

Mr. Wainwright's attorney, Mr. Taylor, told the court that Mr. Wainwright had told him about the microphone and asked him to come see it, but Mr. Taylor did not come to the jail on the evening of Thursday, May 19th. R. at 2396. Mr. Taylor did not see Mr. Wainwright until Friday after 4 p.m., and, by that time, the microphone had been removed. R. at 2396-97. Mr. Taylor told the court concerning that Friday visit:

> When I went up to see my client at approximately four, 4:15, he was very, very upset because the device had been removed. And his concern was that I was the only one he had told about it, and now it was

> removed. And it created, obviously, problems between myself and my
> client such that he did not want to talk to me, and would not let me in
> his cell, and indicated – and I left a message about the phone call
> Saturday, and I did not receive a phone call.

R. at 2397. Mr. Taylor further told the court that, although Mr. Wainwright had

informed him of the microphone on Thursday, May 19th, that "[t]he first I was aware

that there was in fact a device there was today, prior to Mr. Wainwright coming into

court, when I was advised that there, in fact, had been a device placed in there." R.

at 2397-98.

The court then addressed a representative from the Clay County jail,

Lieutenant Charles Tompkins, who confirmed that a microphone had been placed in

Mr. Wainwright's cell and said it was a "security measure." R. at 2399-2400. State

attorney Jerry Blair then stated, "Your Honor, for the record, I believe the Court

advised counsel that the Court became aware of this and ordered it removed." R. at

2403. For the first time, the Court noted:

> The Court did learn that this recording device was in your cell one day
> at lunch last week. And I learned of that from Mr. Dugger, because Mr.
> Dugger at lunch was concerned of security measures. And I instructed
> him it would be wise to remove that. And I'm sure it had something to
> do with the removal of that listening device.

R. at 2404. Lieutenant Tompkins then added, "I think that happened the day that Mr.

Wainwright is concerned about." R. at 2404. This was the first time this ex parte

communication was disclosed to Mr. Wainwright, and it is unclear when this

information was provided to the State.

19

Following the discussion of the microphone in Mr. Wainwright's cell, Mr.
Taylor asked the court to address the other motion that he filed, requesting
appointment of a doctor to provide medication to Mr. Wainwright. R. at 2409 (oral
motion); 1081 (written motion). In the written motion, Mr. Taylor wrote:

1.   On two prior occasions, the Defendant's court appointed
     psychologist, Dr. Michael D'Errico, has requested mild sedatives
     be provided by the Suwanee County Jail to the Defendant.

2.   On both occasions, staff at the Suwanee County Jail has refused
     the request of Dr. D'Errico.

3.   At the present time, the Defendant is under a great deal of stress,
     is confined to a 5 x 10 jail, without radio, television, telephone,
     visitation, and contact with anyone other than jail staff on a
     limited basis.

4.   The Defendant is having difficult with nerves and sleep and
     requests the court to honor the recommendation of Dr. D'Errico
     as to medication.

R. at 1081. The court orally granted the motion for a mental health expert, who
would "communicate to the Court and the Defense only," R. at 2409, and later
appointed Dr. Umesh Mhatre. R. at 1083 (written order).[3]

Following this publicly closed hearing on the morning of May 22, 1995, the
third day of trial resumed. The State presented additional testimony concerning the

---

[3]   At the time of this appointment, Dr. Mhatre was the defense expert for Mr.
Wainwright's codefendant, Mr. Hamilton. App. at 273-74; *Hamilton v. State*, 875
So. 2d 586, 593 (Fla. 2004) (discussing Dr. Mhatre's role as the mental health expert
for Mr. Hamilton at trial). This apparent conflict was never discussed by the trial
court or defense counsel. It is unclear whether defense counsel knew this fact.

forensic processing of the wooded area where the victim's body was found, R. at 2410-53 (testimony of James Gettemy), as well as the autopsy performed, R. at 2456-2503 (testimony of Dr. Margarita Arruza). The medical examiner, Dr. Arruza, testified that, by the time of the autopsy, the victim's body was "partially skeletonized," and had to be identified by dental records. R. at 2460. Through an x-ray, Dr. Arruza recovered fragments of two bullets in the victim's skull. R. at 2463. Dr. Arruza testified that the cause of death was two gunshot wounds to the head, R. at 2468, and that, because of the decomposition of the body, she could not make any conclusions regarding whether the victim was strangled, R. at 2471-72, or sexually assaulted. R. at 2496-99. She concluded that because of blood stains on the victim's t-shirt, she concluded that the victim was alive at the time of the gunshots. R. at 2480-82.

Before Mr. Hamilton's jury only, the State presented the testimony of Florida Department of Law Enforcement (FDLE) agent Robert Kinsey, R. at 2510-61. Agent Kinsey's testimony detailed the confession that Mr. Hamilton gave to FDLE on May 3, 1994, at the Columbia County Jail in Florida. R. at 2513-35. Also present at this May 3, 1994, interrogation was Hamilton County Sheriff Harrell Reid, Hamilton County Sheriff's Officer Mallory Daniels, and Columbia County Investigator Russ Williams. R. at 2560-61. This interrogation was not recorded. R. at 2561. In this confession, Mr. Hamilton said that the green Cadillac that he and Mr. Wainwright

had stolen in North Carolina had started to malfunction, R. at 2524, and that, while they were at Winn Dixie in the area of Lake City, Florida, Mr. Wainwright had been the one to get out of the Cadillac with a shotgun, force the victim into her vehicle (a blue Bronco), and drive away from the store while Mr. Hamilton followed in the Cadillac. R. at 2526-27. Mr. Hamilton further told FDLE that, shortly after leaving Winn Dixie, he and Mr. Wainwright pulled off into a wooded area and left the malfunctioning Cadillac and that Mr. Wainwright drove the blue Bronco back onto the interstate with Mr. Hamilton in the front passenger's seat and the victim on the floor in the space between the back of the driver's seat and the rear seat of the Bronco. R. at 2526-28.

According to Mr. Hamilton, after seeing a roadblock on the interstate, Mr. Wainwright turned the Bronco around and drove it to a wooded area. R. at 2529. There, Mr. Hamilton told FDLE that he raped the victim in the back of the Bronco, R. at 2530, and when he was finished, he said he stood outside of the vehicle while Mr. Wainwright then got into the Bronco and also raped her. R. at 2531. Then, according to Mr. Hamilton, Mr. Wainwright told the victim to get out of the vehicle and lay face down on the ground about ten feet from the vehicle where Mr. Wainwright strangled her with a t-shirt. R. at 2532. Mr. Hamilton told FDLE that, after Mr. Wainwright strangled the victim, he said, "I killed her. I killed her. I finally killed one." And that Mr. Wainwright had a "gung-ho attitude, or a John Wayne

attitude." R. at 2533. Mr. Hamilton said that, after the strangulation, the victim was dead, R. at 2533, and that Mr. Wainwright shot her in the head with a .22 rifle and then drug her body to a more heavily wooded area and covered her with brush. R. at 2534. Mr. Hamilton then said that they left the area in the Bronco, drove to the interstate, and then started throwing the victim's belongings, including her clothing and jewelry, out of the vehicle's window and also threw out the .22 rifle. R. at 2535.

Shortly after Agent Kinsey's testimony, Mr. Wainwright's counsel, Mr. Taylor, became "dizzy," looked "quite ill," and the court determined that he was not "in any condition to proceed this afternoon" with the rest of the day's evidence. R. at 2566. The third day of trial, May 22, 1995, thus ended abruptly.

On the fourth day of trial, May 23, 1995, outside of the presence to the jury, the trial court held a hearing on Mr. Wainwright's motion to suppress his May 9, May 11 and May 20, 1994, statements to Sheriff Harrell Reid. R. at 2578. The trial court admitted the three statements. R. at 2601. Following this ruling, the State disclosed an additional alleged statement from May 10, 1994, to Sherriff Reid. *See* R. at 2602. This statement occurred outside of the presence of Mr. Wainwright's then counsel, Mr. Africano, when only Sheriff Reid was in a law enforcement vehicle with Mr. Wainwright and while Mr. Wainwright was assisting in the location of evidence. R. at 2651-52. The State noted that Sheriff Reid told State Attorney

Blair about the additional statement after he was already deposed,[4] and that the State did not tell the defense until he realized "last night." R. at 2602-03. The State said it was an "inadvertent discovery violation," R. at 2603, and the trial court allowed the statement because it was a "procedural technical violation" that the State did not disclose the additional statement between October 1994 and the fourth day of trial in May 1995. R. at 2606.

Additionally, prior to the commencement of the fourth day of trial, in the presence of the jury, Mr. Taylor made a motion for a mistrial due to the actions of law enforcement on the evening of May 22, 1995, in holding a press conference about the microphone found in Mr. Wainwright's cell at the Clay County Jail. When this microphone was discussed on the third day of trial, May 22, 1995, it was in a hearing closed to the public. Now, before the jury, Mr. Taylor argued specifically:

> [A] representative of the Sheriff's Department appeared to be holding a press conference out in front of this court facility, advising the press exactly what went on in this [May 22, 1995, in-camera] proceeding, advising that there was in fact a device placed in the cell, and advising and making all sorts of statements as to the whys and wherefores, in effect, trying to justify the action. That would appear to fly directly in the face of the in-camera proceedings.

R. at 2607. The trial court denied the motion for a mistrial. R. at 2609.

The fourth day of trial proceeded, and the State presented the testimony of Hamilton County Investigator Mallory Daniels to Mr. Wainwright's jury only. R. at

---

[4]     Sherriff Reid was deposed on October 5, 1994.

24

2610. Daniels participated in the interrogation of Mr. Wainwright on May 9, 1994, with Sheriff Reid, Agent Kinsey, and Mr. Wainwright's prior counsel, J. Victor Africano. R. at 2611. Daniels testified that Mr. Wainwright told them that leaving the prison in North Carolina had been a "spur of the moment" decision, R. at 2618, and that Mr. Hamilton had made all of the arrangements for the escape with individuals on the outside, including 17-year-old Lori Manning, who picked them up outside of the prison, and Renee Bealls and Paula Sinkovich, who rented a motel for Mr. Hamilton and Mr. Wainwright immediately following their escape. R. at 2618-19. Mr. Wainwright told law enforcement that, when he and Mr. Hamilton were in the Winn Dixie parking lot, Mr. Hamilton instructed Mr. Wainwright to drive the green Cadillac up behind the blue Bronco into which the victim was loading groceries. He said Mr. Hamilton got out of the vehicle with a shotgun and forced the victim into her vehicle. R. at 2624. Mr. Hamilton then told Mr. Wainwright to follow him in the Cadillac, while Mr. Hamilton drove the Bronco. R. at 2624. Mr. Wainwright followed Mr. Hamilton to a nearby lumberyard, where they left the Cadillac. Mr. Wainwright got into the Bronco with Mr. Hamilton, who moved to the passenger's seat, and the victim. R. at 2624.

Mr. Wainwright said he then drove the Bronco back to the interstate, and Mr. Hamilton got into the backseat of the Bronco with the victim, slapped her when she was crying, and then raped her and forced her to perform oral sex on him. R. at 2625.

25

Then, after traffic was stopped on the interstate, Mr. Hamilton asked Mr. Wainwright to find a wooded area where they could "chill out for awhile." R. at 2625. After they stopped the Bronco in a wooded area once again, Mr. Hamilton and Mr. Wainwright both got out of the Bronco, leaving the victim inside. Mr. Hamilton returned to the vehicle and raped the victim again. R. at 2626. Mr. Wainwright said that after Mr. Hamilton finished, he got out of the Bronco with the shotgun, and Mr. Wainwright asked him what he was going to do, to which Mr. Hamilton replied that they "couldn't turn her loose." R. at 2627. Mr. Wainwright said Mr. Hamilton told him to get a towel to place over the victim's head, but  Mr. Wainwright refused. Mr. Wainwright told Mr. Hamilton that a gun would make too much noise and that they should tie her up and leave her. R. at 2626-27. Mr. Hamilton then put the shotgun back in the vehicle, got the .22 rifle instead, and shot the victim in the head. R. at 2627-28. Mr. Wainwright said that Mr. Hamilton had thrown out the victim's jewelry before they stopped in the wooded area and that they threw out her other belongings along the interstate afterwards. R. at 2628.

The State presented the testimony of Sheriff Reid to Mr. Wainwright's jury only. R. at 2648. Sheriff Reid testified about the May 10, 1994, statement by Mr. Wainwright, in which his attorney was not present. R. at 2652. Sheriff Reid said during this statement that Mr. Wainwright had told him that Mr. Hamilton had said before the victim was killed, "You know what we've got to do?" and Mr.

26

Wainwright responded "I know we've got to kill her." R. at 2653. Mr. Wainwright also allegedly told Sheriff Reid that they threw the victim's jewelry out of the Bronco window before she was killed because they knew they were going to kill her. R. at 2654. Sheriff Reid testified that this statement was a "change" from the first statement that Mr. Wainwright gave to police with counsel present, because then Mr. Wainwright had "denied any knowledge that she was to be killed." R. at 2654. Sheriff Reid then testified about a May 11, 1994, statement Mr. Wainwright allegedly made, again without the presence of counsel, in which Mr. Wainwright said again that they threw out the victim's jewelry before they killed her because they planned to kill her and didn't want the jewelry to be found on her body when she was located. R. at 2654-55. Sheriff Reid also testified that on May 20, 1994, allegedly prior to taking a polygraph during plea negotiations for this case, Mr. Wainwright told Sheriff Reid that he also raped the victim. R. at 2656. At no point did anyone claim that Mr. Wainwright confessed to killing victim himself.

After Sheriff Reid's testimony, in midtrial on May 23, 1995, the trial court held a brief bench conference. R. at 2670. The trial court then said:

> I will go ahead and inquire of the jury about those news accounts [concerning the microphone in Mr. Wainwright's cell] now, and at some point during the day, we want to get a statement on the record about the mental health of Wainwright. Has he had any medication today?

R. at 2670. Mr. Wainwright's counsel then responded, "[a]pparently." R. at 2670. The trial court noted that it would ask again at the end of the day. *Id.* The trial court asked Mr. Wainwright's jurors if they had seen or read any accounts of trial during the trial, to which the court reporter noted they "all shake heads no." R. at 2670.

Mr. Wainwright's jury was excused, and the trial court then addressed jailers from Clay County jail. R. at 2671. In response to the court, Jailer Tompkins indicated that he did not know if the medication that Dr. Mhatre prescribed to Mr. Wainwright had been obtained. R. at 2671. The trial court then asked the jailers to get the medication "for the noon recess." R. at 2672. The court then addressed Mr. Taylor:

> THE COURT:    Mr. Taylor, your position is, and Mr. Wainwright's is, that the medication will not interfere with his ability to participate in the trial and assist his attorney?
>
> MR. TAYLOR:    No. I discussed that with Dr. Mhatre last night.
>
> THE COURT:    Okay. The doctor indicates the medication will have its desired affects without interfering with the trial?
>
> MR. TAYLOR:    Yes sir.

R. at 2672. The trial court then instructed Mr. Taylor: "If you or Mr. Wainwright experience any matters relative to that, let me know." R. at 2672.[5]

---

[5]    Although the court indicated it was going to follow up later during this trial day concerning Mr. Wainwright's medication status and "mental health," there was no additional information provided on the record concerning either issue.

The fourth day of trial resumed. The State presented the testimony of Taylor County jailer Donald Gutshall to Mr. Wainwright's jury only. He testified about the confinement of Mr. Wainwright at Taylor County jail, as well as his personal knowledge of jail inmates Robert Murphy and Gary Gunter, who were briefly housed in the same area as Mr. Wainwright. R. at 2673-77. The State also presented the testimony of Robert Murphy. R. at 2702. Mr. Murphy could not identify Mr. Wainwright in the courtroom and said he was not present, R. at 2705, until later when the State specifically directed Mr. Murphy to look at the defense table, R. at 2710. Mr. Murphy was incarcerated at the Taylor County jail, had at least eight prior felony convictions, R. at 2715, and had a pending request to lower his current sentence. R. at 2712. Mr. Murphy testified that, while he was incarcerated in Taylor County Jail, Mr. Wainwright told him that Mr. Hamilton raped the victim, but that Mr. Wainwright did not rape her. R. at 2708. Mr. Murphy said that Mr. Wainwright told him that he strangled the victim and shot her in the head. R. at 2708.

The State then presented the testimony of Gary Gunter, another Taylor County Jail inmate. R. at 2737. Mr. Gunter testified he had at least seven felony convictions and that he had AIDS. R. at 2738. Mr. Gunter said he was housed in a medical cell at Taylor County Jail right next to Mr. Wainwright over a weekend in the fall of 1994. R. at 2740. Mr. Gunter testified that Mr. Wainwright allegedly told him that he had escaped from a prison in South Carolina with Mr. Hamilton, drove down

through Alabama where he "robbed some people over there," and then abducted a girl in a shopping center parking lot in Lake City, Florida. R. at 2742. Mr. Gunter testified that Mr. Wainwright told him that both he and Mr. Hamilton raped the woman and then "they" took a gun and shot her in the back of the head. R. at 2742. Mr. Gunter then clarified that Mr. Wainwright said that he had been the one that shot the woman. R. at 2743.

Following this testimony, both juries returned to the courtroom, R. at 2776, and the State presented additional testimony concerning the location and collection of items related to the crime found along the interstate in Florida and Georgia. R. at 2777-85 (testimony of Calvin Davis); 2785-88 (testimony of Brian Rowe); 2789-91 (testimony of Jackie Edmondson); 2791-94 (testimony of Mallory Daniels); 2827-34 (Mallory Daniels recalled). FDLE lab analyst David Williams, accepted as a firearms expert, testified that he had compared the .22 rifle recovered from the side of the interstate with the bullet fragments recovered from the medical examiner's autopsy of the victim. R. at 2794-2809. Mr. Williams concluded that the bullet fragments were "badly mutilated," but he could "determine the rifling characteristics was the same as the [.22] rifle . . . and for that reason and that reason only, the bullet could have been fired from [that] weapon." R. at 2813.[6]

---

[6]     Although defense counsel did not raise the issue during Mr. Wainwright's trial, this Court should take notice that this was not the first expert that analyzed these bullet fragments; prior to Mr. Williams's analysis, report, and testimony,

On the fifth day of trial, May 24, 1995, the court addressed a number of matters, including the midtrial disclosure by the State of additional DNA testing and a challenge to the reliability and validity of the DNA testing. R. at 2848-2989. After denying a motion in limine due to the late disclosure of DNA evidence by the State, and notification that one of Mr. Hamilton's jurors was ill, the trial court ruled that there would be a "24-hour continuance" of the trial. R. at 2870.

Defense counsel also brought to the trial court's attention that the victim's mother appeared to have a listening device, which she was using to eavesdrop on communications between counsels and between attorneys and clients. Specifically, Mr. Taylor told the trial court:

> Judge, there's another matter we need to go ahead and address now. I've been advised, I think both of have been advised by our clients that apparently the victim's mother has some sort of listening device, and that during the bench conference, it's put up on the rail, and obviously, we believe it can pick up. On occasions when I was advising Mr. Blair and Mr. Dekle of that problem, standing right up here, we were really whispering, and there was a visible reaction from both her and the man sitting to her left, and the document – the thing was pulled off and moved. So I believe they are listening.
>
> Now the problem that my client has with that, based on everything that's gone on so far, real, perceived or otherwise, is if that has the ability to pick up communications at this voice level sitting up here, another five, six, or ten feet closer or further away, then it has the ability to pick up communication at counsel table for both Mr. Wainwright,

---

FDLE analyst Edard Love, Jr. had analyzed the same fragments and concluded: "Examination of these fragments revealed they are of no value for identification purposes." R. at 215-16.

communications that would be privileged, and communications that may be ongoing between Mr. Hunt and his client.

R. at 2880-81. The State attorney acknowledged that the victim's mother "does appear to have some type of listening device on," but informed the trial court that they had not received any privileged information from her. R. at 2881-82. Later, the trial court questioned the victim's mother directly about the device, and she said it was a listening device only and did not record. R. at 2989. She said she could pick up some words that were being said at bench conferences, and that combined with reading lips, she could figure out mostly what was being said. R. at 2989. After this, the trial court went into recess until the following day.

On May 25, 1995, the morning of the sixth day of trial, at 8:00 a.m., Mr. Wainwright filled out and submitted an Inmate Request Form in Clay County Jail. App. at 23. In this form, Mr. Wainwright noted that he had "been having trouble receiving" the medication prescribed to him pursuant to the trial court's order and Dr. Mhatre's recommendations. *Id.* Clay County Jailer "Sgt. Murphy" responded to Mr. Wainwright at 9:45 a.m. on the same day:

> You are in Court for your 11AM medication times. This medication is given to the Officer's [sic] that escort you and stay with you. If you need to complain then please file your complaint with them.

*Id.*[7]

That same morning, the trial court again addressed some matters outside the presence of the jury before the commencement of evidence. R. at 2995. Specifically, with regard to the motion for mistrial and motion for sanctions Mr. Taylor made as a result of the microphone that had been placed in Mr. Wainwright's cell at Clay County Jail, the trial court ruled:

> And I also need to announce for the record, after considering carefully Mr. Taylor's motion for mistrial, and I've heard now the testimony of Captain Dugger and Charles Tompkins, the Court has determined from its findings of fact that the State was unaware of the listening device, that there has been no testimony or evidence brought in these proceedings that would be admissible from that listening device, that it was used as a security device and measure, which appears to have been appropriate under the circumstances. Therefore, if there's no further evidence, Mr. Taylor, I'll deny the motion for mistrial, and deny the motion for sanctions.

R. at 2995-96.

The State also made the trial court aware of an additional statement made by Mr. Hamilton that morning that it sought to present at trial; Sheriff Reid allegedly heard Mr. Hamilton say, "Sheriff, what's the big deal about this DNA. We both raped her." R. at 2999. The trial court found this statement admissible. R. at 3002-03. Mr. Taylor then made a motion for a mistrial based on the cumulative effect of

---

[7]     This record reflects a response at 9:45 a.m. on May 25, 1995, but it is unclear when Mr. Wainwright would have received this response, as the court reporter's transcript for the same day reflects that court began at 9:00 a.m. R. at 2995.

the issues happening in Mr. Wainwright's trial. R. at 3003-04. Mr. Taylor informed

the trial court that these issues have "resulted in a number of things that I believe

have impacted on the ability of this attorney and Mr. Owens to try to be focused on

the trial, to render effective assistance to our client." R. at 3005. These issues

included specifically "restrictions on client visitation," R. at 3005, the microphone

that was placed in Mr. Wainwright's cell, R. at 3007, the listening device the defense

discovered that the victim's mother was using, R. 3007-08, the press conference held

publicly by the Clay County Sheriff's Office concerning the microphone in Mr.

Wainwright's cell, R. at 3008, and the late disclosure of DNA evidence by the State,

R. at 3009. Of the microphone in Mr. Wainwright's cell, Mr. Taylor noted:

> [This caused] problems with the client communication and relationship.
> There has been no doubt client paranoia in this case, based upon things
> that at one time you could say, well, he thinks there's a bug in his cell,
> and it's been there apparently from the 15th of May, and it wasn't taken
> out until the afternoon of the 19th of May, even though the Court
> apparently had directed that it ought to be removed as early as the 16th
> of May.

R. at 3007. These issues, Mr. Taylor also noted, "resulted in additional hours being

spent on other collateral matters and not the defense of this case." R. at 3008.

Mr. Taylor elaborated:

> And as a result of all of this, my client has been concerned with
> procedures that have gone on, and we been asked and have had to check
> into and spend time looking at various aspects of other civil rights'
> violations, possible, real or imagined that I can't summarily dismiss
> anymore, when I should be focusing on the trial. I think it's unfortunate.
> I can't in good faith point the finger at any one person with any

> deliberate malice. But I think when you take into consideration the
> attitude and the emotional impact of this case on a number of people,
> well intentioned or otherwise, the end result has been, we have been
> thoroughly distracted. And I do not believe at this point in time we can
> continue to obtain the semblance of a fair trial with the grounds stated,
> and I move for a mistrial on behalf of my client.

R. at 3010. The prosecutor also commented about Mr. Wainwright: "We have spent

a great deal of time during the course of this trial arguing extraneous matters, most

of them occasioned by Mr. Taylor's client's paranoia about certain things." R. at

3011. The trial court denied the motion for a mistrial. R. at 3013. After ruling on that

motion, the trial court inquired of Mr. Taylor:

> An issue you did not raise, but perhaps the Court should, Mr. Taylor,
> your client has been seen by Dr. Mhatre, and was given medication.
> And you and your client represent to me that he's alert and able to assist
> you from the mental aspect in this case; is that correct?

R. at 3013. Mr. Taylor responded: "That's correct." R. at 3013.

The court called for both juries, and the presentation of evidence began on the

sixth day of trial. R. at 3013. The State presented the testimony of Josephine Roman,

an FDLE lab analyst specializing in serology. R. at 3014. Ms. Roman testified that

she tested a number of materials for enzyme types, R. at 3015-3021, and that she

also examined a piece of the seat cover from the back seat of the blue Bronco for

semen, R. at 3022-23. This piece of the Bronco's back seat cover was given an

exhibit number of 75-B for the purposes of FDLE analysis. *Id.* Ms. Roman

determined that this backseat cover did have semen and spermatozoa, as well as the

presence of blood types A and O. R. at 3023-24. This exhibit was sent to the FDLE lab location in Jacksonville, Florida, for further DNA testing. R. at 3025.

Before both juries, the State also presented the testimony of Michael DeGuglielmo, a DNA analyst from the company Genetic Design in North Carolina. R. at 3060-64. Mr. DeGuglielmo testified generally about Restriction Fragment Link Polymorphisms (RFLP) analysis and Polymerase Chain Reaction (PCR) analysis. R. at 3075-83. The State then called James Pollock, an FDLE serologist specializing in DNA testing and RFLP analysis. R. at 3100; 3105. Mr. Pollock testified that he had conducted RFLP analysis on a portion of the rear seat cover from the Bronco (Exhibit 75-B), in which he analyzed six loci/probes, and concluded:

> Taken as a whole, the six probes all are consistent with semen having come from Anthony Wainwright on Exhibit 75-B. And I cannot exclude Hamilton as being an additional semen donor to that exhibit. And there is a potential or is a third donor of unknown origin or at least not identified in that particular sample, as well.

R. at 3155.

The State then recalled Michael DeGuglielmo of Genetic Design, who testified about his PCR testing of the same item (Exhibit 75-B). R. at 3187-88. Mr. DeGuglielmo testified that "[t]he first sample that we analyzed . . . matched or was consistent with Ricky Hamilton, but was different from that of Anthony Wainwright." R. at 3217. DeGuglielmo then noted that after this testing, he "had given the results to Jim Pollock with FDLE. And these results seemed to be not

36

exactly consistent with the results that he had seen from the other side of the sample." R. at 3218. Then, Mr. DeGuglielmo received an additional cutting from the Exhibit 75-B area and concluded that there was "a mixture of DNA's in the sperm fraction of the sample that are consistent with DNA from Ricky Hamilton and Anthony Wainwright." R. at 3221. Following this testimony, the State presented the testimony of Sheriff Reid concerning the additional statement offered midtrial to Mr. Hamilton's jury only, and the presentation of evidence closed for the day. R. at 3272-75.

On May 26, 1995, the seventh day of trial, before the commencement of the presentation of evidence, the trial court was alerted that one of Mr. Wainwright's jurors had failed to appear. R. at 3288. Upon further investigation by the State attorney and the trial court, it was discovered that the missing juror had pending criminal charges at the time of jury selection, was currently out on bond, and had lied on her juror questionnaire about this fact. R. at 3291; 3295. The trial court replaced this juror with an alternate. R. at 3296.

The State then proceeded with the presentation of testimony, calling first FDLE analyst Marvin Stephens, who testified about fingerprint identifications he made on items recovered in the case. R. at 3297-3360. The State then rested. R. at 3361. The trial court heard, and denied, motions for mistrials. R. at 3361-74.

The defense presentation of evidence began with Mr. Hamilton's case-in-chief. R. at 3374. There is no indication that either Mr. Wainwright or his counsel were in the courtroom during the presentation of Mr. Hamilton's case-in-chief.

Mr. Hamilton first presented the testimony of former Taylor County Jail inmate Dennis Givens,[8] before his jury only, who testified that he was incarcerated with Mr. Wainwright in Taylor County. R. at 3379. Mr. Givens testified, "I'm not for sure who did what, but this is what I can remember from the story, [Mr. Wainwright] got out of the truck, got the woman, put the gun on the woman, emptied the contents out of the car into her vehicle and left with her." R. at 3382. Then, according to Mr. Givens, Mr. Wainwright told him that Mr. Hamilton raped the victim and that Mr. Wainwright did not rape her, but "took a scarf or shirt or something and wrapped it around her neck and tried to strangle her, and that didn't work, so he said he punched her in the back of the head a few times." R. at 3384. Mr. Givens said Mr. Wainwright told him that he "went over to the truck, got the gun. [Mr. Wainwright] put a bullet in the gun, walked over there and [] shot her in the back of the head. Went and got another bullet and shot her in the back of the head. [Mr. Wainwright] kicked her to make sure she was dead, and [he] drug her off in some bushes and threw some bushes over her." R. at 3385. Mr. Givens testified

---

[8]     Mr. Givens's name is misspelled in the trial transcript as "Givins." He will be referred to as "Givens" for the purposes of this pleading.

that Mr. Wainwright said Mr. Hamilton was a "pussy" for not killing her himself. R. at 3385.

On cross examination by the State, Mr. Givens testified that Mr. Wainwright had told him that he had killed a police officer in Mississippi and gotten 20 years to life there. R. at 3388. Mr. Givens testified on redirect examination that Mr. Wainwright "kept repeating the same things over and over" such as "it is a good night for a homicide," "I finally did it," and other "crazy stuff." R. at 3392. Mr. Givens said he "gave him a book on magic," and told him "[i]t is evil. You are evil. Hang out with it." R. at 3392. Mr. Givens agreed that Mr. Wainwright "talk[ed] about being a maniac." R. at 3393.

Mr. Hamilton also presented the testimony of former Suwanee County Jail inmate Bill Bispham, who testified that he was incarcerated with Mr. Wainwright. R. at 3394-96. Mr. Bispham testified that Mr. Wainwright told him that he was the "trigger man," and that he had "done the killing." R. at 3399. Mr. Bispham said that Mr. Wainwright told him that both he and Mr. Hamilton raped the victim, and that Mr. Hamilton had wanted to let her go, but Mr. Wainwright said that he "wasn't that f'g dumb," and they couldn't let her go because "[s]he knew their faces." R. at 3401. Mr. Wainwright allegedly told him that Mr. Hamilton was "chicken shit" for cooperating with law enforcement. R. at 3402. Mr. Bispham also testified that Mr.

Wainwright had told him that he had killed a Florida State Trooper. R. at 3405. After the presentation of Mr. Bispham's testimony, Mr. Hamilton rested. R. at 3412.

In rebuttal to Mr. Hamilton's defense presentation, the State recalled former Taylor County inmate Robert Murphy, who had testified previously against Mr. Wainwright before Mr. Wainwright's jury only. R. at 3412. Mr. Murphy again testified about Mr. Wainwright's alleged inculpatory statements, R. at 3412-16, and added that Mr. Wainwright had additionally "mentioned something about after they had escaped on the way down from wherever they had escaped from, South Carolina, or North Carolina, somewhere, that they run across some black people, a drug dealer or whatever, they robbed and killed them." R. at 3418. This information had not previously been presented.

At the mention of this information, Mr. Hamilton's counsel, Mr. Hunt, objected. R. at 3418. State attorney Dekle then told the trial court that he did not know Mr. Murphy was going to say that, and that he expected him to testify about the "killing of a Mississippi State highway patrolman." R. at 3419. State attorney Dekle told the trial court: "I was offering that testimony to show that Mr. Wainwright is a bald faced liar." R. at 3419. The State also noted that it did not have evidence a Mississippi trooper had been killed. R. at 3419.

After the trial court ruled on Mr. Hunt's objection, the cross-examination of Mr. Murphy began. *See* R. at 3424. Mr. Murphy testified that Mr. Wainwright told

him he killed the victim because "fuck that bitch, man. I didn't need her. I have her vehicle." R. at 3427. Mr. Murphy also testified that Mr. Wainwright told him that he "rode with the Aryan brotherhood," R. at 3427, and had previously offered Mr. Murphy money to bring a gun into the jail so he could escape. R. at 3428.

Also in rebuttal, the State recalled Hamilton County Sheriff's Officer Mallory Daniels. R. at 3431. Mr. Daniels testified about Mr. Wainwright's statements to him concerning the crime, including that Mr. Hamilton was the one who slapped and then raped the victim, R. at 3433-34, and that Mr. Hamilton had shot and killed her after ignoring Mr. Wainwright's suggestions that they should tie her up and leave her there alive. R. at 3436-37. The State elicited testimony from Mr. Daniels that Mr. Wainwright never said he raped her and never said he strangled her. R. at 3437. In the afternoon session, Mr. Hamilton rested his case-in-chief. R. at 3467.

On this seventh day of trial, Mr. Wainwright began his defense case-in-chief. R. at 3469. Mr. Wainwright's counsel, Mr. Taylor, first presented the testimony of FDLE Agent Robert Kinsey. R. at 3470. Through Agent Kinsey, Mr. Taylor elicited all of the details concerning Mr. Hamilton's prior statements concerning this crime, R. at 3471-72, in addition to statements that Mr. Hamilton made that had not previously been presented to Mr. Wainwright's jury, including that Mr. Wainwright had robbed and killed an elderly couple in Daytona Beach, R. at 3475-77, and that Mr. Wainwright had killed a teenage girl in Daytona Beach and put her body under

41

a church, R. at 3480-81. Agent Kinsey said that the bodies from these murders had not been located and that, as far as he knew, the statements were false. R. at 3484. On cross-examination, the State went through Mr. Hamilton's statement concerning the murder of the victim in detail, R. at 3488-92, which they had not (and could not) do previously under *Bruton*. *See, e.g*., R. at 1462 (acknowledgment by the prosecutor that the State had a "problem under the *Bruton* [*v. United States*, 391 U.S. 123 (1968)] case"). The State also elicited the statement allegedly made by Mr. Wainwright with regard to the Mississippi State Trooper that "if he had a gun, he would have killed the son of a bitch." R. at 3493.

The only other witness that Mr. Taylor presented on Mr. Wainwright's behalf was Sheriff Harrell Reid. R. at 3493. From Sheriff Reid, Mr. Taylor elicited that Mr. Hamilton had talked about "other bodies" of people that he and Mr. Wainwright had killed, R. at 3496-97, including from the murders of the elderly couple and the teenaged girl in Daytona Beach, Florida, R. at 3499-3501. On cross-examination, the State again went through Mr. Hamilton's confession inculpating Mr. Wainwright in the murder of the victim, R. at 3504-05, and eliciting the statement concerning killing the Mississippi State Trooper, R. at 3507-08. Mr. Taylor then rested Mr. Wainwright's defense case. R. at 3509.

After Mr. Wainwright's jury was excused, a bench conference was held. R. at 3510. Mr. Taylor told the trial court that Mr. Wainwright's "jury went to hell in a

handbasket," R. at 3510, and FDLE agent McDaniel told the court that they had used the stun belt on Mr. Wainwright, which had caused Mr. Wainwright to scream, R. at 3511. Shortly thereafter, Mr. Wainwright was brought into the courtroom. R. at 3512. Mr. Wainwright told the judge, "I just got shocked for – I don't know what for. They shocked me with this belt . . . . He told me I had to put these back on and the chain and all this stuff. I was just trying to explain to him I had to come back here. I didn't make no move or nothing, and he going to shock me with that thing." R. at 3512. An Officer Beck then told the Court, "[h]e was refusing to put the chains back on." R. at 3512. Then the charge conference was held in open court. R. at 3514.

On May 30, 1995, the eighth day of trial, closing arguments were held. R. at 3542. Closing arguments as to Mr. Hamilton were held in the morning,[9] and those as to Mr. Wainwright were held in the afternoon, R. at 3542. The State argued:

> The question is, which one of these two defendant's statement[s] do we believe? The answer is, it doesn't matter which one of them you believe. When these two defendants made their initial statements to law enforcement, they were both trying to save their skins by putting the major blame for what happened to Carmen Gayheart on the other. It's the old, he done it, no he done it, defense.

R. at 3552. The State then argued that Mr. Wainwright's statement convicted him, including both his statements to law enforcement and his statements to jail inmates

---

[9] The closing arguments as to Mr. Hamilton were not included in the record on appeal in Mr. Wainwright's case. They can be found in Mr. Hamilton's record on appeal beginning at R-RH. at 1935.

Murphy and Gunter. R. at 3553-57. Thus, the State said, Gunter and Murphy should be believed because their statements largely matched Sheriff Reid's, and Sheriff Reid's "character and his testimony [is] unimpeachable." R. at 3580-81. The State also argued that Mr. Wainwright and Mr. Hamilton purposefully went to a grocery store, because "who's going to be grocery shopping in the middle of the day? Women. Not only did they plan to get a car here, but they planned to get a woman with a car." R. at 3577.

Mr. Taylor's closing argument on Mr. Wainwright's behalf focused on Mr. Hamilton being a liar, R. at 3601, and the incredibility of statements by Murphy and Gunter, R. 3601-04. Mr. Taylor also argued that the DNA evidence produced was insufficient. R. at 3585-99.

After closing arguments, Mr. Wainwright's jury retired to deliberate at 4:27 p.m. R. at 3651. Shortly before 7:15 p.m., the jury asked a question, and the trial court responded at 7:15 p.m. R. at 3651-52. Both this question and response was not recorded by the court reporter. Again, shortly before 8:20 p.m., the jury asked another question, and the court responded at 8:20 p.m. R. at 3651. Again the question and answer were not recorded by the court reporter. *Id.* At 9:00 p.m., Mr. Wainwright's jury returned verdicts of guilty to all the charges. R. at 3652-53.

On June 1, 1995, penalty phases were held for Mr. Hamilton[10] (in the morning) and Mr. Wainwright (in the afternoon). R. at 3656. Before beginning, the trial court instructed the jury:

> The final decision as to what punishment shall be imposed rests solely with the judge of this Court. However, the law requires that you, the jury, render to the court an advisory sentence as to what punishment should be imposed upon the defendant.

R. at 3664. The State presented no witnesses against Mr. Wainwright, but tendered certified copies of his convictions from Mississippi related to his and Mr. Hamilton's apprehension. R. at 3665-66. Mr. Taylor presented Mr. Wainwright's mother, Kay Wainwright. R. at 3666. Mrs. Wainwright testified that Mr. Wainwright had been a sickly baby, R. at 3668, that he had been "accident prone" as a child, getting "three head injuries," R. at 3669, and that he was a "loner" who had trouble making friends in school. R. at 3669-71. She also testified that he wet the bed until he was fourteen years old, which was embarrassing, R. at 3672, and that she had been told Mr. Wainwright was "borderline mentally retarded," but she didn't believe that, R. at 3676; 3683. Before she could finish testifying, however, Mr. Taylor informed the court: "Based upon the communication with my client, we're going to terminate this inquiry, Judge. Thank you." R. at 3684.

---

[10]   Mr. Hamilton's penalty phase proceedings were not included in Mr. Wainwright's record on appeal, but can be found in R-RH. at 2059.

At a bench conference, after Mrs. Wainwright's testimony had been concluded, Mr. Taylor told the trial court:

> Judge, I need to put something on the record. My client wanted me to terminate the inquiry and not go any further with another matter we had wanted to bring up. So we acceded to his wishes. And he understands fully the importance of it, but doesn't want us to go forward.

R. at 3685. The State attorney, in response, noted:

> Mr. Taylor has furnished me with a copy of a letter that Mrs. Wainwright wrote, and she relied on extensively for her testimony today, and I can assume that matter of which Mr. Taylor is referring deals with the defendant being allegedly sexually molested. I'm assuming that is the matter that he does not wish any inquiry about, and I think we need something on the record reflecting that he has directed Mr. Taylor not to make any further inquiry from his mother.

R. at 3686. Mr. Wainwright was not present during this discussion, and the trial court decided that it would readdress the issue after closing arguments. R. at 3686-87.

During closing arguments for the penalty phase, the State argued for the existence of seven aggravating factors. R. at 3689-3700. The State argued against the presence of any mitigating factors. R. at 3700-06. Mr. Taylor argued on Mr. Wainwright's behalf that the State hadn't met its burden with regard to aggravation, R. 3709-19, and that the defense had proven the mitigating factors that Mr. Wainwright was an accomplice with minor participation, R. at 3720, Mr. Wainwright was under extreme duress of the substantial domination of Mr. Hamilton, R. at 3722-23, and that the "catch-all" mitigator applied to Mr.

Wainwright because the State didn't cross examine Mr. Wainwright's mother, R. at

3723-24. Mr. Taylor then argued:

> [I]f you collectively determine [these mitigators] should be factored
> into giving some consideration to make this man spend at least twenty-
> five of the remaining years of his life, at least, in jail because the law is
> death or life without the possibility of parole for twenty-five years. That
> doesn't mean in twenty-five years and a day, bingo, you're out. It
> simply means you have a possibility of parole, assuming you have no
> other sentences to serve. And you know that he has an unexpired
> sentence from North Carolina and you know from the evidence
> introduced today, he has a life sentence in Mississippi. So twenty-five
> years, ladies and gentlemen, reality wise, is a lifetime.

R. at 3725. Mr. Taylor urged the jury: "I'm asking each and every one of you to

retire now and deliberate and come back with a recommendation that will put

Anthony Wainwright in jail for twenty-five years or more, twenty-five years without

the possibility of parole." R. at 3731.

During jury instructions as to the penalty phase deliberations, the trial court

again told the jury:

> As you've been told, the final decision as to what punishment shall be
> imposed is the responsibility of the judge; however, it's your duty to
> follow the law that will now be given to you by the Court and to render
> to the Court an advisory sentence based upon your determination as to
> whether sufficient aggravating circumstances exist to justify imposition
> of the death penalty and whether sufficient mitigating circumstances
> exist to outweigh any aggravating circumstances that may be found to
> exist.

R. at 3730-31. The jury retired to deliberate at 3:20 p.m. and returned a

recommendation of death by a vote of 12 to 0 at 4:25 p.m. R. at 3738-39.

On June 12, 1995, a *Spencer*[11] hearing was held. Mr. Taylor submitted a sentencing memorandum on Mr. Wainwright's behalf on the morning of the hearing, R. at 3757, which was three and a half pages in length, R. at 1151-54. Mr. Wainwright declined to make an allocution, R. at 3759, and the trial court heard victim impact evidence from the victim's mother, father, sister, and mother-in-law, R. at 3760-70. The trial court then sentenced Mr. Wainwright to death. R. at 3776. The trial court, in announcing the sentences of Mr. Wainwright and Mr. Hamilton, noted that he viewed both defendants as equally culpable. R. at 3785.

## B.   Direct Appeal

Mr. Wainwright appealed his conviction and sentence to the Florida Supreme Court. *Wainwright v. State*, 704 So. 2d 511 (Fla. 1997). He raised nine claims:

> [T]he court erred on the following points: (1) in allowing [his] pre-trial statements to be introduced; (2) in allowing the final three DNA loci to be introduced; (3) in allowing the case to be tried jointly with separate juries; (4) in allowing introduction of evidence of other crimes; (5) in removing a juror on the tenth day of trial; (6) in allowing introduction of testimony that [the victim] routinely picked her kids up from

---

[11]      Under the death penalty scheme in place at the time of Mr. Wainwright's trial, hearings were required in Florida pursuant to *Spencer v. State*, 615 So. 2d 688 (Fla. 1993). At a *Spencer* hearing, the trial judge would "give the defendant, his counsel, and the State, an opportunity to be heard," "afford, if appropriate, both the State and the defendant an opportunity to present additional evidence" that was not presented to the jury, and "afford the defendant an opportunity to be heard in person." *Id.* at 691. Then, the trial judge would "recess the proceeding to consider the appropriate sentence" and, if deciding to impose a death sentence, "set forth in writing the reasons for imposing the death sentence." *Id.*

48

preschool; (7) in overlooking the State's failure to establish the corpus delicti of sexual assault; (8) in allowing introduction of [his] statement to police that he had AIDS; and (9) in imposing the mandatory minimum portions of the noncapital sentences, and in retaining jurisdiction over the life sentences.

*Id.* at 513. The Florida Supreme Court ruled that the trial court did not err in these ways, that there was competent substantial evidence to support Mr. Wainwright's conviction and death sentence, and that his death sentence was not disproportionate. *Id.* at 516 (affirming convictions and death sentence).

### C.    Initial State Postconviction

On November 19, 1998, attorney David Tarbert was appointed to represent Mr. Wainwright in state postconviction. He moved to withdraw, which was granted in December 1998. On December 21, 1998, attorney Glenn Arnold was appointed by the trial court as Mr. Wainwright's state postconviction counsel.

On May 14, 1999, Mr. Arnold filed Mr. Wainwright's initial state postconviction motion pursuant to Fla. R. Crim. P. 3.850 and R. 3.851. On September 1, 1999, Mr. Arnold filed the first of several motions to withdraw from Mr. Wainwright's case.

On July 27, 2000, Mr. Arnold filed an amended postconviction motion, raising 14 claims.[12] PCR. I at 3-33; *see also Wainwright v. State*, 896 So. 2d 695, 697 n.1

---

[12]    Specifically, the claims raised were: (1) trial counsel was ineffective regarding the admission of additional DNA evidence; (2) trial counsel was ineffective regarding Wainwright's statements and admissions; (3) trial counsel was ineffective

(Fla. 2004). On December 14, 2000, a *Huff*[13] hearing was held, and the postconviction court granted Mr. Wainwright an evidentiary hearing on claims 4, 7, 10, 12, and 14.

An evidentiary hearing was held on January 23, 2002, in which only four witnesses testified (Mr. Wainwright's trial attorney, Clyde Taylor; State Attorney Jerry Blair; Hamilton County Sheriff Harrell Reid; Hamilton County Sheriff's Office Investigator Mallory Daniels), in addition to Mr. Wainwright.

---

regarding evidence of Wainwright's out of state crimes; (4) trial counsel was ineffective regarding a microphone discovered in Wainwright's cell; (5) trial counsel was ineffective for failing to object to the penalty phase instructions on the aggravators; (6) trial counsel was ineffective for failing to object to the prosecutor's argument at the guilt and penalty phases; (7) trial counsel was ineffective for failing to maintain a proper attorney-client relationship, failing to ensure that Wainwright received adequate mental health evaluations and failing to investigate and present additional mitigating evidence; (8) trial counsel was ineffective for allowing the victim's family to testify at sentencing; (9) trial counsel was ineffective for failing to object to an alleged error under *Caldwell v. Mississippi*, 472 U.S. 320 (1985); (10) initial counsel, Victor Africano, was ineffective in his pretrial representation of Wainwright; (11) trial counsel was ineffective for failing to be prepared for trial; (12) trial counsel was ineffective for introducing statements of the codefendant; (13) trial counsel was ineffective for committing an alleged discovery violation; (14) trial counsel's illness during trial rendered him ineffective.

[13]    Pursuant to *Huff v. State*, 622 So. 2d 982, 983 (Fla. 1993), in state postconviction cases in Florida, "the judge must allow the attorneys the opportunity to appear before the court and be heard on an initial [postconviction] motion. This does not mean that the judge must conduct an evidentiary hearing in all death penalty postconviction cases. Instead, the hearing before the judge is for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion."

With regard to claim seven, that Mr. Wainwright's trial counsel was ineffective at the penalty phase for failing to develop and present mitigating evidence, Mr. Arnold presented no information from anyone who had known Mr. Wainwright, either by testimony or by sworn statement, and no information from a mental health expert. He relied exclusively on five exhibits of psychological evaluations from Mr. Wainwright's childhood, which amounted to less than 50 pages of material. In fact, the only witness apart from Mr. Wainwright himself that Mr. Arnold presented at the evidentiary hearing was Mr. Wainwright's trial counsel; all other witnesses were called by the State.

On March 11, 2002, Mr. Arnold filed a pro se Motion to Dismiss written by Mr. Wainwright on February 3, 2002. App. at 29-33. In this filing, Mr. Wainwright expressed dissatisfaction with Mr. Arnold and noted, among many issues, that Mr. Arnold had failed to file any public records requests in order to investigate his case and did not seek the files of or speak with his trial defense expert, Dr. Michael D'Errico, did not properly style his claims pursuant to his federal constitutional rights so they could be exhausted for federal review, and did not support any of the claims made in his initial state postconviction motion with citations or case law. *Id.* Mr. Wainwright wrote Mr. Arnold again on April 8, 2002, concerned about his claims being properly exhausted for federal habeas review. App. at 35.

On April 12, 2002, the postconviction court denied Mr. Wainwright's postconviction motion. PCR. I at 107. Mr. Wainwright filed a notice of appeal to this denial on May 8, 2002. PCR. I at 144. On September 11, 2002, Mr. Arnold filed an initial brief for Mr. Wainwright's appeal and a state habeas petition[14] on Mr. Wainwright's behalf, in the Florida Supreme Court.

On October 8, 2002, Mr. Wainwright filed another pro se Motion to Dismiss his current counsel, Mr. Arnold, in the Florida Supreme Court, and then filed supplements to this motion over the next few weeks.

The State filed its answer brief as to both on May 6, 2003. Mr. Arnold did not request oral argument and did not submit a reply brief.[15] On October 7, 2003, Mr. Hobson and Mr. Arnold filed a joint Stipulation for Substitution of Counsel in the Florida Supreme Court, substituting Mr. Hobson as Mr. Wainwright's counsel of record, which the Florida Supreme Court accepted on the following day.

---

[14]     The state habeas petition raised four claims: (1) that Florida's capital sentencing scheme is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000); (2) that his trial counsel failed to raise an issue involving the felony murder jury instruction; (3) the trial court erred by failing to make specific findings before requiring Wainwright to wear a stun belt at trial; and (4) the trial court erred by failing to conduct an inquiry pursuant to *Koon v. Dugger*, 619 So.2d 246 (Fla.1993). *See Wainwright v. State, et. al*, 896 So. 2d 695, 703 (Fla. 2004).

[15]     On May 22, 2003, Mr. Arnold sent the Florida Supreme Court a letter stating: "I do not intend to file a reply to the State's answer in the two above listed matters. Instead, I will proceed on my initial brief and petition." App. at 36.

On November 24, 2004, the Florida Supreme Court denied Mr. Wainwright's appeal of his R. 3.851 motion and his state habeas petition in a joint opinion. *See Wainwright v. State, et. al*, 896 So. 2d 695 (Fla. 2004). On December 29, 2004, Mr. Wainwright filed a Motion for Rehearing in the Florida Supreme Court, which the court denied on March 1, 2005. The mandate issued on March 17, 2005.

### D.   Federal Habeas

#### i.   Mr. Wainwright's § 2254 Petition and Proceedings

Mr. Wainwright had been concerned about his federal habeas proceedings consistently in the months before his federal deadline, and wrote Mr. Hobson a number of times about the preparation of his federal petition. App. at 37-40; 41; 42-43; 44; 46-47; 48-50. Mr. Hobson twice responded to Mr. Wainwright's letters, assuring him that the next step was preparing his federal petition, and attempting to organize payment for his representation. App. at 51-52, 53-56.

On March 11, 2005, Mr. Hobson wrote Mr. Wainwright saying that he had received the denial of the Motion for Rehearing from the Florida Supreme Court. App. at 57. Seemingly unaware that the deadline for submitting a petition for federal habeas relief pursuant to 28 U.S.C. § 2254 was imminent, Mr. Hobson wrote to Mr. Wainwright again about his federal petition, noting:

> I will then begin immediately a Petition for a Writ of Certiorari the United States Supreme Court as well as on the Federal Habeas Corpus Petition. I will be up to visit you soon. There are many issue which we

need to discuss which will be presented in your prepare for federal release.

*Id*.

On March 29, 2005, Mr. Hobson filed a § 2254 petition in this Court. ECF No. 1. The petition raised 11 claims and was riddled with typographic errors and factual inaccuracies. The typographical errors are not garden variety spelling or formatting errors that are apt to periodically occur. The errors were unprofessional, pervasive, and systemic.[16]

Apart from citations to Mr. Wainwright's own case, the entire petition cited only four other cases. *See* ECF No. 1 at 63-64; 66. Most claims within the petition did not even refer to the state court's underlying judgment.

On April 12, 2005, the State filed a Motion for Summary Judgment, arguing that Mr. Wainwright's petition was untimely. ECF No. 2. On May 23, 2005, Mr.

---

[16]   *See, e.g.*, ECF No. 1 at 14 (identifying Mr. Wainwright's first attorney as "Vincent" Africano, rather than Victor Africano); *Id.* at 26 (claim four: "The failure of petioner's counsel to move for a mistrial as well aas preserve for appeal the issue of a secret microhone being discovered in petitioner's jail cell in the course of the trial"); *Id.* at 28 (identifying State Attorney Bob Dekle, who prosecuted Mr. Wainwright, as a jailer); *Id.* at 35 (sentence reading, in part: "Petitioner had requested trial counsel to make arrangements to see a physiatrist same was not done."); *Id.* at 39 (claiming "Petitioner was a 19 year old male at the time of the killings" when Mr. Wainwright was 23 years old at the time of the murder, and there were not multiple "killings."); *Id.* at 50 ("str4ike"); *Id.* at 50 ("Petitioner's layer argued . . ."); *Id.* at 66 (claim 11: "Petitonr's rights under the Sixth Eight and Fourteenth amendmentsfifth and Foruteenth amendmenets to the Untied Ststes Constituion were violated by the trial court in allowing petition to be tried jointly with is co defendant before separate juries.").

Hobson filed an amended § 2254 petition, entitled "Corrected Petition," which primarily just fixed most of the numerous spelling and grammar errors in the initial petition. ECF No. 6. On May 25, 2005, Mr. Hobson wrote to Mr. Wainwright and told him that the State's assertions that his petition was untimely were incorrect, because "[t]he year period from the denial of cert by the Florida Supreme Court is tolled by the filing for public records requests." App. at 60.

On June 9, 2005, the Court ordered Mr. Hobson to respond within 30 days to the State's Motion for Summary Judgment, ECF No. 11, and on July 11, 2005, more than 30 days later, Mr. Hobson filed a response. ECF No. 12. In response to the State's contention that Mr. Wainwright's § 2254 petition was untimely, Mr. Hobson suggested that, because Mr. Wainwright had filed public records requests before filing his state postconviction motion, this tolled the federal deadline. ECF No. 12 at 3. In the alternative, Mr. Hobson argued that the State's timeliness arguments were premature and seemed to suggest that equitable tolling could be warranted, stating: "[T]his Honorable Court can be more properly briefed and apprised as to facts upon which to make its ruling as regards the timeliness of the petition and as regards the inequitable factors that may have – if the court finds such to be the case – prevented a timely filing." ECF No. 12 at 5. With his response, Mr. Hobson also filed a copy of his CM/ECF registration, including his username and password. ECF No. 12 at 7. Without leave of the Court, Mr. Hobson also filed on July 20, 2005, a "Second

Amended Motion to Strike and to Toll the Time to Substantively Answer Respondent's Motion for Summary Judgement," ECF No. 14, which was substantively the same as the prior filing.

On August 3, 2005, the Court ordered the State to respond to the § 2254 petition and denied the State's motion for summary judgment because Mr. Wainwright had filed an amended petition after its filing. ECF No. 15. The following day, the State filed a renewed Motion for Summary Judgment, arguing again that Mr. Wainwright's § 2254 petition was untimely, ECF No. 16, Mr. Hobson filed another motion to strike the State's motion, which was substantively the same as his prior responses. ECF No. 17; 18; 19. On October 26, 2005, the Court denied Mr. Hobson's motions to strike the State's Renewed Motion for Summary Judgment as untimely and "granted [Petitioner] another opportunity to substantively respond to the Renewed Motion for Summary Judgment." ECF No. 22.

On November 29, 2005, Mr. Hobson responded to the State's renewed motion for summary judgment. ECF No. 24. In this response, Mr. Hobson argued for the first time that equitable tolling applied to Mr. Wainwright's untimely filing. Specifically, he wrote that he had changed law firms in January 2005 and that, although he changed his address with the Florida Bar, the Florida Supreme Court

mailed the March 2, 2005,[17] order denying Mr. Wainwright's Motion for Rehearing regarding the denial of his initial state postconviction appeal to his prior address.

Critically, Mr. Hobson did not mention when he received the Florida Supreme Court's denial or the mandate (which was the operative date), claiming only he was "not properly notified of nor provided with the operative rulings from the Florida Supreme Court that triggered the deadline." ECF No. 24 at 7. He further argued that statutory tolling applied to Mr. Wainwright's case because of public records requests filed in state postconviction. ECF No. 24 at 8. Mr. Hobson argued that this constituted extraordinary circumstances warranting equitable tolling, and wrote: "To procedurally dismiss a crucial pleading in a case with literally mortal consequences because a pleading is, arguably, a scant eight days late is harsh and unnecessary." ECF No. 24 at 5. The State filed a reply to these arguments. ECF No. 27.

On March 10, 2006, the Court granted the State's Motion for Summary Judgment due to the untimely filing of Mr. Wainwright's § 2254 petition and dismissed Mr. Wainwright's § 2254 petition with prejudice. ECF No. 29. In so doing, the Court concluded that Mr. Wainwright's one-year deadline to file under the AEDPA began running on May 19, 1998, the day after the United States Supreme Court denied review of his direct appeal, and that he was entitled to statutory tolling

---

[17]    Although Mr. Hobson wrote in this filing that the Florida Supreme Court's rehearing denial issued on March 2, 2005, it actually issued on March 1, 2005.

for his initial state postconviction proceedings from May 14, 1999, when he filed his first state postconviction motion, until March 17, 2005, when the mandate from the Florida Supreme Court issued on his postconviction appeal. *Id*. at 6-7. When his federal habeas clock began running again on March 18, 2005, he had 6 days to file his § 2254 petition, making his federal filing deadline March 23, 2005. *Id*. at 7-8. Thus, his March 29, 2005, petition was untimely. *Id*. at 8.

On March 20, 2006, Mr. Hobson filed a motion pursuant to Fed. R. Civ. Pro. R. 59(e), raising the same grounds for tolling that he had previously raised. ECF No. 31. Much of the motion was identical to his prior responses, including the erroneous prior calculation of the federal deadline as March 21, 2005, rather than the Court's ruling that it was March 23, 2005. *See* ECF No. 31 at 7. The Court denied the Rule 59(e) motion on May 12, 2006. ECF No. 34. Mr. Hobson thereafter filed a notice of appeal on June 9, 2006, ECF No. 35, which the district court denied as untimely as to his § 2254 petition. ECF No. 37. Thereafter, the Eleventh Circuit granted a Certificate of Appealability (COA) as to four issues. ECF No. 38.

### ii.    Mr. Wainwright's Eleventh Circuit Appeal

After granting Mr. Wainwright a COA, ECF No. 38, Mr. Hobson filed an initial brief in the Eleventh Circuit on January 23, 2007. In it, Mr. Hobson argued that his notice of appeal was timely because his Fed. R. Civ. P. 59(e) motion tolled the time to file a notice of appeal, and that Mr. Wainwright was entitled to statutory

and equitable tolling for his § 2254 petition. Mr. Hobson also argued for the first time that there was a circuit split over whether a petition for certiorari review in the United States Supreme Court following the denial of initial state postconviction, and this split caused "confusion" that entitled Mr. Wainwright to equitable tolling. Additionally, he reiterated his prior arguments that equitable tolling should apply because he did not receive the denial of the rehearing motion due to his change in address and because the United States Supreme Court's denial of Mr. Wainwright's petition for certiorari review was not recorded by the Florida Supreme Court until May 26, 1998, and he argued that statutory tolling should apply because of the public records request filed before he filed his state postconviction motion.

On November 13, 2007, the Eleventh Circuit affirmed the district court's decisions dismissing Mr. Wainwright's § 2254 petition and denying his Rule 59(e) motion. The Eleventh Circuit found that his notice of appeal was timely and that, although Mr. Hobson had only named the order denying the Rule 59(e) motion, he plainly intended to appeal both that denial and the dismissal of his § 2254 petition, and thus the Court had jurisdiction to rule on the appeal. The Court held, however, that Mr. Wainwright was not entitled to equitable tolling, finding that he failed to preserve the arguments he raised for the first time on appeal, and that his other arguments for tolling were meritless.

### E.    Successive Postconviction

### i.    Mr. Wainwright's Successive State Postconviction Motion

Mr. Hobson assisted Mr. Wainwright in the filing of one successive postconviction motion, based on newly discovered evidence of a signed statement from his co-defendant, Mr. Hamilton, claiming that Mr. Wainwright did not participate in the sexual assault of the victim in their case. *Wainwright v. State*, 2 So. 3d 948 (Fla. 2008).[18] On September 26, 2008, the state trial court granted Mr. Hobson's motion requesting his appointment as registry counsel for Mr. Wainwright. App. at 98. After that, although Mr. Hobson remained on Mr. Wainwright's case in name, Mr. Wainwright himself attempted to raise and exhaust many claims in successive filings in state court. *See, e.g.*, *Wainwright v. State*, 43 So. 3d 45 (Fla. 2010) (table); *Wainwright v. State*, 77 So. 3d 648 (2011); *Wainwright v. State*, FSC No. SC15-2280 (Fla. Jan. 30, 2017).

Mr. Wainwright's pro se filings were stricken by the trial court because he was represented by Mr. Hobson. Mr. Wainwright tried repeatedly to remove Mr. Hobson from his case, including filing complaints with the Florida Bar as early as January 2008 (App. at 73-88; 109-16; 117-18; 120; 137-41), and to have his claims

---

[18]    That Mr. Hobson did more than simply sign his name to this pleading and file it is doubtful. Mr. Wainwright wrote a complaint to the Florida Bar in January 2008, and attached a sworn statement from another inmate, indicating that Mr. Hobson took a motion prepared by that inmate, deleted the words "pro se" from the title, and filed it. App. at 86-87.

heard. On August 30, 2010, Mr. Wainwright tried again to discharge his counsel,

and the trial court ordered Mr. Hobson to respond. Mr. Hobson filed a response on

November 17, 2010, agreeing that he should be discharged from Mr. Wainwright's

case. On January 3, 2011, the trial court denied Mr. Wainwright's and Mr. Hobson's

joint request, ruling:

> This Court finds the Defendant has already filed similar requests with
> the Florida Supreme Court. The Defendant's assigned counsel, Mr.
> Joseph Hobson, has also asked that he be permitted to withdraw from
> representing the Defendant. The Florida Supreme Court denied each of
> these requests. . . . This Court finds no reason to deviate from the
> decisions of the Florida Supreme Court. As such, both the Defendant's
> conflicting requests to have "competent counsel" appointed and to
> represent himself pro se are denied.

App. at 101-02. The trial court denied Mr. Wainwright's additional requests to

discharge Mr. Hobson in December 2012. App. at 106-08. In July 2013, Mr. Hobson

filed another motion to withdraw as counsel, and in October 2013, the trial court

finally granted the request. App. at 134. The trial court subsequently appointed

attorney Baya Harrison to represent Mr. Wainwright, and he filed a notice of

appearance on February 24, 2014. App. at 142.

In March 2015, Mr. Wainwright sent a letter to the state postconviction court

raising concerns about Mr. Harrison, who had represented to him that he was going

to file a postconviction motion in his case, but had not discussed or given Mr.

Wainwright a copy of the motion beforehand. App. at 146-49. Shortly thereafter,

Mr. Harrison filed one successive postconviction motion in April 2015, which was

initially summarily denied by the postconviction court, and then set for a case management conference following a Motion for Rehearing. In a memorandum submitted prior to the case management conference, Mr. Harrison informed the postconviction court that he believed his motion could be resolved on the basis of the evidentiary hearing transcript from Mr. Wainwright's initial postconviction proceeding. App. at 154-69. Although he had filed this successive postconviction motion, and a motion for rehearing, in this memorandum Mr. Harrison stated:

> Undersigned counsel does not have a copy of the evidentiary hearing transcript, and made the sworn allegations in the motion based on detailed references to the evidentiary hearing testimony in the Florida Supreme Court's opinion affirming the denial of the Defendant's first motion for postconviction relief.

App. at 157.

In September 2015, the postconviction court summarily denied the successive postconviction motion filed by Mr. Harrison.

### ii.    Mr. Wainwright's Successive Federal Habeas Litigation

In March 2009, Mr. Wainwright filed, pro se, an application to file a successive federal habeas petition pursuant to § 2244(b)(2) in the Eleventh Circuit. The application raised the newly discovered evidence of his co-defendant's sworn statement exculpating him from the sexual assault, and other claims relating primarily to the ineffective assistance of his trial counsel. The Eleventh Circuit denied the application on May 7, 2009.

62

### F.    Appointment of Current Counsel

Mr. Wainwright was without federal counsel from the time of Mr. Hobson's withdrawal until this Court appointed the Office of the Federal Public Defender for the Northern District of Florida, Capital Habeas Unit (CHU), on June 22, 2018. ECF No. 47.

## IV.    AUTHORITY

### A.    Federal Rule Civil of Procedure 60(b)

Federal Rule of Civil Procedure 60(b) provides for relief from a final judgment for the following reasons:

(1)    mistake, inadvertence, surprise, or excusable neglect;

(2)    newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or other misconduct of an opposing party;

(4)    the judgment is void;

(5)    the judgment has been satisfied, released, or discharged, it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b). A Rule 60(b) motion alleging grounds (1), (2), or (3) must be made within one year of the final judgment, whereas a motion alleging grounds (4), (5), or (6), must be made "within a reasonable time." Fed. R. Civ. P. 60(c).

## B.    Rule 60(b)(6) is an Equitable Power to Achieve Justice

This motion is filed under Rule 60(b)(6). Since its creation in 1948, Rule 60(b)(6) has been broadly interpreted to achieve justice. *See, e.g.*, *Klapprott v. United States*, 335 U.S. 601, 614-15 (1949) ("In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."); *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 864 (1988) (explaining that courts have the authority to vacate judgments as appropriate and whenever necessary to accomplish justice); *Balentine v. Thaler*, 626 F.3d 842, 846 (5th Cir. 2010) ("Rule 60(b)(6) is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses . . . ."). This broad equitable power applies in habeas cases. *See, e.g.*, *Johnson v. Bell*, 605 F.3d 333, 336 (6th Cir. 2010) (noting that Rule 60(b)(6) "confers upon the district court a broad equitable power to 'do justice'" in habeas actions) (internal citation omitted).

"[A] district court has broad discretion in ruling on a Rule 60(b) motion." *Ramsey v. Walker*, 304 F. App'x 827, 828 (11th Cir. 2008) (citing *Cano v. Baker*, 435 F.3d 1337, 1342 (11th Cir. 2006)). In the context of a Rule 60(b)(6) motion, a movant must demonstrate that "circumstances are sufficiently extraordinary to

warrant relief." *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1317 (11th Cir. 2000) (internal citation omitted).

### C.    Rule 60(b)(6) Relief is Appropriate in Cases of Fraud on the Court Not Delineated in Subsection (b)(3)

Rule 60(b)(3) provides for relief from a judgment where there is "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or other misconduct of an opposing party." Fed. R. Civ. P. R. 60(b)(3). This fraud, for purposes of 60(b)(3), includes only that of an *opposing* party, and thus does not include fraud by a petitioner's prior counsel. *See, e.g.*, *Sherman v. Verizon Virginia, Inc.*, 220 F.R.D. 260, 262 (E.D. Va. 2002) (holding "Plaintiff's former counsel is not an 'adverse party' under the plain meaning of Rule 60(b)(3)"), *aff'd in part, dismissed in part,* 55 F. App'x. 136 (4th Cir. 2003) (finding no reversible error in district court's holding on Rule 60(b)(3)).

However, allegations of fraud on the court by other parties can be cognizable under Rule 60(b)(6). *See, e.g.*, *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (distinguishing fraud under R. 60(b)(3) from fraud under R. 60(b)(6)). "'Fraud upon the court' [is] fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Travelers Indemnity Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir. 1985) (per curiam) (quoting Moore's Federal Practice ¶ 60.33). This includes fraud

perpetrated on a court in the context of habeas proceedings, which is properly raised in a Rule 60(b)(6) motion because it impugns the validity of the proceedings themselves. *See, e.g.*, *Gonzalez,* 545 U.S. at 532 n.5 (noting that "[f]raud on the federal habeas court is one example of such a defect" in the integrity of proceedings properly raised in a Rule 60(b) motion); *Brooks v. Bobby*, 660 F.3d 959, 962 (6th Cir. 2011) (noting that Rule 60(b) motions "that do not seek to add a new ground for relief but instead raise 'some defect in the integrity of the federal habeas proceeding,' such as '[f]raud on the federal habeas court,' are not successive petitions") (internal citation omitted).

### D.    A Rule 60(b)(6) Motion is Not a Successive Habeas Filing When it Seeks to Correct a Defect in the Prior Process

Rule 60(b) motions are not substitutes for successive habeas filings. *See, e.g.*, *Williams v. Chatman*, 510 F.3d 1290, 1295 (11th Cir. 2007). Successive applications for habeas relief are governed by 28 U.S.C. § 2244(b). Such applications require approval from the appropriate court of appeals before they can be filed, *see* 28 U.S.C. § 2244(b)(3)(A), otherwise a district court lacks jurisdiction to decide them, *Williams*, 510 F.3d at 1295. District courts, in considering Rule 60(b) motions, are thus instructed to first analyze whether a petitioner's Rule 60(b) motion should be considered a successive habeas filing, before reaching the merits of the motion. *See, e.g.*, *Gonzalez v. Sec'y for Dept. of Corr.*, 366 F.3d 1253, 1262-63 (11th Cir. 2004).

As the Eleventh Circuit has recognized, "a Rule 60(b) motion is to be treated as a successive habeas petition if it: (1) 'seeks to add a new ground of relief;' or (2) 'attacks the federal court's previous resolution of a claim on the merits.'" *Williams*, 510 F.3d at 1293-94 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005)). A 60(b) motion is not a successive habeas filing, however, where the motion "challenge[s] 'some defect in the integrity of the federal habeas proceedings.'" *Howell v. Sec'y, Fla. Dept. of Corr.*, 730 F.3d 1257, 1260 (11th Cir. 2013) (quoting *Gonzalez*, 545 U.S. at 532).

A defect in a prior proceeding can be, for example, "when a movant asserts that a previous ruling which precluded a merits determination was in error" because a court erroneously found that a claim precluded due to "failure to exhaust, procedural default, or [a] statute-of-limitations bar." *Gonzalez*, 545 U.S. at 532 n. 4; *see also Lugo v. Sec'y, Fla. Dept. of Corr.*, 750 F.3d 1198, 1210 (11th Cir. 2014) (finding that ruling that petition was time-barred was properly raised in a Rule 60(b) motion); *Williams*, 510 F.3d at 1295 (finding that district court's denial of further briefing was properly raised in a Rule 60(b) motion); *Cobble v. Kemp*, 2008 WL 4527563, *4 (N.D. Ga. Oct. 2, 2008) (finding that allegations that court did not consider entire record and misrepresented the legal status of claims were properly raised in a Rule 60(b) motion). Thus, "[a] movant is not making a habeas claim when he seeks only to lift the procedural bars that prevented adjudication of certain claims

on the merits." *Moreland v. Robinson*, 813 F.3d 315, 322-23 (6th Cir. 2016) (citing *Gonzalez*, 545 U.S. at 532 n.4).

An allegation that prior counsel had a conflict of interest that resulted in a defect in the integrity of the prior proceedings is also properly raised in a Rule 60(b) motion. *See, e.g.*, *Clark v. Davis*, 850 F.3d 770, 779 (5th Cir. 2017); *Munoz v. United States*, 2013 WL 12231877, *2 (S.D. Fla. Feb. 19, 2013). Likewise, the proper application of equitable tolling to a prior determination that found a claim time-barred is an appropriate basis for relief under Rule 60(b)(6). *See, e.g.*, *Satterfield v. Dist. Attorney of Phila.*, 872 F.3d 152, 163 (3d Cir. 2017).

## V.    RULE 60(b) RELIEF IS WARRANTED HERE

In the following section, Mr. Wainwright makes distinct arguments that both independently and cumulatively justify his request for Rule 60(b)(6) relief. Specifically, Mr. Wainwright demonstrates "extraordinary circumstances" exist justifying this relief in the following sections because his prior proceedings were defective due to his prior counsel's conflict of interest, *infra* section (V)(A)(i); his prior counsel's extraordinary misconduct in repeatedly lying to Mr. Wainwright about his federal habeas proceedings, *infra* section (V)(A)(ii); and his prior counsel's fraud on the habeas court, *infra* section (V)(A)(iii).

Additionally, Mr. Wainwright demonstrates "extraordinary circumstances" exist for Rule 60(b)(6) relief because of the cumulative circumstances in Mr.

Wainwright's case, including the misconduct of his habeas attorney which resulted in the loss of federal review of his case, the meritorious issues he raises herein, as well as because Mr. Wainwright is actually innocent of his conviction and death sentence, *see infra* section (VI)(A).

### A. Mr. Wainwright Should Have Been Entitled to Equitable Tolling

#### i. Mr. Hobson Had a Conflict in Arguing His Own Misconduct and Should Not Have Been Permitted to Do So

Equitable tolling is available where a petitioner can demonstrate "(1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 556 U.S. 631, 649 (2010) (internal quotation marks omitted). "The focus of the inquiry regarding 'extraordinary circumstances' is 'on the circumstances surrounding the late filing of the habeas petition' and not on the circumstances of the underlying conviction." *Arthur v. Allen*, 452 F.3d 1234, 1253 (11th Cir. 2006) (citation omitted). A district court has wide discretion in deciding whether equitable tolling applies, and a district court's factual findings supporting equitable tolling are only reviewable for clear error. *Cadet v. Fla. Dep't of Corr.,* 853 F.3d 1216, 1221 (11th Cir. 2017).

Routine attorney mistakes or negligence alone are not sufficiently extraordinary for equitable tolling. *See, e.g.*, *Holland*, 556 U.S. at 651-52 ("We have previously held that 'a garden variety claim of excusable neglect,' such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline does not warrant

equitable tolling.") (internal citations omitted). This was clearly established law at the time of Mr. Wainwright's § 2254 proceedings. *See, e.g.*, *Irwin v. Dep't of Veterans Affairs*, 489 U.S. 89, 96 (1990). Equitable tolling can be available, however, for "more serious instances of attorney misconduct." *Holland*, 556 U.S. at 652.

Mr. Hobson missed Mr. Wainwright's § 2254 petition filing deadline by six days. Missing this deadline necessarily implicated his own conduct, and any argument that equitable tolling was warranted required him to discuss and explain why the deadline was missed. Thus, Mr. Hobson was faced with the following choice: evaluate and discuss his own conduct for "serious instance[] of attorney misconduct," *Holland*, 556 U.S. at 652, which would have potentially secured Mr. Wainwright equitable relief, or maintain his reputation as a criminal defense lawyer. Mr. Hobson chose the latter, and his interest in maintaining that reputation is evidenced by the fact that even after his conduct in Mr. Wainwright's case, he continued to advertise that he had "significant experience in . . . death penalty cases." App. at 71.

Mr. Hobson was not in a position to act in Mr. Wainwright's best interest, or to act as an advocate as the Sixth Amendment contemplates. *See, e.g.*, *Penson v. Ohio*, 488 U.S. 75, 87-88 (1988) ("The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests

of his client.") (citation, quotations omitted); *United States v. Cronic*, 466 U.S. 648, 656 (1984) (describing "the duty of loyalty [as] perhaps the most basic of counsel's duties"); *Anders v. California*, 386 U.S. 738, 743 (1967) (describing constitutionally effective "counsel acting in the role of an *advocate*") (emphasis added).

That an attorney has a conflict of interest in arguing for equitable tolling of a deadline they themselves missed is not novel. *See, e.g.*, *Christeson v. Roper*, 135 S.Ct. 891 (2015) (finding an abuse of discretion where a district court denied a motion to substitute counsel where petitioner argued that his counsel had a conflict in arguing for equitable tolling due to the attorney's failure to file petition timely). Indeed, "the Supreme Court has indicated that lower courts have the responsibility to ensure that § 2254 petitioners have conflict-free counsel." *Stewart v. Sec'y, Fla. Dept. of Corr.*, 635 F. App'x. 711, 715 (11th Cir. 2015) (citing *Martel v. Clair*, 565 U.S. 648, 658 (2012)).

Additionally, that Mr. Hobson should not have been able to argue for equitable tolling, because it necessarily created a conflict, is analogous to the scenario in which an attorney argues their own ineffectiveness for purposes of *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) . In such scenarios, it is well-settled that it is inappropriate for an attorney to argue their own ineffectiveness. *See, e.g.*, *Juniper v. Davis*, 737 F.3d 288, 290 (4th Cir. 2013) ("[W]e find it ethically untenable to require counsel to assert claims of his or her own

71

ineffectiveness in the state habeas proceedings in order to adequately present defaulted ineffective-assistance-of-trial-counsel claims under *Martinez* in the federal habeas proceedings."). If anything, because the burden requires an "extraordinary circumstance" to establish equitable tolling, it is even more problematic for an attorney to evaluate their own conduct in this context.

The Eleventh Circuit's decision in *Stewart* is instructive. Stewart, a death-sentenced individual, had his federal habeas petition dismissed as untimely, having been filed 191 days after his federal deadline, by his attorney Mr. Norgard. *Stewart*, 635 F. App'x. at 715. Upon realizing this, the district court appointed separate counsel, the Office of the Federal Public Defender for the Middle District of Florida (FPD-MDFL), to brief the issue of equitable tolling. *Id.* FPD-MDFL argued that Mr. Norgard had an actual conflict in briefing equitable tolling because doing so would have scrutinized his own conduct for specific periods during which he was working on another death penalty case and that he may also have misled Stewart's family as to when his petition was actually filed. *Id.* at 716. Thus, the *Stewart* Court held:

> Given the overall record, we agree that Stewart has sufficiently shown that, after Norgard did not file the § 2254 petition until January 6, 2011, Norgard at that time developed an actual conflict of interest as to the equitable tolling issues, and that a remand is necessary for the appointment of [FPD-MDFL] as conflict-free counsel.

*Id.* at 717.

As discussed further below, like Mr. Norgard in *Stewart*, Mr. Hobson should not have been permitted to evaluate and argue his own extraordinary conduct in this case—both in theory, and in reality, given that Mr. Hobson lied to both Mr. Wainwright and this Court. Mr. Wainwright had conflicted counsel, and the integrity of his habeas proceedings (and specifically, his equitable tolling arguments) were defective as a result.

> **ii.    Mr. Hobson Lied to Mr. Wainwright, Mr. Wainwright Relied on Those Lies, and Thus Mr. Hobson's Misconduct Rises to the Level of Extraordinary Circumstances**

"Circumstances other than abandonment can meet the extraordinary circumstance element for equitable tolling," such as "bad faith, dishonesty, divided loyalty, and mental impairment." *Cadet,* 853 F.3d at 1236 (citing *Thomas v. Att'y Gen.*, 795 F.3d 1286, 1292-94 (11th Cir. 2015)). Where an attorney lies to his client, equitable tolling can be warranted. *See, e.g.*, *United States v. Wynn*, 292 F.3d 226, 230 (5th Cir. 2002) ("We agree with the district court that Wynn's allegation that he was deceived by his attorney into believing that a timely § 2255 motion had been filed on his behalf presents a 'rare and extraordinary circumstance' beyond petitioner's control that could warrant equitable tolling of the statute of limitations."); *United States v. Riggs*, 314 F.3d 796, 799 (5th Cir. 2003) ("An attorney's intentional deceit could warrant equitable tolling, but only if the petitioner shows that he reasonably relied on his attorney's deceptive misrepresentations.").

In this case, Mr. Hobson lied to Mr. Wainwright, leading him to believe that he was working on his federal habeas petition, and Mr. Wainwright relied on his misrepresentations to his detriment. From the first letter that Mr. Wainwright sent to Mr. Hobson, on November 1, 2003, he told Mr. Hobson that he wanted his representation specifically for his federal appeals. App. at 37. He also wrote Mr. Hobson repeatedly toward the end of 2004 about the preparation of his federal habeas petition, and specific issues surrounding the application of the AEDPA. *See, e.g.,* App. at 46 (Letter from October 14, 2004); 48 (Letter from November 12, 2004). In his November 12, 2004, letter to Mr. Hobson, Mr. Wainwright even apologized, saying, "I hope my numerous letters to you recently aren't bothering you." App. at 48. In response to Mr. Wainwright's repeated concerns about the preparation of his federal habeas petition, Mr. Hobson assured Mr. Wainwright that he was working on preparing it. For example, on December 1, 2004, Mr. Hobson wrote to Mr. Wainwright after the Florida Supreme Court's denial of the appeal of his initial postconviction motion: "[T]he silver lining in that dark cloud might be that such denial is a germ [sic] for Federal relief. . . . Practically speaking, our attention now turns to the filing of the Federal Habeas Corpus Writ." App. at 51. Likewise, on December 17, 2004, Mr. Hobson wrote Mr. Wainwright, stating: "I am eagerly looking forward to the preparation of your Federal Habeas Corpus petition." App. at 53.

Mr. Hobson also refused to give Mr. Wainwright a copy of his federal habeas petition before it was filed and, even after it was filed, further failed to give him a copy of it for over two months. App. at 61 (Mr. Wainwright's May 31, 2005 letter: "All I wanted was a copy of my federal habeas corpus . . . I should have received a copy of it before it was even filed."). That Mr. Hobson was diligently working on Mr. Wainwright's federal habeas petition is belied by a plain reading of the petition that he filed on Mr. Wainwright's behalf, which was riddled with extraordinary factual and typographical errors, and did not contain more than four case citations. *See supra* section (III)(D)(i). Mr. Hobson made these assurances to Mr. Wainwright, and Mr. Wainwright reasonably relied on them, though these assurances turned out to be hollow.

Even after Mr. Hobson untimely filed an unprofessional federal habeas petition, Mr. Hobson continued to lie to Mr. Wainwright and misrepresent the status of his federal petition. For example, Mr. Hobson lied to Mr. Wainwright repeatedly about the law. In a letter to Mr. Wainwright after Mr. Hobson had been alerted to the untimeliness of the petition, Mr. Hobson wrote:

> [T]he writ is timely. The year period from the denial of cert by the Florida Supreme Court is tolled by the filing of public records requests and, regardless, the actual date the year began to run was March 26, 1998, which was when the actual denial of writ was filed in the Florida Supreme Court.

App. at 60. This was not a simple error, or miscalculation—both of these were affirmative representations to Mr. Wainwright about timeliness that had no basis in law or fact. There was not then, and is not now, any legal support for the notion that the filing of public records requests tolls the statutory deadline under the AEDPA. Likewise, the date the "actual denial of writ was filed in the Florida Supreme Court" is not relevant to when the AEDPA clock started running again, and also has no legal support.[19] These were not mistakes or miscalculations. Simply put, Mr. Hobson made legal representations that were indisputably lies and were designed to deceive Mr. Wainwright, and, as a result, Mr. Wainwright lost access to any federal merits review of his conviction and death sentence.

### iii.    Mr. Hobson Perpetrated a Fraud on this Court

Equitable relief is appropriate where an attorney perpetrated a fraud on the habeas court. Mr. Wainwright raises this, distinctly and separately, both as an

---

[19]    Mr. Hobson should have known of the relevant deadlines for calculation of Mr. Wainwright's federal deadline—not only because that is what a professionally reasonable attorney who had accepted more than $20,000 from a charity to represent a death-sentenced inmate would do, but also because on his own personal schedule for "March 16, 2005" Mr. Hobson listed: "12. Anthony Floyd Wainwright look at deadlines." App. at 58. This was before the mandate issued and was seven days prior to Mr. Wainwright's federal deadline. Nonetheless, Mr. Hobson missed the relevant deadline, and proceeded to repeatedly lie to Mr. Wainwright and the Court about the relevant dates for the calculation of the deadline.

extraordinary circumstance appropriate for Rule 60(b)(6) relief, *see Gonzalez*, 545 U.S. at 532 n. 5, as well as a basis for equitable tolling.[20]

Mr. Wainwright's federal counsel perpetrated a fraud on this Court. Mr. Hobson not only lied to Mr. Wainwright, but he also repeatedly lied to this Court. Specifically, after being alerted to the untimeliness of Mr. Wainwright's petition, Mr. Hobson argued that "the Florida Supreme Court failed to mail a copy of the aforementioned Order [denying Mr. Wainwright's motion for rehearing] to Petitioner's counsel at his correct address which had been filed with the Florida Bar," ECF No. 24 at 4, and that "[d]espite Petitioner's counsel's diligent effort, he was not properly notified of nor provided with the operative rulings from the Florida Supreme Court that triggered the deadline," *id*. at 7. The operative deadline was the mandate from the Florida Supreme Court, and the denial of the rehearing motion would have put Mr. Hobson on notice that such mandate was imminent. Mr. Hobson told the Court in this pleading, which was his only argument for equitable tolling, that he did not receive these decisions in time. This was a lie.

On March 11, 2005—six days before the mandate issued, and 12 days before the federal deadline, *see* ECF No. 29 at 7-8—Mr. Hobson mailed Mr. Wainwright a

---

[20]     Though Mr. Wainwright asserts that the fraud on the Court perpetrated by Mr. Hobson delineated herein is cognizable in a Rule 60(b)(6), this Court could alternatively grant relief for this fraud pursuant to Rule 60(d)(3). *See, e.g., Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993).

copy of the Florida Supreme Court's order denying his motion for rehearing. App. at 57. In this March 11, 2005 letter, Mr. Hobson told Mr. Wainwright, as he had repeatedly assured him previously, that he would "begin" the Federal Habeas Corpus Petition. *Id.* Mr. Hobson had indeed received a copy of this order, with minimal delay. His attempt to blame the Florida Supreme Court was another deception designed to hide his own misconduct, and he made material misrepresentations to this Court. This was fraud on this Court, and it made Mr. Wainwright's habeas proceedings fundamentally defective.

### iv.    Mr. Wainwright Was Diligent

Mr. Wainwright was diligent in attempting to vindicate his federal rights. For equitable tolling, "[d]ue diligence . . . does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts." *Aron v. United States*, 291 F.3d 708, 712 (11th Cir. 2002); *see also Holland*, 556 U.S. at 653 ("The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence."). Further, the "due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system." *Aron,* 291 F.3d at 712 (quoting *Montenegro v. United States*, 248 F.3d 585, 592 (7th Cir. 2001)).

Diligence can also be affected by the reality of a petitioner's time left to file and deceit by their attorney. *See, e.g.*, *Downs v. McNeil,* 520 F.3d 1311, 1322 (11th

Cir. 2008) ("Although Downs' persistence resulted in his counsel ultimately filing his state habeas petition one day before his federal limitations period expired, his counsel's deceit and delay nonetheless put him in an untenable position. We say untenable because there was no way Downs, imprisoned as he was, would receive notice of the state court's ruling in time to file his federal petition within the one day remaining in his federal limitations period.").

The Eleventh Circuit has found diligence established when, for example, a client wrote to his counsel three times, expressing concern over the running of an AEDPA clock or the need to file a state court pleading, and tried to assist his counsel by suggesting issues to be included in the petition. *Downs*, 520 F.3d at 1323.

Mr. Wainwright was diligent. He was clearly concerned with his federal habeas petition, as he referred to the need to exhaust in state court and federalize his claims to his state postconviction attorney, Mr. Arnold, *years* before his federal deadline. App. at 35 (Mr. Wainwright's April 8, 2002 letter: "I'm just looking ahead on this question. If the federal district court denies my federal habeas corpus, I was all actions taken so that my case can be heard in the 11th Circuit . . . that's why I want all my issues federalized and meet[ing] the exhaustion doctrine."). He sought out an attorney specifically for his federal proceedings, even raising funds through a non-profit organization to hire one. App. at 275-76 (Declaration of Annarita Magri). Mr. Wainwright wrote to Mr. Hobson numerous times concerning issues in

his case and the preparation of his federal habeas petition. *See, e.g.*, App. at 37 (Letter from Mr. Wainwright to Mr. Hobson on November 1, 2003), 46 (Letter from Mr. Wainwright to Mr. Hobson on October 14, 2004), 48 (Letter from Mr. Wainwright to Mr. Hobson on November 12, 2004). Again and again, Mr. Hobson assured Mr. Wainwright that he was "eagerly looking forward to the preparation of [his] Federal Habeas Corpus petition." App. at 53. As these letters demonstrate, Mr. Wainwright was monitoring the preparation of his federal habeas petition, and wanted a copy of his federal habeas petition before it was filed. App. at 61.

Further, as the Eleventh Circuit considered in *Downs*, Mr. Wainwright was in an "untenable position": he had a mere six days left on his federal clock, following the issuance of the mandate from the Florida Supreme Court. Mr. Wainwright, an incarcerated individual with inconsistent and frequently delayed access to mail, could not have prepared and filed a federal habeas petition in those six days himself, even if his attorney had not affirmatively misrepresented to him that he was preparing and filing his federal habeas petition, inducing Mr. Wainwright's detrimental reliance. Indeed, it is unlikely that Mr. Wainwright would have even received the mailing of the mandate in time; in all likelihood, by the time he would have received it through prison mail, it would have been too late to mail in a federal habeas petition. Mr. Wainwright reasonably relied on his attorney.

This inquiry is further complicated to Mr. Wainwright's detriment by Mr. Hobson's refusal to give him a copy of his habeas petition before it was due, and the affirmative misrepresentations of Mr. Hobson about the law. Mr. Wainwright, going back years, was concerned with his federal habeas filing and was diligent in pursuing those rights.

## B. This Court Should Permit Mr. Wainwright's Current Counsel to Argue that Equitable Tolling is Appropriate in This Case and Order an Evidentiary Hearing

Establishing whether equitable tolling is applicable in any given case is an "'equitable, often fact-intensive' inquiry." *Holland*, 560 U.S. at 654 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 540 (2005) (Stevens, J., dissenting)); *see also Downs*, 520 F.3d at 1322 (noting that in considering whether equitable relief is appropriate, a court must "consider all relevant facts"). Mr. Wainwright has argued herein that equitable tolling would have been warranted in his case because he was diligent in pursuing his federal rights, and that sufficient "extraordinary circumstances" exist that prevented him from timely filing his federal habeas petition. These extraordinary circumstances included his federal attorney's, Mr. Hobson's, serious misconduct in repeatedly lying to Mr. Wainwright and this Court. Further, as detailed elsewhere in this motion, *see supra* section (VI)(A), Mr. Wainwright could also demonstrate that equitable tolling is warranted due to his actual innocence of his conviction and death sentence. *See, e.g., Sibley v. Culver*,

377 F.3d 1196, 1205 (11th Cir. 2004) (citing *Malone v. Oklahoma*, 100 Fed. App'x 795, 797 (10th Cir.2004) for the proposition that "[E]quitable tolling would be appropriate, for example, when a prisoner is actually innocent....").

To the extent that there are any disputes regarding the applicability of equitable tolling in this case, an evidentiary hearing would be necessary to resolve those factual disputes. *See, e.g., Downs,* 520 F.3d at 1325 (finding an evidentiary hearing appropriate for fact-finding related to equitable tolling analysis). Mr. Wainwright's allegations and proffered evidence here is significant, and if this Court has questions of fact or believes a factual dispute exists, it should grant his current counsel the ability to resolve factual disputes and further develop the reasons equitable tolling is appropriate in this case through an evidentiary hearing.

## VI.   THERE ARE INDEPENDENT GROUNDS FOR GRANTING MR. WAINWRIGHT RELIEF FROM HIS CONVICTION AND DEATH SENTENCE THAT ARE COGNIZABLE IN THIS RULE 60(B)(6) MOTION BY VIRTUE OF THE ACTUAL INNOCENCE GATEWAY

### A.   Independent Grounds for Relief are Reviewable Under *Schlup v. Delo* and *McQuiggin v. Perkins* Because He is Actually Innocent

#### i.   The Actual Innocence Standard

It has been long observed that certain procedural bars in federal habeas proceedings may be excused in the context of actual innocence. *See Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). A petitioner is not required to present affirmative proof of innocence. Demonstrating actual innocence requires

a "threshold showing" of "sufficient doubt about [a petitioner's] guilt to undermine confidence in the result of the trial." *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) (internal citation omitted). Sufficient doubt exists when "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Arthur*, 452 F.3d at 1245 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). It is enough if the "post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt." *Sistrunk v. Armenakis*, 292 F.3d 669, 673 (9th Cir. 2002) (en banc). Further, the petitioner's conviction must have "probably resulted" from "a constitutional violation." *Id.* (quoting *Schlup*, 513 U.S. at 327).

In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court of the United States extended the "miscarriage of justice" exception to time-barred claims in 28 U.S.C. § 2254 proceedings where a petitioner can make a credible showing of actual innocence. The *Perkins* decision, while extending the actual innocence exception described by *Schlup* and *House*, decided the question specifically for time-barred petitioners for the first time. The actual innocence exception described by *Perkins* is "grounded in the 'equitable discretion' of habeas courts to see that federal constitution errors do not result in the incarceration of innocent persons." *Perkins*, 569 U.S. at 392 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

The miscarriage of justice exception has been applied in the past "to overcome various procedural defaults . . . includ[ing] 'successive' petitions asserting previously rejected claims, 'abusive' petitions asserting in a second petition claims that could have been raised in a first petition, failure to develop facts in state court, and failure to observe state procedural rules, including filing deadlines." *Perkins*, 569 U.S. at 392-93 (citations omitted). While the AEDPA created provisions modifying the application of the exception, "[i]n a case not governed by those provisions, i.e., a first petition for federal habeas relief, the miscarriage of justice exception survived AEDPA's passage intact and unrestricted." *Id.* at 397.

The actual innocence gateway described by *Perkins* is distinct from the consideration of equitable tolling. A request for equitable tolling is "a plea to override the statute of limitations when actual innocence is shown" while an actual innocence gateway claim "seeks an equitable *exception* to § 2244(d)(1), not an extension of the time statutorily prescribed." *Perkins*, 569 U.S. at 392. Equitable tolling requires a habeas petitioner to show that he has been pursuing his rights diligently, and that some extraordinary circumstance stood in his way and prevented timely filing. *See Holland*, 560 U.S. at 649. In contrast, to pass through the actual innocence gateway, a habeas petitioner is required to show neither diligence nor extraordinary circumstances. *Id.*

In the capital context, this exception has been extended to include petitioners who are actually innocent of their death sentence. *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 336 (1992); *Sibley v. Culliver*, 377 F.3d 1196, 1205 (11th Cir. 2004); *McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011); *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1013 (11th Cir. 2012). For death-sentenced petitioners claiming innocence of their sentence only, the actual innocence exception is limited "to cases in which the applicant could show 'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Sawyer*, 505 U.S. at 336). Thus, the relevant inquiry for innocence-of-the-death-penalty is whether the petitioner has asserted that he is innocent of the aggravating factors applied to make his crime a capital offense. *See, e.g., Sibley*, 377 F.3d at 1205 ("Either in addition, or as an alternative, to [asserting factual innocence] a petitioner may attempt to demonstrate that, whether or not he is guilty of the capital offense, he is 'innocent' of the death penalty because none of the aggravating factors legally necessary for invocation of the death penalty applied.").

### ii. Actual Innocence is Cognizable in a Rule 60(b) Motion

The application of the actual innocence exception is not limited to consideration of initial or successive habeas petitions, and can be considered in the

context of a Rule 60(b)(6) motion. *See, e.g.*, *Satterfield*, 872 F.3d at 163 ("[A] proper demonstration of actual innocence [] should permit Rule 60(b)(6) relief unless the totality of equitable circumstances ultimately weigh heavily in the other direction."); *Willis v. Jones*, 329 F. App'x 7, 14 (6th Cir. 2009) (considering the actual innocence exception in review of the denial of a Rule 60(b)(6) motion).

Mr. Wainwright's claims herein can be considered by this Court, properly in his Rule 60(b)(6) motion, to excuse the time-bar applied to his initial § 2254 petition. Mr. Wainwright asserts both that his actual innocence is an extraordinary circumstance warranting equitable tolling that is appropriately raised in a Rule 60(b)(6) motion, and as well as that *Perkins* is a change in decisional law that was not available to him at the time of his § 2254 proceedings that is sufficient to demonstrate an extraordinary circumstance for Rule 60(b)(6) purposes. *See, e.g., Satterfield*, 872 F.3d at 163 (remanding for consideration of whether *Perkins*, along with other equitable circumstances, constituted a change in decisional law for Rule 60(b)(6) purposes); *United States v. Biggin*s, 2017 WL 4697345 at *1 (N.D. Fla. Oct. 18, 2017) (considering *Perkins* in the context of a Rule 60(b)(6) motion); *see also Ritter v. Smith*, 811 F.3d 1398, 1401 (11th Cir. 1987) (noting that the Eleventh Circuit has approved of Rule 60(b)(6) motions in the context of changes in law, including, for example, intervening Supreme Court decisions).

Further, regardless of this Court's finding concerning the timeliness of this motion, this Court should consider the bases for relief herein because when actual innocence is asserted, "a court cannot consider a petition's untimeliness as 'an absolute barrier to relief.'" *Eberle v. Warden, Mansfield Corr. Inst.,* 532 F. App'x 605, 612 (6th Cir. 2013) (quoting *Perkins*, 569 U.S. at 387). Even "unjustifiable delay on a habeas petitioner's part" should not be an absolute barrier, but merely "a factor in determining whether actual innocence has been reliably shown." *Perkins*, 569 U.S. at 387.

### iii. Mr. Wainwright Meets the Actual Innocence Standard

In assessing actual innocence, "[t]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, and make a probabilistic determination about what reasonable, properly instructed jurors would do if they considered fairly all of the evidence presented." *Brown v. Sec'y, Fla. Dep't of Corr.*, 580 F. App'x 721, 727 (11th Cir. 2014) (internal quotation omitted); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (A "habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."). Further, "[a]s part of that determination, the district court must account for how reasonable triers of fact would use the newly presented evidence to assess the

credibility of the witnesses presented at trial." *Brown,* 580 F. App'x at 727; *see also*

*Caracciolo v. McDonough*, 456 F. Supp. 2d 1240, 1244 (S.D. Fla. 2006).

As discussed further in supra section (VI)(b)(vii), Mr. Wainwright has

obtained new scientific evidence that, taken in conjunction with other evidence

developed in his case and the scant evidence against him at trial compared with his

co-defendant, that meets the threshold showing of innocence required by *Schlup*,

*Perkins*, and progeny. Specifically, the conclusions of a DNA expert reveal:

> At Wainwright's trial, the expert testimony regarding DNA samples
> was unreliable, inaccurate, and misleading. The attorneys for both
> parties then repeated inaccuracies in their arguments to the jury.
> Scientific testimony is complicated and sophisticated, and Mr.
> Wainwright's jury did not have the information necessary to sift
> through the experts' testimony and identify the errors. There is no
> reliable scientific or DNA evidence that Mr. Wainwright participated
> in a sexual assault of the victim; further there is no reliable scientific or
> DNA evidence that ties Mr. Wainwright intimately to the victim in this
> case. The analysts, Pollock and DeGuglielmo specifically,
> inappropriately consulted with one another about their initial analyses,
> testified to matters that were not contained in their reports or notes,
> offered opinions that were not supported by statistics, and offered
> opinions that were not supported by reliable and verifiable testing. The
> attorneys then confused statistics that applied to Mr. Hamilton and
> argued to the jury that the statistics applied to Mr. Wainwright when
> there was no support for such.

App. at 268.

Mr. Wainwright meets the threshold showing required by *Perkins* and

progeny that he is actually innocent of both his conviction and death sentence. To

frame the importance of the new evidence of his innocence in this case, it is

important to assess the case against Mr. Wainwright at trial. This was not an easy case for the State. While the physical evidence presented at trial indicated that Mr. Wainwright was physically present during the kidnapping, sexual assault, and murder of the victim, nothing indicated that Mr. Wainwright participated in the planning or carrying out of any of those events, to the exclusion of reasonable doubt. Mr. Wainwright maintained his innocence completely, and no physical evidence tied him to the murder. Mr. Wainwright's fingerprints were not found on the recovered murder weapon or the spent .22 casings recovered from the scene. *See* R. at 403. There was no physical evidence of the sexual assault of the victim found on her body, let alone any that connected Mr. Wainwright to such an assault. *See* R. at 2470 (noting no physical evidence of sexual assault found on the victim); *see also supra* section (VI)(C)(vii) (discussing the false presentation of DNA evidence in Mr. Wainwright's case and that no physical evidence connected Mr. Wainwright to a sexual assault of the victim). Further, there was no eyewitness testimony or other direct evidence concerning the kidnapping or the murder, apart from the statements of Mr. Wainwright's co-defendant, Mr. Hamilton. Even then, the evidence presented by the State did not support – and even contradicted – Mr. Hamilton's statements. For example, there was no physical evidence of the strangulation Mr. Hamilton claimed occurred. *See* R. at 2471.

The evidence presented to the juries indicated that Mr. Hamilton was the mastermind of the escape and the subsequent crimes. Mr. Wainwright's jury heard testimony that when they were apprehended in Mississippi, Mr. Wainwright was driving, and Mr. Hamilton was shooting at police; Mr. Wainwright did not shoot at police and was not found in possession of a weapon. R. at 2030; 2056. Following their arrests, both were taken to the county jail in Mississippi. Mr. Wainwright's jury heard testimony that Mr. Hamilton was found with hacksaw blades in his jail cell in Mississippi, R. 2352, and a letter was found in his cell addressed to Mr. Wainwright, again trying to get him to escape confinement with him. R. at 2358. Even the State did not believe that Mr. Wainwright was the leader in this case, or that Mr. Hamilton's version of events was accurate; in their closing argument, the State told Mr. Hamilton's jury:

> The statements [Mr. Hamilton] made to the police, I think are interesting, in that he attempts to put all the blame on his accomplice, Mr. Wainwright. Of course, Mr. Wainwright attempted to return the favor by putting all the blame on Mr. Hamilton. But let's look at the statement just a minute and see if there's any reason to believe Mr. Hamilton's attempt to put all the guilt on his accomplice, Mr. Wainwright. He lied about who was driving the car in that parking lot. Do you remember? Wainwright drove all the way from North Carolina all the way down to Daytona. He drove all the way from Daytona back to Jacksonville. He drove all the way from Jacksonville back to Lake City. And then they get in Winn Dixie parking lot and they change drivers? And then after the murder, he drives all the way to Mississippi. The reason that Mr. Hamilton had to swap drivers was so Wainwright would be the one who jumped out with the shotgun. I submit to you, that didn't happen. The driver stayed the same in that parking lot, and

Richard Eugene Hamilton jumped out with the shotgun and took Carmen Gayheart prisoner.

* * *

Now the [Hamilton] defense offered evidence that Wainwright claimed to be the big dog. And it might be interesting to explore this issue of who was the big dog. I'll agree that Wainwright certainly tried to act like a big dog, but I submit to you, that there's very little in Wainwright's statements that can be believed, unless it's corroborated by other evidence.

* * *

Who's the big dog? Hamilton's the big dog.

* * *

And who's the big dog? Hamilton was the big dog, because ladies and gentlemen of the jury, in any pack of dogs, the big dog goes first. Hamilton planned the escape. He fully approved of the killing.

R-RH at 1939-43.

The only evidence against Mr. Wainwright that was presented to his jury, apart from Mr. Hamilton's self-serving statements, was the testimonies of two jail inmates, Mr. Murphy and Mr. Gunter, which were riddled with factual inaccuracies, and also did not support Mr. Hamilton's statements. Mr. Murphy, an eight-time felon, R. at 2715, who had a pending motion to modify his sentence at the time of his testimony, R. at 2712, could not even identify Mr. Wainwright, and initially claimed he was not in the courtroom at all, R. at 2705. He identified Mr. Wainwright only when the State Attorney said: "Let me ask you specifically to direct your attention to counsel table over there. Do you recognize anybody seated at that table right there?" R. at 2710. Mr. Murphy also testified that Mr. Wainwright did not sexually assault the victim. R. at 2708. Mr. Gunter, a seven-time felon, R. at 2738,

claimed to have heard Mr. Wainwright confess while they were housed near each other over a single weekend. R. at 2740. Mr. Gunter testified that Mr. Wainwright told him he'd escaped from a *South* Carolina prison, R. at 2742, that he had robbed people in Alabama, *id*., and that he had shot at police in Mississippi, R. at 2743, all of which were factually inaccurate. Mr. Gunter also testified that he had a television and portable radio in his cell, R. at 2757-58, during the time that this trial was so widely publicized, a change of venue was reluctantly granted by the trial court after a jury could not be seated in Hamilton County.

The State had a more difficult case against Mr. Wainwright than it did against Mr. Hamilton, and this fact was obvious to both juries. Mr. Wainwright's jury took more than four hours to return a verdict in this case, asked two separates questions during their deliberations, and did not return their verdict until 9:00 p.m. R. at 3651-53. Mr. Hamilton's jury did not ask any questions, and took hardly more than an hour to return a verdict. *See* R-RH. at 2048-49 (noting that Mr. Hamilton's jury retired to deliberate at 12:12 p.m., and returned a verdict at 1:20 p.m.).

Now, in the instant motion, Mr. Wainwright has provided an expert report concluding that the only physical evidence allegedly tying him to the sexual assault of the victim – the alleged DNA evidence – was false and misleading. App. at 261-68. Simply put, the information that the jury heard about the DNA evidence was completely inaccurate, and no such conclusions could be drawn. *See infra* section

92

(VI)(C)(vii). That Mr. Wainwright did not participate in the sexual assault of the victim is further corroborated by the fact that Mr. Hamilton later signed a statement indicating that he lied about this. App. at 62-64. Additionally, this Court should also consider the evidence Mr. Wainwright has developed that indicates he was a psychosocially immature, suggestible, 23-year-old suffering actively from undiagnosed and untreated PTSD at the time of the crime. App. at 202-03; 250-51.

One district court in the Eleventh Circuit has recently considered claims pursuant to actual innocence and *Perkins* in a successive habeas petition. *See Letemps v. Sec'y, Fla. Dep't of Corr.*, 114 F. Supp. 3d 1216 (M.D. Fla. 2015). There, Letemps was convicted of three counts of sexual battery and one count of kidnapping, primarily based on the victim's identification of Letemps as her attacker. *Letemps*, 114 F. Supp. at 1218-19. In addition, testimony at trial by an FDLE serologist concerning the testing of a stain on a robe — containing semen from the true perpetrator — concluded that "Letemps could not be ruled out as a contributor of the semen, even though the absorption test [the serologist did] had not detected his blood type." *Letemps*, 114 F. Supp. at 1223. In his successive habeas filing, Letemps presented the affidavits of two serological experts, who concluded on the basis of records that the FDLE serologist's testimony was inaccurate, and that the proper interpretation of the testing that the FDLE serologist would conclude that Letemps was excluded as a source of the semen. *Id.* at 1224. The district court in

*Letemps* found that "[w]hile it is true that this [serological] evidence does not directly refute the victim's identification of Letemps," that that evidence was "not especially powerful," and the threshold showing for actual innocence had been met. *Id*. at 1225.

In Mr. Wainwright's case, like in *Letemps*, he has proffered evidence refuting the scientific validity of the DNA testimony presented against him at trial. The case against Mr. Wainwright is further weakened by Mr. Hamilton's admission that he lied in his statements to police, and inculpated Mr. Wainwright in a sexual assault he did not commit. In a retrial, this would have been a substantial challenge to Mr. Hamilton's credibility, especially when corroborated by the new scientific evidence concluding that the DNA testimony previously presented was false.

Additionally, this new information in conjunction with the scant evidence against Mr. Wainwright, would have substantially challenged any attempt to convict Mr. Wainwright of the capital crime of felony murder. Typically, the "actual innocence" gateway is only available for petitioners who assert factual innocence, and not legal innocence. *Rozzelle v. Sec'y, Fla. Dept. of Corr*., 672 F.3d 1000, 1013 (11th Cir. 2012). However, many circuit courts of appeals have found that innocence can include, for example, where a petitioner has a complete defense to a crime that would not have resulted in their conviction. *See Rozzelle*, 672 F.3d at 1014-15 (noting that the Fifth, Sixth, Seventh, Eighth, and Ninth Circuits have held that facts establishing that a petitioner could not have been *convicted* of their crime could

assert innocence, even where their conduct was not a typical factual innocence scenario). Actual innocence has been found for equitable tolling purposes in the context of felony murder, where there was insufficient evidence of an underlying felony, which put the conviction and sentence in doubt. *See Conic v. Warran*, No. 05-cv-73944, 2007 WL 772923, * 5 (E.D. Mich. March 12, 2007) ("Petitioner has stated an arguable claim of actual innocence of the penalty for felony murder. His claim of actual innocence is sufficient to overcome his failure to comply with the statute of limitations."). Here, Mr. Wainwright argues his new evidence, in consideration of all of the evidence in his case and developed subsequently, establishes his actual innocence of both premeditated first-degree murder, as well as felony murder.

To convict Mr. Wainwright of felony murder, the State would have had to prove beyond a reasonable doubt that Mr. Wainwright was a principal in the felonies prior to the victim's death. *See, e.g*., R. at 1109 (jury instruction on felony murder); R. at 3628 (Court's reading of the felony murder jury instruction). To establish that Mr. Wainwright was a principal, the State had to prove beyond a reasonable doubt that Mr. Wainwright knew what was going to happen, intended to participate in the robbery, kidnapping, and sexual assault of the victim, and actually did something to

help. *See, e.g.*, R. at 1110 (jury instruction on principals)[21]; R. at 3629 (Court's reading of the principals jury instruction). No physical evidence in the case reflected that Mr. Wainwright participated in the sexual assault, and even the State did not believe Mr. Wainwright was the individual who got out of the Cadillac, abducted the victim, and stole her Ford Bronco in the process. R-RH at 1940 ("[Mr. Hamilton] lied about who was driving the car in that parking lot. . . . The driver [Mr. Wainwright] stayed the same in that parking lot, and Richard Eugene Hamilton jumped out with the shotgun and took Carmen Gayheart prisoner.").[22]

---

[21]    The written instructions given to the jury in Mr. Wainwright's case required that, to find felony murder in the first degree, the jury find that Mr. Wainwright himself, or another person if both were principals, killed the victim "in the commission of ROBBERY, KIDNAPPING *AND* SEXUAL BATTERY." R. at 1109 (emphasis added). The Court's reading of the jury instructions, R. at 3629, was unclear on this point, and did not specifically instruct the jury whether finding one or all of the felonies was sufficient. Thus, assuming the jury relied on the written instructions given to them, they would have found that Mr. Wainwright had not committed a sexual battery or was not a principal in that event, it would not have convicted him even of felony murder.

[22]    The only remaining evidence that Mr. Wainwright ever knew that the victim in this case was going to be abducted, sexually assaulted or killed, is the alleged statement of Mr. Wainwright from May 10, 1994, about which Sheriff Harrell Reid testified. R. 2651-52. Sheriff Reid testified that while Mr. Wainwright was without counsel, and while he was in a parked police car alone with Mr. Wainwright for no apparent reason, that Mr. Wainwright told him spontaneously that he and Mr. Hamilton had thrown out the victim's jewelry before they killed her because they knew they were going to kill her. R. at 2653-54. On retrial, however, this statement would properly be viewed as extremely suspect; Sheriff Reid did not disclose this alleged statement until mid-trial, when he suddenly remembered it was never previously disclosed, and he didn't mention it in his pretrial deposition, R. at 2602-03. Further, this statement contradicts that of Mr. Hamilton, who told police that the

On review of the total circumstances in Mr. Wainwright's case, and the evidence against him, this would have met the "threshold showing" of "sufficient doubt about [a petitioner's] guilt to undermine confidence in the result of the trial." *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) (internal citation omitted). The State in this case, on retrial, would not be able to prove beyond a reasonable doubt that Mr. Wainwright was guilty of capital premeditated or felony murder.

The aforementioned evidence also establishes that Mr. Wainwright is innocent of his death sentence, because it demonstrates by "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Dretke*, 541 U.S. at 393 (internal quotation omitted). Had it not been for the constitutional error—the false evidence presented—at his trial, Mr. Wainwright would not have been convicted and sentenced to death. Thus, his bases for relief should be reviewed by this Court.

---

victim's jewelry was thrown out *after* her murder. *See, e.g*., R. at 2535 (testimony of Robert Kinsey).

**B.      Applying the Actual Innocence Gateway, This Court Should Review Meritorious Claims that Were Not Available to Mr. Wainwright at the Time of His Federal Habeas Proceedings**

   **i.      Mr. Wainwright's Trial Violated His Right to Be Sentenced By an Impartial and Constitutionally Adequate Decision-Maker**

In a capital case, a defendant has the right to be sentenced by a unanimous jury and to have critical fact-finding determinations made by a unanimous jury. *Ring v. Arizona*, 536 U.S. 584 (2002); *Hurst v. Florida*, 136 S. Ct. 616 (2016). From jury selection through the sentencing, proceedings in a capital case are structured to culminate in an individualized assessment of the defendant and his crime.

> [A]s *Woodson v. North Carolina*, 428 U.S. 280 (1976), made clear, "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."

*Penry v. Lynaugh*, 392 U.S. 302, 316 (1989).

The Constitution also requires that death sentences be individualized. The "punishment must be tailored to [the defendant's] personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782 (1982).

> Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases.

*Lockett v. Ohio*, 438 U.S. 586 (1978).

> The Constitution requires that capital sentencing proceedings be reliable.

> From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. . . . [T]he sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause.

*Gardner v. Florida*, 430 U.S. 349 (1977).

Capital sentencing must include a meaningful adversarial testing of the evidence where the defendant has the effective assistance of counsel and a fair opportunity to deny, rebut, and mitigate the evidence against him. *United States v. Cronic*, 466 U.S. 648 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland v. Washington*, 466 U.S. 668 (1984); *Crawford v. Washington*, 541 U.S. 36, 38 (2004).

The Eighth Amendment demands especially stringent review of a judge's impartiality in a death-penalty trial. "[I]n no proceeding is the need for an impartial judge more acute than one that may end in death." *In re Al-Nashiri*, 921 F.3d 224, 231 (D.C. Cir. 2019); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality opinion) ("[T]he [Supreme] Court has been particularly sensitive to ensure that every safeguard is observed.").

Mr. Wainwright's capital sentencing lacked all of these safeguards. The result of a fundamentally unfair proceeding—tainted by ex parte communications, a lack

of objective and independent fact-finding, and a curtailed role of the jury—his death sentence is unreliable and constitutionally infirm.

>    **ii.    Mr. Wainwright Was Sentenced to Death Under a Sentencing Scheme that Deprived Him of His Sixth And Eighth Amendment Rights to Unanimous Fact-Finding by a Jury**

Mr. Wainwright's death sentence violates *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). In *Hurst v. Florida*, the United States Supreme Court held that Florida's capital sentencing scheme violated the Sixth Amendment because it required the judge, not the jury, to make the findings of fact necessary to impose the death penalty under Florida law. 136 S. Ct. at 620-22. Those findings included: (1) the aggravating factors that were proven beyond a reasonable doubt; (2) whether those aggravators were "sufficient" to justify the death penalty; and (3) whether those aggravators outweighed the mitigation. Florida's unconstitutional scheme, however, had an advisory jury to render a generalized recommendation for life or death by a majority vote, without specifying the factual basis for the recommendation, and then empowered the sentencing judge alone, notwithstanding the jury's recommendation, to conduct the required fact-finding. *Id.* at 622. The Court held that the jury, not the judge, must make the findings of fact required to impose the death penalty. *Id.*

In *Hurst v. State*, the Florida Supreme Court explained that the Eighth Amendment also requires unanimous jury fact-finding as to (1) which aggravating

factors were proven, (2) whether those aggravators were "sufficient" to impose the death penalty, and (3) whether those aggravators outweighed the mitigation. 202 So. 3d at 53-59.[23] Each of those determinations are "elements" that must be found by a jury unanimously and beyond a reasonable doubt. *Id.* at 57; *see also Jones v. State*, 212 So. 3d 321, 344 (Fla. 2017). In addition to rendering unanimous findings on each of those elements, the Florida Supreme Court explained that the jury must unanimously recommend the death penalty before a death sentence may be imposed. *Hurst*, 202 So. 3d at 57 ("[B]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death."). The court cautioned that, even if the jury unanimously found that each of the elements required to impose the death penalty was satisfied, the jury was not required to recommend the death penalty. *Id.* at 57-58 ("We equally emphasize that . . . we do not intend to diminish or impair the jury's right to recommend a sentence of life

---

[23]     This holding was consistent with the constitutional "evolving standards of decency," *Atkins v. Virginia*, 536 U.S. 304, 312 (2002), which have led to a national consensus that death may be imposed only upon unanimous jury verdicts.

even if it finds the aggravating factors were proven, were sufficient to impose death, and that they outweigh the mitigating circumstances.").

Petitioner's jury was never asked to make unanimous findings on any of the elements required to impose a death sentence under Florida law. Instead, after being instructed that its verdict was advisory, and that the ultimate responsibility for imposing a death sentence rested with the judge, Petitioner's jury rendered a generalized advisory recommendation to impose the death penalty. The record does not reveal whether the jurors unanimously agreed that any particular aggravating factor was proven beyond a reasonable doubt, or unanimously agreed that those specific aggravators were sufficient to impose the death penalty, or unanimously agreed that those specific aggravators outweighed the mitigation. The jury's written "advisory sentence" reflects only that twelve jurors "advise and recommend" that the court sentence Mr. Wainwright to death. R. at 1143. The advisory recommendation contains no further information regarding the jury's reasoning, nor is any such information included elsewhere in the record.

After the jury's recommendation, the judge made the findings of fact required to impose a death sentence under Florida law: (1) the specific aggravating circumstances that had been proven beyond a reasonable doubt; (2) those aggravating circumstances were "sufficient" to justify the death penalty; and (3) the aggravating circumstances outweighed the mitigating circumstances. R. at 1176; Fla.

Stat. § 921.141(3). The judge considered the evidence that had been presented to the jury, in addition to written arguments by the parties, R. 1144-54, and argument made at a separate hearing pursuant to *Spencer v. State*, 615 So. 2d 688 (Fla. 1993), where the court also heard testimony from the victim's family. R. at 1176, 3760-74.

In addition to the lack of jury unanimity on critical fact-finding, Mr. Wainwright's jury was repeatedly instructed that it could only render an advisory recommendation. Throughout the penalty phase, and immediately before deliberating, jurors were repeatedly reminded by the court, the prosecutor, and defense counsel, that their sentencing recommendation—life in prison or death— was "advisory" and would not be accompanied by findings of fact or any other explanation for the recommendation, and that the final decision regarding the death penalty rested solely with the judge. R. at 3647, 3664, 3687, 3688, 3689, 3707, 3708, 3716, 3731, 3732, 3735, 3736, 3737, 3738.

The jury's written recommendation—titled an "advisory sentence"— reiterates that the responsibility of the jury was merely to "advise and recommend" a sentence for the court to impose. R. 1143. These repeated references to the jury only being asked to advise, and reminders that the court would be the one to actually determine the sentence, render Mr. Wainwright's sentence unreliable.

The Supreme Court "has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task" and

has found unconstitutional under the Eighth Amendment comments that "minimize the jury's sense of responsibility for determining the appropriateness of death." *Caldwell*, 472 U.S. at 341. Under *Caldwell*, the scheme under which Mr. Wainwright was sentenced violates the Eighth Amendment by relying entirely on an advisory jury recommendation that was rendered by jurors whose sense of responsibility for a death sentence was diminished by the trial court's repeated instructions that the jury's role was merely advisory.

In *Caldwell*, a Mississippi penalty-phase jury did not receive an accurate description of its role in the sentencing process due to the prosecutor's suggestion that the jury's decision to impose the death penalty would not be final because an appellate court would review the sentence. *Id.* at 328-29. The Court found that the prosecutor's remarks impermissibly "led [the jury] to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere." *Id.* at 329. The Court concluded that, because it could not be ascertained that the remarks had no effect on the jury's sentencing decision, the jury's decision did not meet the Eighth Amendment's standards of reliability. *Id.* at 341. Under the Eighth Amendment, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence lies elsewhere." *Id.* at 328-29.

Although Mr. Wainwright's state postconviction counsel raised a claim that trial counsel was ineffective for failing to raise and litigate a *Caldwell* challenge, PCR. I at 3-33, the instant claim has heightened significance after *Hurst*.

The *Hurst* cases shed new light on Eighth Amendment violations of *Caldwell* in Mr. Wainwright's case. Throughout the penalty phase, and immediately before deliberating, Mr. Wainwright's advisory jurors were reminded by the court and counsel that their sentencing recommendation—life in prison or death—was "advisory" and that it would not be accompanied by findings of fact or any other explanation for the recommendation; and that the final decision regarding the death penalty rested with the judge. R. 3647, 3664, 3687, 3688, 3689, 3707, 3708, 3716, 3731, 3732, 3735, 3736, 3737, 3738.

>   iii.   **The Trial Court—the Ultimate Sentencer—Received and Relied Upon Unreliable and Inflammatory Evidence that Was Unknown to Mr. Wainwright and His Counsel**

At two significant points in the proceedings against Mr. Wainwright, the trial court received information that was unknown to Mr. Wainwright and his counsel. Mr. Wainwright had no opportunity to confront this evidence, and it was submitted to Mr. Wainwright's sentencer, the trial court, unrebutted and unmitigated.

First, the court received information from the jail administrator related to future dangerousness. During a discussion about the bug or wire that had been placed

in Mr. Wainwright's cell by the jail staff, the trial judge disclosed that he had had an ex parte conversation about the device with Richard Dugger, jail administrator.

> The Court did learn that this [] device was in your cell one day at lunch last week. And I learned of that from Mr. Dugger, because Mr. Dugger at lunch was concerned of security measures. And I instructed him it would be wise to remove that. And I'm sure it had something to do with the removal of that listening device.

R. 2404.[24] The trial court never elaborated on what security concerns the jail administrator shared, but, as the concerns were related to security, they likely involved the administrator's impressions of a risk or threat or danger that Mr. Wainwright posed. The concerns of the jail administrator on such issues are tantamount to expert opinion. The court received these opinions ex parte, depriving Mr. Wainwright any opportunity to confront, deny, or mitigate them. The court also accepted as truth the jail administrator's concerns, as indicted by the court's oral ruling to deny the defense's motion for mistrial based on the listening device that had been planted in Mr. Wainwright's cell; the court found that the device was for security "which appears to have been appropriate under the circumstances." R. at 2995-96.

---

[24]    Despite that the trial court knew the jail staff had installed a "listening device" in Mr. Wainwright's cell where Mr. Wainwright and his attorney had legal meetings, the court did not alert the defense on its own initiative. The court only disclosed its knowledge of the device after Mr. Wainwright brought the matter to the court's attention. R. 2393, 2404.

Then, during the penalty phase of Mr. Hamilton's trial, the court heard detailed testimony from three witnesses that amounted to a series of cold, remorseless, boastful confessions and the witnesses' opinions of Mr. Wainwright as evil, an animal, and deserving to die. The witnesses portrayed Mr. Wainwright as a calculating, violent predator who relentlessly bragged about his crimes.

Mr. Wainwright had no opportunity to challenge the following testimony:

- Mr. Wainwright said that it was him, not his co-defendant, who got out of the car and "got the woman, put the gun on the woman, emptied the contents out of the car into her vehicle, and left with her." R-RH. 1768.

- Mr. Wainwright said that "he wanted her to shut up, and she wouldn't shut up. . . . He said he took a scarf or shirt or something and wrapped it around her neck and tried to strangle her, and that didn't work, so he said he punched her in the back of the head a few times." R-RH. 1770.

- Mr. Wainwright "used a lot of vulgarities" to describe "that he was trying to kill her." R-RH. 1771.

- "He said he was sitting on her back, and she was naked, on all fours, and was sitting on her back, and he had the shirt around her neck and [was] trying to strangle her, and she wouldn't die, and wouldn't stop screaming. So, he dropped the shirt and started punching her in the back of the head, trying to knock her out, and said that didn't work. He told Hamilton to get the gun. Hamilton wouldn't get the gun. He got it. He said, 'I got it. I went over the truck, got the gun. I put a bullet in her the gun, walked over there, and I shot her in the back of the head. Went and got another bullet and shot her in the back of the head, kicked her to make sure she was dead, and I drug her off in some bushes and threw some bushes over her.'" R-RH. 1771.

- "He said Hamilton was a pussy . . . [b]ecause he didn't kill the girl." R-RH. 1771.

- "[R]ight is right and wrong is wrong, and that's an animal, and he doesn't need to be out on the streets." The witness went on to testify that, if the victim had been his sister, the jury would not be necessary and "you-all wouldn't have to worry about no trial," suggesting that he would have killed Mr. Wainwright himself. R-RH. 1772.

- The witness testified that he acted out against Mr. Wainwright, pouring "dirty mop water under his [cell] door," "kick[ing] his bean hold shut," and doing "everything [he] could to piss him off," because he was so disgusted with what Mr. Wainwright had done to the victim. R-RH. 1773.

- "[T]his guy is a lunatic. You don't say, 'I finally killed one, I finally killed the bitch.' You don't sit up there and brag about stuff like that." R-RH. 1773.

- Mr. Wainwright "was bragging. All you would hear him claiming in his cell, 'I finally did it. I finally killed somebody. I killed the bitch.' That dude is sick, man." R-RH. 1773.

- "I wouldn't have cared if he cut his wrists up, I would have got no help for him." R-RH. 1773-74.

- Mr. Wainwright said that he shot a police officer and killed him. R-RH. 1774.

- Mr. Wainwright boasted that the victim was pleading not to be killed, saying that she had two kids, and was "crying and screaming hysterically, and he couldn't take it anymore, and he kept telling her to shut up, and she wouldn't shut up, so he shot her in the back of the head twice." R-RH. 1776.

- Mr. Wainwright said that "he slapped her." R-RH. 1776.

- Mr. Wainwright tried to impress the witness, repeatedly bragging about killing the woman and the police officer. R-RH. 1777-78.

- Mr. Wainwright said "crazy stuff" over and over, like "'It's a good night for a homicide,' or 'I finally did it.'" R-RH. 1778.

- Mr. Wainwright is "evil." R-RH. 1778.

- He talked about "being a maniac." R-RH. 1779.

- Mr. Wainwright said that he "raped her repeatedly." R-RH. 1787.

- Mr. Wainwright said that "Hamilton wanted to let her go . . . Hamilton, my crime partner, . . . he said let her go, but . . . I wasn't that f'g dumb. He said I wasn't going to let her go. She knew their faces. So, that's when he told me he put her at the front of the vehicle and shot her. . . . He just told me that he shot her and done away with her like that, so no evidence could be found." R-RH. 1787.

- Mr. Wainwright "more or less was the person that was the gunman. He always insisted to me that he was the gunman." R-RH. 1788.

- Mr. Wainwright described how he "put her off in a wooded area and kind of covered her body a little bit. . . . He said Mr. Hamilton would not get out of the vehicle, that he didn't want to have any part to do with that, that he done everything to dispose of the body. . . . He more or less told me that Hamilton was a chicken shit." R-RH. 1788.

- According to Mr. Wainwright, Mr. Hamilton "was against killing her." R-RH. 1789.

- Mr. Wainwright described how he shot and killed a state trooper. R-RH. 1791.

- Mr. Wainwright wanted to impress the witness. R-RH. 1793.

- Mr. Wainwright said that "Mr. Hamilton wanted to let her go and he said no." R-RH. 1794.

- Mr. Wainwright was "the man, the big dog" between the two co-defendants and was the one who "did the deed." R-RH. 1795.

- "This man bragged about what he done. This man has no remorse for anything or any human life. He don't care. He brags about it, and he said in that cell [] he was happy to be killing. He was telling me, 'I'm a maniac going on death row. It's a good night for a homicide.' . . . [A] family like this don't deserve something like this. And I felt like my obligation was to come forward. I

prayed about it, and I thought about it, and so therefore I come forward . . . ." R-RH. 1796.

- Mr. Wainwright said that "his crime partner, Mr. Hamilton, stood idly by while he killed her." R-RH. 1797.

- Mr. Wainwright said that, while they were on the run, they had "run across some black people, a drug dealer or whatever, they robbed and killed them." R-RH. 1805.

- Mr. Wainwright also confessed to killing a state trooper in Mississippi. R-RH. 1810.

While the trial court did not explicitly refer to the testimony it heard outside the presence of Mr. Wainwright when sentencing him, this is not a situation where the court heard one passing comment or a fleeting reference to a matter of insignificance. This is a situation where the court received extensive information on matters directly related to Mr. Wainwright's culpability, character, remorse, and future dangerousness—matters at the heart of whether Mr. Wainwright should be sentenced to death.

Mr. Wainwright's death sentence is unconstitutional, as it is based on information received by the trial court—the ultimate sentencer—outside the presence of the defense. Mr. Wainwright was deprived of due process, the assistance of counsel, and a meaningful adversarial testing of the evidence. *Gardner v. Florida*, 430 U.S. 349, 359 (1977); *U.S. v. Cronic*, 466 U.S. 648, 656-57 (1984).

a.   **Mr. Wainwright's Sentence is Based on Evidence the Defense had No Opportunity to Rebut**

When a court receives and relies on information that is unknown to the parties and when the parties have no opportunity to question the information, "[t]he risk that some of the information . . . may be erroneous, or may be misinterpreted, by the . . . judge, is manifest." *Gardner v. Florida*, 430 U.S. 349, 359 (1977).

If a court intends to "use any information not presented in open court as a factual basis" for a ruling, "he must advise the defendant of what it is and afford the defendant an opportunity to rebut it." *Porter v. State*, 400 So. 2d 5, 7 (Fla. 1981). *See also Krawczuk v. State*, 92 So.3d 195, 201 (Fla. 2012) ("[I]t is well settled that if a trial judge uses information not stated in open court . . . he or she must give the defendant an opportunity to rebut the information."); *Barclay v. State*, 362 So.2d 657, 658 (Fla. 1978) (vacating death sentences because, although the judge stated the sentences were not based on any information unknown to the defense, it was unclear from the record whether the defense "had a meaningful opportunity to be heard" on presentence reports); *Edelstein v. Roskin*, 356 So. 2d 38, 39 (Fla. 3d DCA 1978) citations omitted) ("There is no doubt that in evaluating the evidence, the [judge] should confine its considerations to the facts in evidence as weighed and interpreted in the light of common knowledge. [Judges] must not act on special or independent facts which were not received in evidence.").

While "it is not necessary for a [judge] to have no knowledge other than that which he receives in the courtroom," it is necessary that he not consider the information he acquired outside of the courtroom. *Id. See also Snook v. Firestone Tire & Rubber Co.*, 485 So. 2d 496 (Fla. 5th DCA 1986) ("In reaching a verdict, [the fact-finder] must not act on special or independent facts which were not received in evidence."); *Krawczuk*, 92 So. 3d at 202 (explaining that it is "disconcerting for a judge" to consider information he has received outside of the courtroom).

It is indisputable that due process includes the right to an impartial tribunal. *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). This Court has recognized the harmful effect of ex parte communications on the appearance of impropriety, stating: "The most insidious result of ex parte communications is their effect on the appearance of the impartiality of the tribunal. The impartiality of the trial judge must be beyond question." *Rose v. State*, 601 So. 2d 1181, 1183 (Fla. 1992). It further explained: "Nothing is more dangerous and destructive of the impartiality of the judiciary than a onesided communication between a judge and a single litigant. Even the most vigilant and conscientious of judges may be subtly influenced by such contacts." *Id*. This is because "[n]o matter how pure the intent of the party who engages in such contacts, without the benefit of a reply, a judge is placed in the position of possibly receiving inaccurate information or being unduly swayed by unrebutted remarks about the other side's case." *Id.* The Florida Bar Association has also recognized the

harmful effect of ex parte communications. Canon 3 A(4) of Florida's Code of Judicial Conduct provides: "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding."

Here, the trial court had significant, detailed information that it received in ex parte settings. The court did not inform Mr. Wainwright of the information it had received and, in fact, denied such. R. 1176 ("The court . . . has no information not disclosed to defendant or his counsel, which the defendant has not had an opportunity to deny or explain."). Mr. Wainwright never knew what security concerns the jail administrator expressed to the trial court, and Mr. Wainwright never knew that the trial court had heard sworn testimony about confessions and boasts Mr. Wainwright allegedly made. Mr. Wainwright was sentenced to death after the trial court received ex parte information about his character and culpability that Mr. Wainwright had no opportunity to confront, deny, or mitigate.

### b.    Mr. Wainwright Was Deprived of Assistance of Counsel at a Critical Stage in the Proceedings

Neither Mr. Wainwright nor his counsel were present at a critical stage in the proceedings: the penalty phase of Mr. Hamilton's case. App. at 269-70. This was a critical stage, as the trial court received extensive aggravating evidence against Mr.

Wainwright. Counsel's absence at this stage of the proceedings constructively denied Mr. Wainwright his right to counsel.

"The Sixth Amendment recognizes the right to the assistance of counsel, because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland*, 466 U.S. at 685.

> [T]he adversarial process protected by the Sixth Amendment requires that the accused have counsel acting in the role of an advocate. The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. . . . [I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*United States v. Cronic*, 466 U.S. 648, 656-57 (1984) (emphasis added).

In *Cronic* and *Strickland*, which were decided on the same day, the U.S. Supreme Court outlined the analysis for determining if a defendant's right to counsel was fulfilled. In each case, the Court set forth an analysis that a court must use to assess a certain type of Sixth Amendment claim. When a habeas petitioner alleges that he is actually or constructively denied counsel altogether, then *Cronic* applies; when the petitioner alleges that his attorney was ineffective in particular instances, then *Strickland* applies. *Bell v. Cone*, 535 U.S. 685, 697 (2002). Stated differently, the rule of *Cronic* applies when a petitioner challenges the complete failure of trial counsel, whereas *Strickland*, applies when a petitioner challenges "specific attorney

errors." *Id.* ("For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind.").

When a defendant alleges under *Cronic* that he was denied counsel, the habeas court must evaluate whether the events of trial fall within specific categories of *Cronic*; if they do, then the court must presume that the defendant's convictions are unreliable. *Cronic*, 466 U.S. at  659. *Cronic* applies to "situations . . . that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Cone*, 535 U.S. 695 (quoting *Cronic*, 466 U.S. at 658-59). These situations, the Supreme Court has explained, can be divided into three categories: (1) "where the accused is denied the presence of counsel at 'a critical stage,'" (2) where "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,'" and (3) "where counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Cone*, 535 U.S. at 695-96 (internal citations, emphasis omitted).

When a petitioner alleges that one of these situations deprived him of his constitutional right to counsel, the petitioner need not identify specific errors of counsel. Instead, the petitioner alleges that his attorney's failure was complete; the petitioner alleges that he was denied the right to counsel, because his attorney "entirely" failed to ensure an adversarial testing. If the court finds this to be the case, then the court does not conduct a prejudice analysis. The constructive denial of

counsel presumes that the petitioner was prejudiced. *Cone*, 535 U.S. at 697; *Cronic*, 466 U.S. at 659 (explaining that such circumstances "make[] the adversary process itself presumptively unreliable").

"[T]he absence or denial of counsel at a critical stage of a criminal proceeding represents one of the egregious circumstances that requires the presumption of prejudice." *Burdine v. Johnson*, 262 F.3d 336, 344 (5th Cir. 2001). *See also Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (holding that, when a defendant is without the assistance of counsel "during a critical stage of the proceeding," the defendant must be "spared" the requirement of proving prejudice in a Sixth Amendment claim).

Mr. Wainwright was presumptively prejudiced by his attorney's absence at a proceeding where the trial court heard sworn testimony that was highly aggravating, placed the blame of the charged offenses on Mr. Wainwright, inculpated Mr. Wainwright in uncharged violent offenses, and accused him of pride and an utter lack of remorse for the offenses.

> c.   **The Sentencer in Mr. Wainwright's Case—the Trial Court—Did Not Engage in an Independent Assessment of the Evidence**

Exacerbating the jury deprivation Mr. Wainwright suffered under the judge-sentencing/advisory-recommendation scheme is that Mr. Wainwright's trial judge did not actually engage in independent fact-finding. The record indicates that Mr.

Wainwright's sentence does not reflect the independent thinking and analysis of the trial court but rather reflects fact-finding by the prosecutor.

In this case, counsel for both parties submitted written sentencing briefs. R. 1144-54. The brief submitted by the State was adopted virtually verbatim by the trial court. *Compare* R. 1144-50 with R. 1170-77. The court's sentencing order is in exactly the same font, capitalization, and formatting as the State's brief, strongly suggesting that the court had an electronic format of the State's order that it could edit—or that the State prepared two versions of its brief, one that it submitted and one that the court could simply sign. Either way, there was some ex parte communication between the State and the court regarding the sentencing order.

While the identical font and formatting are telling, it is the identical substance that is alarming. All fact-finding set forth in the trial court's sentencing order matches that requested by the State. The differences in language are insignificant. For example, where the State's brief includes that the court "must consider," the court's order says "has considered." *Compare* R. 1144 with R. 1170. Where the State's order titles a paragraph describing an aggravator as "Argument," the court's order titles the same paragraph as "Finding." *Compare* R. 1145-48 with R. 1171-74.

The findings of the court as to mitigation and the weight assigned to the mitigation appears first in the State's brief and then is adopted wholesale in the court's order. *Compare* R. 1147-49 with R. 1174-76. For example, the State says the

117

court "should find that defendant's difficulties in school and his social adjustment problems . . . do provide some measure of mitigation" and "should accord them little weight." R. 1149. The court then "finds that defendant's difficulties in school and his social adjustment problems . . . do provide some measure of mitigation" and "accords them little weight." R. 1176.

The order sentencing Mr. Wainwright is nearly the same the sentencing order as Mr. Hamilton's, further demonstrating that Mr. Wainwright did not receive an individualized and independent weighing of the evidence. For example, the trial court makes a significant substantive error in both sentencing orders—an error that originally appears in the State's sentencing brief in Mr. Wainwright's case and is then repeated in both sentencing orders. In all three documents, a specific statutory mitigating circumstance—that the defendant acted "under the substantial domination of another person"—is discussed as not being supported by any evidence in the case and then is accorded "little weight."[25] Of course, the logical conclusion

---

[25]   From State's Brief in Mr. Wainwright's Case:

> **(e) The defendant acted under extreme mental duress or under the substantial domination of another person.**
>> Argument: . . . There is no evidence that either ANTHONY FLOYD WAINWRIGHT or his co-defendant, RICHARD EUGENE HAMILTON exercised substantial domination over the other, or in any way created an atmosphere of extreme mental duress for the other. To the contrary, ANTHONY FLOYD WAINWRIGHT was clearly the master of his own fate and consistently made his own

would be that the trial court reject a mitigating circumstance that is not supported by

the evidence, as the court did with numerous other mitigators. R. 1174-75. It is also

---

> decisions. The Court should give little weight to this mitigating
> circumstance.

R. 1148.

From Mr. Wainwright's Sentencing Order:

**(e) The defendant acted under extreme mental duress or under the substantial domination of another person.**

> Finding: . . . There is no evidence that either ANTHONY FLOYD
> WAINWRIGHT or his co-defendant, Richard Eugene Hamilton
> exercised substantial domination over the other, or in any way
> created an atmosphere of extreme mental duress for the other. To
> the contrary, ANTHONY FLOYD WAINWRIGHT was clearly the
> master of his own fate and consistently made his own decisions. The
> Court gives little weight to this mitigating circumstance.

R. 1174.

From Mr. Hamilton's Sentencing Order:

**(e) The defendant acted under extreme mental duress or under the substantial domination of another person.**

> Finding: . . . There is no evidence that either RICHARD EUGENE
> HAMILTON or his co-defendant, ANTHONY FLOYD
> WAINWRIGHT exercised substantial domination over the other, or
> in any way created an atmosphere of extreme mental duress for the
> other. To the contrary, RICHARD EUGENE HAMILTON was
> clearly the master of his own fate and consistently made his own
> decisions. The Court gives little weight to this mitigating
> circumstance.

R. 4152.

illogical that the trial court would give weight to this particular mitigator in the cases of both of the defendants.

The procedure used in this case implicates two errors of constitutional magnitude: the deprivation of an independent weighing of the evidence, and improper ex parte communications between the trial court and the prosecutor.

When a prosecutor drafts a sentencing order that is then adopted, nearly wholesale, by the trial court, a defendant is "deprived of an independent weighing of the aggravators and mitigators." *Card v. State*, 652 So. 2d 344 (Fla. 1995). When a trial court fails to conduct an independent weighing of the aggravators and mitigators, any sentence it imposes is based on arbitrariness and caprice, and a reviewing court cannot have confidence in the sentence. *State v. Richmann*, 777 So. 2d 342 (2000). *See also Hurst*, 136 S. Ct. at 620 (discussing that Florida's hybrid scheme required that, "[i]f the court imposes death, it must set forth in writing its findings upon which the sentence of death is based" and "the sentencing order must reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors") (citations, internal quotations omitted).

The Florida Supreme Court has advised against the procedure in this case where the trial court "copies verbatim . . . or substantial portions" of the State's brief:

> A sentencing order should reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors and the weight each should receive. When a judge simply copies verbatim the State's submission, whether it is designated a "sentencing order" or

a "sentencing memorandum," the judge abdicates that responsibility. Moreover, such verbatim copying renders more difficult, if not impossible, our own duty to determine whether the trial court fulfilled its sentencing responsibility. Therefore, we warn trial judges that they should avoid copying verbatim a State's sentencing memorandum. While we recognize the efficiency modern computer technology affords in drafting orders, efficiency cannot substitute for independent consideration of the evidence.

*Blackwelder v. State*, 851 So. 2d 650, 653 (Fla. 2003), abrogated by *Hurst*.

This error is magnified by the inherent ex parte communications that occur when a court obtains an electronic copy of the State's sentencing order or requests that the State draft an order for the court to sign.[26]

It is the circuit judge who has the principal responsibility for determining whether a death sentence should be imposed. Capital proceedings are sensitive and emotional proceedings in which the trial judge plays an extremely critical role. This Court has stated that there is nothing "more dangerous and destructive of the impartiality of the judiciary than a one-sided communication between a judge and a single litigant." This statement was made in recognition of the purpose of canon 3A(4), Code of Judicial Conduct, which states:

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.

*Spencer v. State*, 615 So. 2d 688, 691 (Fla. 1993) (citation omitted).

---

[26]    Mr. Wainwright's 1995 trial occurred at a time before electronic filing existed in Florida and before the widespread use of email. There is no indication that counsel or the court used email during the pretrial, trial, or sentencing proceedings. Therefore, this is not an instance where a court edited a pleading that had been electronically filed or emailed by the prosecutor.

In this case, Mr. Wainwright was sentenced to death on the basis of fact-finding by the prosecutor—not fact-finding by a unanimous jury or even an impartial judge. His sentence is based on ex parte communications and evidence he had no opportunity to rebut, deny, or mitigate. His death sentence is unreliable and the result of unfair proceedings that lacked due process and the constitutional protections he was guaranteed under the Sixth, Eighth, and Fourteenth Amendments.

> ### iv. Mr. Wainwright's Trial Counsel Violated His Rights Under *McCoy v. Louisiana* When, Against His Client's Expressed Desire, He Conceded Mr. Wainwright's Guilt and Presented Evidence of It

Mr. Wainwright pleaded not guilty in this case and exercised his rights to be presumed innocent and to be tried by a jury with the assistance of counsel. He maintained his innocence to trial counsel and was adamant that he did not want trial counsel to concede his guilt. When trial counsel proposed a trial strategy of proportionality that was geared towards protecting Mr. Wainwright from the death penalty—arguing that, while Mr. Wainwright and Mr. Hamilton had committed the crimes together, Mr. Hamilton was the leader and the more culpable of the two— Mr. Wainwright was adamant that he did not want trial counsel to pursue any strategy that included an admission Mr. Wainwright was guilty. Opposing a strategy of proportionality, which would include a concession of some guilt, was Mr. Wainwright's constitutional right.

The Sixth Amendment provides defendants the right to the assistance of counsel. Nonetheless, "[t]he choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018); *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) ("[A] defendant must be allowed to make his own choices about the proper way to protect his own liberty."). Balancing a defendant's ability to control his own litigation and an attorney's duty to pursue a client's best defense can, in making isolated decisions at trial, be a challenging task and require nuance in management. *See, e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 1770 (2008) ("These matters [of trial procedure and strategy] can be difficult to explain to a layperson . . .").

However, the law is clear that, while some decisions can be made by counsel alone on behalf of a defendant, the overall direction of a defendant's litigation is fundamentally a choice of the defendant. *See McCoy*, 138 S. Ct. at 1508 ("These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*."). Choosing the objective of the litigation is fundamental to a defendant's autonomy, and interference with a competent defendant's choice of objectives for his defense violates his Sixth Amendment rights. *McCoy*, 138 S. Ct. at 1510; *see also State v. Horn*, 251 So. 2d 1069, 1075 (La. 2018) ("*McCoy* is broadly written and focuses on a defendant's autonomy to choose the objective of his defense.").

In this case, Mr. Wainwright's trial counsel opened the defense case-in-chief by presenting the testimony of FDLE Agent Robert Kinsey. R. at 3470. Agent Kinsey testified to Mr. Hamilton's prior statements about the offense, including to statements that Mr. Wainwright's jury had not previously heard.[27]

Defense counsel elicited testimony from Agent Kinsey that, according to Mr. Hamilton, "Mr. Wainwright was responsible for the abduction and the murder" and that Mr. Wainwright was the one who did "the actual killing" by strangling the victim and shooting her twice in the back of the head. R. 3471-72. Defense counsel also elicited testimony that, while stopped at a rest area on AIA between Jacksonville and Daytona Beach, Mr. Wainwright and Mr. Hamilton confronted an elderly white couple in a Chrysler with Ohio license plates. As the couple started to walk on the beach, Mr. Wainwright approached them from behind, robbed them at gunpoint, and then had them lie on the ground face down while he shot them both in the back of the head with a .22 caliber pistol. R. 3475-76. Trial counsel elicited details about how Mr. Wainwright and Mr. Hamilton disposed of the bodies and the couple's car.

---

[27]   Mr. Wainwright's jury would never have learned about the multiple statements Mr. Hamilton made to police confessing his involvement in the offenses, inculpating Mr. Wainwright, and blaming the actual killing on Mr. Wainwright but for the actions of defense counsel. *Bruton v. United States*, 391 U.S. 123, 127-28 (1968) (explaining that, in a joint trial, the confrontation rights of a non-testifying defendant are compromised when the statements of his co-defendant, naming the defendant as a participate in the offenses, are admitted). The prosecutor in this case conceded to the court that the State had "a problem under *Bruton*." R. 1462.

R. 3477. Trial counsel also elicited testimony from Agent Kinsey that Mr. Hamilton

gave another statement where he described Mr. Wainwright's killing of a seventeen-

year-old white female by strangulation and explained how Mr. Wainwright hid her

body under the crawl space under a church in the Daytona Beach/Ormond Beach

area. R. 3480-81.[28]

        This presentation was in clear contrast to Mr. Wainwright's expressed wishes

to not concede guilt. *McCoy*, 138 S. Ct. at 1509. The Supreme Court has explained

that critical to a defendant's rights is the choice of whether or not to concede guilt.

> Some decisions . . . are reserved for the client—notably, whether to
> plead guilty, waive the right to a jury trial, testify in one's own behalf,
> and forgo an appeal.
>
> Autonomy to decide that the objective of the defense is to assert
> innocence belongs in this latter category. Just as a defendant may
> steadfastly refuse to plead guilty in the face of overwhelming evidence
> against her, or reject the assistance of legal counsel despite the
> defendant's own inexperience and lack of professional qualifications,
> so may she insist on maintaining her innocence at the guilt phase of a
> capital trial. These are not strategic choices about how best to achieve
> a client's objectives; they are choices about what the client's objectives
> in fact are.
>
> Counsel may reasonably assess a concession of guilt as best suited to
> avoiding the death penalty . . . . But the client may not share that
> objective. He may wish to avoid, above all else, the opprobrium that
> comes with admitting he killed [someone]. Or he may hold life in prison
> not worth living and prefer to risk death for any hope, however small,

---

[28]     Defense counsel also elicited testimony from Officer John Leggett that Mr.
Hamilton told him "had he not shot at me, Anthony Wainwright would have killed
me." R. 2072. This testimony was unduly prejudicial, unreliable, and irrelevant.
Defense counsel was ineffective for eliciting it.

of exoneration. When a client expressly asserts that the objective of "*his* defence" is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt.

*McCoy*, 138 S. Ct. at 1508-09 (citations omitted).

Mr. Wainwright's attorney overrode Mr. Wainwright's professed desire to maintain his innocence. Mr. Wainwright never wavered on his desire to maintain his innocence; he was steadfast in his refusal to concede any responsibility, even when defense counsel thought some concession as part of a proportionality argument could help Mr. Wainwright avoid the death penalty. App. at 270.

In addition to violating Mr. Wainwright's Sixth Amendment right to maintain innocence, the presentation of Mr. Hamilton's statements to the jury is an example of unreasonable and ineffective assistance of counsel. "The most egregious examples of ineffectiveness do not always arise from what counsel did not do but from what he did do – or say." *Blanco v. Singletary*, 943 F.2d 1477, 1497 (11th Cir. 1991). This is one of those cases. Evidence of Mr. Hamilton's confession—a confession that included inculpating Mr. Wainwright and assigning him substantial responsibility for the crimes against the victim—and evidence that Mr. Wainwright was also responsible for three unrelated, uncharged homicides was presented by Mr. Wainwright's own counsel. This was not an act of advocacy as envisioned by the Sixth Amendment. *See King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir. 1984) (holding counsel to be ineffective for emphasizing the reprehensible nature of his

client's actions); *U.S. v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991) (holding that the defendant was entitled to relief when his own attorney "shouldered part of the Government's burden of persuasion"); *Rickman v. Bell*, 131 F.3d 1150, 1159 (6th Cir. 1997) (holding that the defendant was constructively denied counsel when "the most damaging images of [the defendant] came from his own attorney").

### v.   Mr. Wainwright's Death Sentence Should Be Precluded by the Eighth Amendment and *Roper v. Simmons*

Mr. Wainwright's execution, given his age and impaired brain development at the time of his offense, would violate the prohibition on cruel and unusual punishment as expressed in the Eighth Amendment to the Constitution. *Roper v. Simmons*, 543 U.S. 551 (2005) (holding capital punishment unconstitutional for individuals under the age of eighteen at the time of their offenses). As individuals in their early twenties function more like adolescents than adults with matured brains, they possess the lessened culpability detailed by *Roper*. Mr. Wainwright, 23 years old at the time of the offense, falls into this category of lessened culpability. Given Mr. Wainwright's age, cognitive dysfunction, and delayed maturation, he should be exempt from execution.

The Eighth Amendment prohibits "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins v. Virginia*, 536 U.S. 304, 311 n.7 (2002). Whether a punishment is cruel, unusual, or excessive is a moral judgment determined by evolving societal standards of decency. *Kennedy v.*

*Louisiana*, 554 U.S. 407, 419 (2008). Applicability of the Eighth Amendment must change as "public opinion becomes enlightened by a humane justice." *Gregg v. Georgia*, 428 U.S. 153, 171 (1976).

A death sentence "is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Id.* at 183. The sentence must meet both conditions, since "[a] punishment might fail the test on either ground." *Kennedy*, 554 U.S. at 441. In some cases, certain characteristics about a category of offense or offender are so likely to risk an excessive death sentence that courts must "insist upon confining the instances in which capital punishment may be imposed." *Id.* at 440. This requires a categorical bar to execution, such as the bar to executing intellectually disabled offenders or those who have not committed homicide. *Atkins*, 536 U.S. at 321; *Coker v. Georgia*, 433 U.S. 584 (1977).

While American society once viewed the execution of juvenile offenders as acceptable punishments, *Stanford v. Kentucky*, 492 U.S. 361 (1989), society no longer accepts such. *Roper*, 436 U.S. at 560. Now, societal standards have evolved to the point of prohibiting the execution of individuals in their late teenage years and early to mid-20s who, by virtue of their delayed cognitive and psychosocial development, are still in the developmental stage of late adolescence.

As part of the evolving standards of decency, it is important to consider the consensus of the medical community and scientific data in determining where to draw the lines of culpability. *Hall v. Florida*, 572 U.S. 701 (2014) (explaining how courts and legislatures "are informed by the work of medical experts"). Recent scientific and social science research has demonstrated that, like sixteen and seventeen year olds, people in their early to mid-20s do not have fully developed brains, are immature, and are vulnerable to peer pressure and risk-taking behavior. In *Roper*, the Court cited, as grounds for treating juveniles differently than adults, immaturity and impulsivity, vulnerability and susceptibility, and transitory personality and unfixed character. *Roper*, 543 U.S. at 569-70. This reasoning applies with equal force to those in their early twenties as it does to seventeen year olds.

A death sentence is only constitutionally appropriate when reserved for "those whose extreme culpability makes them the most deserving of execution." *Kennedy*, 554 U.S. at 420 (citation omitted). This requires consideration of the individual circumstances of each offender. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("[A]n individualized decision is essential in capital cases.").

In keeping with this principle, the United States Supreme Court's recent Eighth Amendment jurisprudence demonstrates a shift away from strict application of numerical cutoffs. *Hall*, 572 U.S. 713-14 (cautioning against strict application of

a numerical boundary where an individual asserts that he is categorically barred from execution due to intellectual disability). The Court stressed that the focus must be on an individual's "condition, not a number," and eschewed the practice of barring death-sentenced defendants from presenting evidence "that the Constitution prohibits their execution" simply because those defendants did not fit within a bright-line numerical cutoff. *Id.* at 723.

Likewise, an individual who makes a threshold showing of being exempt from execution due to young age must be given an individualized determination under *Roper*. The temporal divide between adolescence and adulthood is not a one-size-fits-all determination. Scientific communities recognize an overall presumption people in their early to mid-20s are still maturing. *See* Leah H. Somerville, *Searching for Signs of Brain Maturity: What are we Searching For?*, 92 NEURON. 1164 (2016); Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. ADOLESC. HEALTH 216, 218 (2009).

Determining whether a particular person's brain is "mature" requires application of general scientific principles regarding brain development to the individual in question. Mr. Wainwright, by virtue of his young chronological age (23) at the time of his offense, can make a threshold showing sufficient to presume he is exempt from execution via the rationale of *Roper*. This presumption, as well as

the necessity of *Roper*'s Eighth Amendment protections in Mr. Wainwright's case, are further validated by his individual cognitive and psychosocial impairments.

Mr. Wainwright's life has been shaped by lifelong cognitive and psychosocial impairment. From childhood, he has suffered from learning disabilities and developmental disorders. He could not function properly in a mainstream classroom, and his IQ is so low that it approaches the range of intellectual disability. App. at 239; 241. He displays multiple areas of clinical neurocognitive dysfunction, which are attributable to some combination of his learning disabilities and multiple head traumas including injuries causing loss of consciousness. App. at 240. This dysfunction rises to the level of a neurocognitive disorder. App. at 243. Mr. Wainwright has a severely impaired memory, does not sufficiently comprehend "complex or multi-step" material, perseverates, lacks attention to detail, and has poor abstract reasoning and impaired judgment. App. at 243; 245.

Mr. Wainwright struggled to form and maintain friendships. App. at 240. He was a "follower" of peers, was easily intimidated by peer pressure, lacked social perception and reasoning, struggled to communicate, and was difficult to engage in conversation. App. at 240; 243; 245. His inability to crystalize or "formulat[e] verbal expression of his thoughts and feelings" likely predisposed him to frustration and the need to express himself through behaviors rather than words. App. at 243; 245. He was impulsive, hyperactive, and immature. App. at 240-41.

Mr. Wainwright's widely-documented immaturity hindered his ability to "develop age-appropriate social-emotional skills" and to "manage his own behavior in the absence of formal structures and supervision." App. at 243. Consequently, like many individuals with such impairment, Mr. Wainwright has been institutionalized for much of his life, including over 250 days in solitary confinement. App. at 241, 12. Although institutionalization was likely a byproduct of Mr. Wainwright's pre-existing impairments, it also served to exacerbate those impairments. App. at 248.

Additionally, Mr. Wainwright demonstrates symptoms consistent with possible diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), emotional dysregulation and mania as well as depressive mood symptoms such as suicidality (including suicide attempts), limited emotional expressiveness, social withdrawal, impaired motivation, and possible slowed mental processing speed. App. at 243-44. He engaged in substance abuse and suffered from multiple forms of trauma. App. at 245-46; 186.

The instability in Mr. Wainwright's childhood impeded his ability to function as he neared adulthood. Disruptions in household stability, substance abuse, abuse and neglect, ADHD, and other psychiatric disorders—all of which were present in Mr. Wainwright's history—are risk factors for delayed psychosocial maturity. App. at 247. These factors further delay the development of executive functioning. App.

at 246-47. Thus, at the age of 23, Mr. Wainwright was functioning at the level of much younger adolescent. App. at 247.

At the time of the offense, "Mr. Wainwright was a psychosocially immature adolescent/young adult who had spent very little time in the community (and thus had impoverished community-living skills), had untreated complex mental illness and unaccommodated disabilities, and was unusually vulnerable to social pressure . . . ." App. at 251. That Mr. Wainwright, with his susceptibility to peer influence and brain immaturity, "was in the company of a[n] older antisocial peer (i.e., Richard Hamilton) at the time of the offense" is particularly relevant.  App. at 248. He is entitled to the categorical protections of *Roper*.

### C. Applying the Actual Innocence Gateway, This Court Should Also Review Meritorious Claims that are Not Exhausted or Were Defaulted by His Prior Counsel(s)

### i. Mr. Wainwright was Not Competent During His Trial

At the time of Mr. Wainwright's trial, he was suffering from post-traumatic stress disorder and major depressive disorder which—combined with the circumstances of the trial and his confinement—rendered him not competent. App. at 203. According to an assessment by Dr. David R. Price, at the time of trial, Mr. Wainwright "was unable to reasonably and intelligently participate in his trial; cooperate with his attorney; make meaningful contributions to his legal representation; and/or assist in his own defense." App. at 203. In Dr. Price's

professional opinion, "Mr. Wainwright, more likely than not, was not competent at the time of his trial." *Id.*

> Mr. Wainwright's Posttraumatic Stress Disorder, Major Depressive Disorder, Recurrent Type, likely pre-existing Attention-Deficit Disorder, and probable Neurocognitive Disorder . . . certainly could affect Mr. Wainwright's ability and competency to stand trial. It impeded his ability to understand the facts relevant to his case. He had impairment in the ability to understand the legal issues and procedures in his case. He was not aware of the legal defenses available on his behalf. His distrust in his attorney and his paranoia over the efforts and his concern over the intrusions into his privacy with listening devices disrupted his ability to cogently assist his attorney. He was not able to differentiate the roles of the defense counsel and the prosecuting attorney. To some extent he felt that they were one and the same. He certainly could not relate to his defense counsel. He certainly was not able to trust and communicate relevantly with his counsel, particularly after his counsel would not come to see him when he reported the presence of a listening device in his cell. He was not able to maintain a collaborative relationship with his attorney nor follow testimony for contradictions or errors, given his avoidance and "zoning out." He was not appropriately medicated nor evaluated to identify these issues and to try to offer an effective remedy for them. Although he wanted to testify, it is unlikely he could have testified relevantly. He was unable to tolerate the stress of trial and while awaiting trial.

App. at 201.

### a.   Mr. Wainwright's Due Process Rights Were Violated Because He was Tried and Sentenced While Incompetent

The criminal trial of an incompetent defendant violates due process. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). This due process right cannot be waived. *Pate v. Robinson,* 383 U.S. 375, 384 (1966).

134

> [A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. . . . [T]he prohibition is fundamental to an adversary system of justice.

*Drope*, 420 U.S. at 171-72. The test for assessing a petitioner's competency is whether he "ha[d] sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he ha[d] a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

A petitioner, "raising a substantive claim of incompetency, . . . must demonstrate . . . his incompetency by a preponderance of the evidence." *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992). It is "inherent[ly] difficult[]" for a court to make a retrospective, or nunc pro tunc, determination of a defendant's competence; thus, when a defendant establishes by a preponderance of the evidence that he was in fact incompetent when he waived his rights, the court must vacate the conviction and order a new trial. *Drope*, 420 U.S. at 184.

Mr. Wainwright's conviction should not be permitted to stand. As Dr. Price stated, it is more likely than not that Mr. Wainwright was not competent to stand trial. App. at 201; 203.

**b.      Mr. Wainwright's Rights Were Violated When Neither the Trial Court Nor Defense Counsel Ensured He was Competent During Trial**

Once a genuine doubt has been raised as to a defendant's competency—by the court or defense counsel—the court must conduct a competency hearing. *Pate,* 383 U.S. at, 384; *see also* Fla. R. Crim. P. 3.210(a-b). The defendant cannot waive the hearing. *Pate*, 383 U.S. at 384.

Where there is sufficient doubt of the defendant's mental capacity to stand criminal proceedings, such an inquiry includes, at a minimum, a hearing to determine the competency of a defendant. *Pate,* 383 U.S. at 387 (explaining that a hearing is constitutionally guaranteed when the record contains "sufficient indicia of incompetence" to doubt the defendant's competency); *see also Medina v. California*, 505 U.S. 437, 448 (1992) ("If a defendant is incompetent, due process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him.").

"[A] petitioner may allege that the trial court denied him or her due process by failing sua sponte to hold a competency hearing. This is . . . a substantive incompetency claim with a presumption of incompetency and a resulting reversal of proof burdens on the competency issue." *James*, 957 F.2d at 1571-72. Under this standard, after a petitioner "establish[es] that the trial court should sua sponte have

held a competency hearing," the burden shifts to the State to prove that the error was harmless. *Id.* at 1570 (explaining that there is a "presumption of incompetency upon a showing by a habeas petitioner that the state trial court failed to hold a competency hearing on its own initiative despite information raising a bona fide doubt as to the petitioner's competency").

A court must sua sponte inquire into a defendant's competency when there are reasonable grounds to doubt her competency. *Pate,* 383 U.S. at 385; *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir. 1987) ("[W]hen a court has a 'bona fide doubt' as to a defendant's competence, it must sua sponte conduct a hearing on his competence to stand trial."). Adequate safeguards must be observed upon a doubt as to a defendant's competency, including the suspension of proceedings pending an evaluation and hearing. *Drope*, 420 U.S. at 171.

In the instant case, the trial court neglected to order a hearing on Mr. Wainwright's competency despite knowing that Mr. Wainwright had been prescribed mental health medication during the trial (R. 2670, 2672) and that Mr. Wainwright suffered from paranoia throughout the proceedings (R. 3007, 3010-11). The court knew Mr. Wainwright's competency was questionable, as the court inquired of defense counsel, on two separate occasions, whether Mr. Wainwright was able "to participate in the trial and assist his attorney" "from the mental health aspect." R. 2672, 3013. The court neither asked Mr. Wainwright any questions about

this, nor set a hearing, nor involved any mental health expert. The court had a duty to conduct a competency hearing in light of its concerns. Its failure renders Mr. Wainwright's conviction unreliable.

On the same day that trial counsel informed the court that Mr. Wainwright believed counsel was "working against him" and "not acting in his best interests"—beliefs that trial counsel characterized as paranoid—trial counsel asked for the court's assistance in facilitating a psychiatric evaluation for Mr. Wainwright to possibly be medicated; counsel explained this was necessary due to Mr. Wainwright being under a "great deal of stress" and "having difficulty with nerves." R. 1073-83. This should have triggered Mr. Wainwright's competency being evaluated.[29]

Mr. Wainwright's attorney also had a responsibility to investigate his possible incompetence. Ineffective assistance of counsel is analyzed under the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must show that trial counsel's representation fell below an objective level of reasonableness and that, but for counsel's deficient performance, there is a reasonable likelihood an evaluation would have found him not competent. *Id.* at 688.[30]

---

[29]    The trial court appointed Dr. Mhatre for the limited purpose of assessing Mr. Wainwright for immediate treatment and prescribing medication, R. 1083, but Dr. Mhatre could not evaluate Mr. Wainwright for competency, mitigation, or other matters, as Dr. Mhatre was the confidential, defense-retained mental health expert in Mr. Hamilton's case. App. at 273-74.

[30]    Failure to raise a defendant's potential incompetency can be the basis for a claim of ineffective assistance of counsel. *Coker v. State,* 978 So. 2d 809, 810

Counsel has a duty to ensure his client is "capable of making a rational choice 'among rationally understood probabilities.'" *Galowski v. Berge,* 78 F.3d 1176, 1180 (7th Cir.1996) (citation omitted). Accordingly, counsel should request a competency evaluation whenever he has a good faith doubt as to his client's competence. *U.S. v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998) (holding that defense counsel has "a professional duty" to bring the issue of competency to the court's attention when there is a substantial doubt as to the client's competency); *Jermyn v. Horn*, 266 F.3d 257, 283 (3rd Cir. 2001) (explaining that counsel's representation is objectively unreasonable when he does not have his client evaluated despite indications of incompetence).

Although "the existence of even a severe psychiatric defect is not always apparent to laymen." *Bruce v. Estelle*, 536 F.2d 1051, 1059 (5th Cir. 1976), counsel has a duty to inform the court when there is "reasonable doubt" as to his competence. *Kibert v. Peyton,* 383 F.2d 566, 569 (4th Cir. 1967). "If counsel fails . . . to alert the court to the defendant's mental status, the fault is unlikely to be made up." *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990).

---

(Fla. 1st DCA 2008) (recognizing the failure to raise a defendant's alleged incompetency as a ground for asserting ineffective assistance of counsel); *Schultheis v. State,* 12 So. 3d 811, 812 (Fla. 1st DCA 2009) ("A narrow argument that counsel was ineffective for failing to raise the competency issue. . . is cognizable in the postconviction posture.").

To show prejudice from counsel's ineffective assistance to investigate his competency, the petitioner must show that there exists "at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial." *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989)). *See also Alexander v. Dugger,* 841 F.2d, 371, 375 (11th Cir. 1988) ("[T]o demonstrate prejudice from counsel's failure to investigate his competency, petitioner has to show that there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial.'") (citation omitted).

Here, trial counsel knew that Mr. Wainwright was struggling with the jail condition and the stress of trial, that he needed medication and had not been sleeping, that he suffered substantially from paranoia and a lack of trust, that he fixated on seemingly small things, that he was regularly very agitated and irritable, and that he did not believe trial counsel was working on his behalf. App. at 272. These mental health symptoms should have prompted trial counsel to raise the issue of Mr. Wainwright's competency to the court and to seek safeguards to ensure Mr. Wainwright was not competent. Had counsel sought to have his client's competency assessed, there is a reasonable probability the expert would have deemed Mr. Wainwright not competent and recommended that the trial proceedings be suspended. App. at 201; 203.

###### ii.    Mr. Wainwright's Due Process Rights Were Violated by the State's Inconsistent Positions on Mr. Wainwright's Truthfulness

In the instant case, the prosecutor made arguments to Mr. Wainwright's jury that were inconsistent with arguments he made to Mr. Hamilton's jury. Relying on a contradictory portrayal of Mr. Wainwright's credibility and character to urge the jury to convict Mr. Wainwright, the State engaged in misconduct and deprived Mr. Wainwright of due process.

A prosecutor's use of inconsistent and irreconcilable theories of a crime in a capital trial renders any resulting death sentence unreliable and violates the Eighth Amendment's prohibition on cruel and unusual punishment. Because the death penalty is "qualitatively different from a sentence of imprisonment," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), courts must ensure a heightened standard of reliability to guarantee that the penalty of death is not administered arbitrarily or capriciously, considering both the reliability of the outcome and the fairness of the process by which it was reached. *Johnson v. Mississippi*, 486 U.S. 578, 586-87 (1988) (holding a death sentence based on inaccurate information to be unreliable); *Turner v. Murray*, 476 U.S. 28, 35-36 (1986) (vacating death sentence where procedure created unacceptable risk of unreliable conviction).

"[A]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976).

The requirement of "fundamental fairness" is "embodied in the Due Process Clause of the Fourteenth Amendment." *In re Winship*, 397 U.S. 358, 369 (1970) (Harlan, J., concurring). Due process requires "fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections." *Moran v. Burbine*, 475 U.S. 412, 467 (1986) (Stevens, J., dissenting). Due process protects the accused from actions violating "'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (citations omitted). While fundamental fairness is not easily defined, it clearly dictates that a fair trial is a basic right guaranteed to every defendant as a part of due process. *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965). Due process applies equally to proceedings determining guilt and to those determining penalties. *Green v. Georgia*, 442 U.S. 95, 97 (1979). The courts must ensure that the procedures used to sentence Mr. Wainwright comported with notions of fundamental fairness. They did not.

Drawing on concepts of fundamental fairness, the Supreme Court has made certain that prosecutors, as representatives of the State, have a responsibility to

142

ensure fairness and integrity in the legal process. *See, e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935), overruled on other grounds, *Stirone v. United States*, 361 U.S. 212 (1960). "The criminal trial should be viewed not as an adversarial sporting contest," *United States v. Kattar*, 840 F.2d 118, 127 (lst Cir. 1988), but as a truth-seeking forum in which the prosecutor strives to uncover the actual facts surrounding the commission of a crime, *United States v. Wade*, 388 U.S. 218, 256 (1967) (White, J., dissenting in part and concurring in part). This is because the prosecutor's role "transcends that of an adversary," *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985), creating a concomitant "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger*, 295 U.S. at 88. *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting) ("The function of the prosecutor . . . is to vindicate the rights of people as expressed in the laws and give those accused of crime a fair trial.").

The Supreme Court has recognized an array of prosecutorial conduct that is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (prohibiting prosecutors from deliberately and knowingly presenting false evidence or misrepresenting the truth to a jury); *Miller v. Pate*, 386 U.S. 1, 6-7 (1967) (prohibiting presentation of false and inconsistent argument on appeal). Similarly, prosecutors have a duty to correct false testimony and testimony that creates a false impression. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972);

*Napue v. Illinois*, 360 U.S. 264, 269 (1959). Likewise, prosecutorial suppression of evidence material to either guilt or sentencing deprives a defendant of due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This is true regardless of the good or bad faith of the prosecution, because "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.* at 87.

Applying bedrock due process principles rooted in two centuries of Supreme Court jurisprudence, courts have concluded that the use of inconsistent, irreconcilable theories to sentence two defendants to death violates due process. *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); *In re Sakarias*, 106 P.3d 931 (Cal. 2005).[31] Indeed, in a capital sentencing proceeding, "it is well established that, when no new significant evidence comes to light, a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 538 (1998).

---

[31]     *See also* Anne Bowen Poulin, *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight*, 89 Calif. L. Rev. 1423 (2001); Michael Q. English, *A Prosecutor's Use of Inconsistent Factual Theories of a Crime in Successive Trials: Zealous Advocacy or Due Process Violation*, 68 Fordham L. Rev. 525 (1999); Steven F. Shatz & Lazuli M. Whitt, *The California Death Penalty: Prosecutors' Use of Inconsistent Theories Plays Fast and Loose with the Courts and the Defendants*, 36 U.S.F. L. Rev. 853 (2002); Barry Tarlow, *Limitations on the Prosecution's Ability to Make Inconsistent Arguments in Successive Cases*, 21 Champion 40 (1997).

Where a prosecutor relies on and then later repudiates evidence in sequential capital cases, this reduces the justice system to mere gamesmanship and affronts a "'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Medina v. California*, 505 U.S. 437, 445 (1992) (quoting *Speiser v. Randall*, 357 U.S. 513, 523 (1958)). Indeed, "[e]ven if our adversary system is 'in many ways, a gamble,' that system is poorly served when a prosecutor, the State's own instrument of justice, stacks the decks in his favor. The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth." *Smith*, 205 F.3d at 1051 (quoting *Payne v. United States*, 78 F.3d 343, 345 (8th Cir. 1996)).

The prosecutor's use of irreconcilable theories rendered Mr. Wainwright's death sentence unreliable. Because accurate sentencing information is an "indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," *Gregg*, 428 U.S. at 190, and Mr. Wainwright's sentence is based on inaccurate information, his sentence cannot stand.

At Mr. Wainwright's trial, the State argued that the jury should convict Mr. Wainwright based on the statements he made: "[T]he defendant Wainwright, by his own lips, has convicted himself of all four of these crimes of which he is accused." R. 3552-53. The State proceeded to detail multiple statements attributed to Mr.

Wainwright and argue that the jury should convict Mr. Wainwright of all the charged offenses. R. 3552-57.

But, at Mr. Hamilton's trial, the State took a different approach, arguing that Mr. Wainwright was a liar upon whose statements the jury should not rely. At Mr. Hamilton's trial, Mr. Hamilton's counsel—in an attempt to minimize his client's culpability—called two jailhouse snitches (Dennis Givens and Bill Bispham) to testify that Mr. Wainwright had made statements taking responsibility for the offenses and for confession to other violent offenses. R-RH. 1760, 1780.

The State cross-examined these witnesses, attacking their testimony and suggesting that any statements Mr. Wainwright had made to the snitches were false statements and made in an effort "to impress" the inmates. R-RH. 1774, 1777, 1792. Then, in rebuttal, the State called another inmate (Robert Murphy) to the stand "to show that Mr. Wainwright is a bald faced liar." R-RH. 1805.

During its closing argument at Mr. Hamilton's trial, the State continued to dispute the version of events that the jury heard during Mr. Hamilton's case-in-chief and argued that, contrary to the testimony of Mr. Givens and Mr. Bispham, Mr. Hamilton was the leader and the more culpable of the defendants—not Mr. Wainwright.

> The statements [Mr. Hamilton] made to the police, I think are interesting, in that he attempts to put all the blame on his accomplice, Mr. Wainwright. . . . [L]et's look at the statement just a minute and see if there's any reason to believe Mr. Hamilton's attempt to put all the

guilt on his accomplice, Mr. Wainwright. He lied about who was driving the car in that parking lot. Do you remember? Wainwright drove all the way from North Carolina all the way down to Daytona. He drove all the way from Daytona back to Jacksonville. He drove all the way from Jacksonville back to Lake City. And then they get in Winn Dixie parking lot and they change drivers? And then after the murder, he drives all the way to Mississippi. The reason that Mr. Hamilton had to swap drivers was so Wainwright would be the one who jumped out with the shotgun. I submit to you, that didn't happen. The driver stayed the same in that parking lot, and Richard Eugene Hamilton jumped out with the shotgun and took Carmen Gayheart prisoner.

\* \* \*

Now the [Hamilton] defense offered evidence that Wainwright claimed to be the big dog. And it might be interesting to explore this issue of who was the big dog. I'll agree that Wainwright certainly tried to act like a big dog, but I submit to you, that there's very little in Wainwright's statements that can be believed, unless it's corroborated by other evidence.

\* \* \*

And who's the big dog? Hamilton was the big dog, because ladies and gentlemen of the jury, in any pack of dogs, the big dog goes first. Hamilton planned the escape. He fully approved of the killing.

R-RH. 1939-43.

By employing inconsistent theories at the two trials and making contradictory arguments about Mr. Wainwright's credibility and related character, the State deprived Mr. Wainwright of due process.

The State's misconduct is not nullified by uncertainty over which portrayal of Mr. Wainwright's credibility, character, and culpability the State truly believed. *See Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (Clark, J., concurring). If, as suggested by the State's arguments in Mr. Hamilton's case, the State thought that

Mr. Wainwright ran his mouth and made false statements to impress inmates, to appear tough, or to protect himself from other inmates, and the State "did not believe" Mr. Wainwright, "then the prosecutor used testimony he thought was false in order to convict" Mr. Wainwright. *Id.* at 1479.

A conviction obtained through the State's use of false evidence is unreliable and violates due process. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.").

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors . . . that a defendant's life or liberty may depend.

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted); *Giglio v. U.S.*, 405 U.S. 150 (1972) (explaining that "deliberate deception of a court and jurors" can occur through "the presentation of known false evidence" regarding the reliability of a witness and evidence affecting the credibility of a witness).

148

Regardless of what "the prosecutor actually believed," the record shows that, in one trial, he relied upon the purported words of Mr. Wainwright, while in another he called Mr. Wainwright "a bald face liar" who the jury could not believe. "[T]he prosecution's theories of the same [issue] in the two different trials negate one another. They are totally inconsistent. This flip flopping of theories . . . was inherently unfair." *Drake*, 762 F.2d at 1479 (explaining that "the actions by the prosecutor violate that fundamental fairness essential to the very concept of justice). "The State cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth." *Id.*

### iii. Mr. Wainwright's Counsel Was Ineffective During the Penalty Phase of His Trial and His State Postconviction Counsel was Ineffective in Investigating and Presenting this Claim

Counsel renders ineffective assistance in violation of the Sixth Amendment under *Strickland* where (1) counsel's performance was "deficient," and (2) the deficient performance was prejudicial. 466 U.S. at 687. The same *Strickland* standards that apply to claims of trial ineffectiveness also apply to ineffectiveness at a Florida capital sentencing proceeding. *Hardwick v. Sec'y, Fla. Dep't of Corrs.*, 803 F.3d 541, 551-52 (11th Cir. 2015).

Deficient performance means that counsel did not "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."

*Strickland*, 466 U.S. at 685. In particular, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Counsel's performance is measured against an objective standard of reasonableness. *Id.* at 694; *see also Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239, 1244 (11th Cir. 2015).

The Supreme Court has made clear that *Strickland* "prejudice" analysis is not an outcome-determinative test. *Strickland*, 466 U.S. at 693-94. The question is not whether representation by effective counsel would have changed the outcome of the trial, nor even whether representation by effective counsel would "more likely than not" have changed the outcome. *Id.* Instead, prejudice is established when confidence in the outcome is undermined because of counsel's deficiencies. *Id.* at 694. The "undermines confidence" standard requires only a "reasonable probability" of a different result. *Id.* at 687; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (noting that the "undermines confidence" standard "is not a stringent one" and is "less demanding than the preponderance standard.").

The *Strickland* prejudice inquiry's concern with the effect on the overall outcome of a case makes clear that the effect of all of counsel's deficient performance should be considered cumulatively. *See Strickland*, 466 U.S. at 695; *see also Berryman v. Morton*, 100 F.3d 1089, 1101-03 (3d Cir. 1996) (finding prejudice based on cumulative effect of instances of deficient performance); *Kubat*

*v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989) (*Strickland* "clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced"); *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003) (emphasizing that *Strickland* analysis requires the court to aggregate the impact of counsel's errors in assessing prejudice).

In capital cases, the Supreme Court has announced specific guidelines for evaluating claims of ineffective assistance for failure to adequately investigate and present mitigating evidence at the penalty phase. Effective capital counsel "conduct a thorough investigation of the defendant's background" for "*all reasonably available* mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (emphasis in original) (internal quotation omitted). Although counsel's failure to present certain mitigating evidence is not per se ineffective assistance of counsel, *Stevens v. Zant*, 968 F.2d 1012, 1025 (11th Cir. 1987), a decision not to put on certain mitigating evidence is only reasonable to the extent that it is based on a professionally reasonable investigation, *Wiggins*, 539 U.S. at 521. Thus, in each case, it must be determined "whether counsel conducted a reasonable background investigation *or* made a reasonable decision that made conducting a background investigation unnecessary." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 931 (11th Cir. 2011). Counsel render ineffective assistance where, due to inattention and not strategy, they fail to look beyond limited evidence of a defendant's life history

that contains leads to more comprehensive evidence without reason to believe pursuing those leads would be fruitless. *See Wiggins*, 539 U.S. at 523-29. Even when a defendant's family members have suggested no mitigating evidence is available, counsel are bound to make reasonable efforts to obtain and review material that counsel knows will be relevant during sentencing. *See Rompilla v. Beard*, 545 U.S. 374, 381-89 (2005).

In this case, Mr. Wainwright's trial attorney, Mr. Taylor, was ineffective in failing to investigate or present anything about Mr. Wainwright's life or complex mental health history. At the penalty phase of Mr. Wainwright's trial, Mr. Taylor presented only the testimony of Mr. Wainwright's mother. *See* R. at 3666. In state postconviction, Mr. Taylor said this was because he did not think that the defense expert, Dr. D'Errico, would be helpful. Additionally, when confronted by state postconviction counsel with five mental health evaluations from Mr. Wainwright's childhood, Mr. Taylor asserted:

> [A]ll of those reports, were discussed on more than one occasion with me, D'Errico, and I believe Sean Owens who was doing a lot of that leg work. So I know at some point in time all of this was discussed.

PCR. III at 110. However, this was untrue. Mr. Taylor did not give Dr. D'Errico most of the records that were available for Mr. Wainwright. Dr. D'Errico, as was his practice, carefully noted what records he reviewed in this case, and submitted it as part of his billing to the Court. App. at 252 (Dr. D'Errico's declaration); X (Dr.

D'Errico's billing). In his billing records, Dr. D'Errico wrote that the only background records that he reviewed for Mr. Wainwright were records from Edgecombe-Nash Mental Health Center and one psychological evaluation from the University of North Carolina. App. at 26-27. His total record review was 3 hours. *Id*. This was most certainly not all the record based information that was available for Mr. Wainwright, and further, was not inclusive of all the information that state postconviction counsel had—although he failed to challenge Mr. Taylor's claims in that proceeding. Critically, missing from Dr. D'Errico's review were records from approximately eight other hospitals or mental health practices, which included information about Mr. Wainwright's head injuries, car accidents, and at least one suicide attempt. App. at 252-53 (D'Errico dec); 183-93 (Dr. Price Report).

Moreover, Dr. D'Errico's opinions, and Mr. Wainwright's mitigation presentation, was woefully deficient because Mr. Taylor failed to investigate Mr. Wainwright's case in any other manner, including speaking to members of Mr. Wainwright's family beyond his mother, or other individuals who knew Mr. Wainwright. In the short period of time undersigned counsel has had to investigate Mr. Wainwright's case, more than 20 years after the fact, a dozen individuals who had mitigating information about Mr. Wainwright and his life were readily available and indicated that no one had ever spoken to them previously about Mr. Wainwright. App. at 210-31; 233-36; 254-60; 277 (Declarations). These individuals had

information that supported Mr. Taylor's theory of mitigation—that Mr. Wainwright was a "follower," that he was suggestible, and had mental health issues. *See* App. at 213, 217, 222, 225, 231 (Mr. Wainwright was a follower, gullible, easily manipulated, or susceptible to peer pressure.); App. at 210, 213, 219 (Mr. Wainwright had mental health problems from an early age.); App. at 210, 213, 215, 219, 230 (Mr. Wainwright ran away as a child to get away from something going on at home.); App. at 212, 215, 219, 231, 234 (Mr. Wainwright had a family history of alcoholism.); App. at 212, 215 (Mr. Wainwright's father suffered from mental health problems related to his combat service in the Vietnam War, including flashbacks and nightmares.); App. at 213, 215, 219, 220, 230, 277 (Mr. Wainwright's parents neglected him emotionally and openly favored his sister.).

Thus, Dr. D'Errico's opinions regarding Mr. Wainwright were necessarily incomplete, because of Mr. Taylor's inadequate investigation and failure to provide him with sufficient records. With sufficient records and information about Mr. Wainwright's life, mental health experts in this case now readily describe Mr. Wainwright's trauma, depression, suggestibility, early substance abuse, and related dissociation. App. at 172-82 (finding that as a child Mr. Wainwright suffered from "symptoms of a severe neurodevelopmental disorder" requiring "intensive and repeated treatment" and that he has suffered "[m]ultiple traumatic brain injuries"); 183-203 (diagnosing Mr. Wainwright as suffering from Post-Traumatic Stress

Disorder and Major Depressive disorders, conditions he has suffered since adolescence and at the time of the offense, the trial, and currently); 237-51 (explaining that, at the time of the offense, Mr. Wainwright "had untreated complex mental illness and unaccompanied disabilities and was unusually vulnerable to social pressure" due to his history of institutionalization and trauma and his psychosocial immaturity). This amounted to deficient performance. *See Hardwick v. Sec'y, Fla. Dep't of Corrs.*, 803 F.3d 541, 553-54 (11th Cir. 2015) (finding deficient performance where counsel "did not obtain any of Hardwick's life-history records or conduct a life-history investigation."). Mr. Wainwright—whose jurors voted 12-0 for death—was prejudiced as a result.

### iv.  Mr. Wainwright's Trial Rights Were Violated When His Trial Counsel Disparaged His Character to Mr. Wainwright's Judge and Sentencer

At various points in this case, defense counsel disparaged Mr. Wainwright to the trial court, portraying Mr. Wainwright as untrustworthy, unreliable, demanding, and paranoid. Trial counsel repeatedly suggested that Mr. Wainwright wove theories about counsel conspiring against him and imagined problems. But this portrayal created real problems for Mr. Wainwright because the trial judge was the actual sentencer. *See infra* section (VI)(B)(i). Trial counsel's portrayal of Mr. Wainwright amounted to unduly prejudicial non-statutory aggravating evidence.

At trial, an in camera hearing was held to discuss Mr. Wainwright's complaint that his cell had been bugged with a microphone, allowing the jail staff to hear conversations in the cell; the cell is where Mr. Wainwright's meetings with trial counsel occurred. R. at 2392. During the hearing, defense counsel suggested to the court that, while Mr. Wainwright had told him about the microphone and wire in the cell, counsel had not believed his client.

Although Mr. Wainwright had pleaded with trial counsel to come to the jail to observe the microphone for himself, counsel delayed doing so. R. at 2394-95. A couple of days later, by the time counsel went to view it, the microphone had been removed. R. at 2396-97.

> Trial counsel explained the problems this caused with Mr. Wainwright:
> [Mr. Wainwright] was very, very upset because the device had been removed. And his concern was that I was the only one he had told about it, and not it was removed. And it created, obviously, problems between myself and my client such that he did not want to talk to me, and would not let me in his cell . . . .

R. at 2396-97.[32]

---

[32]   By relaying this information about Mr. Wainwright's reaction to the device and his suspicion that his attorney was involved in the installation or use of the device, trial counsel violated Mr. Wainwright's right to confidentiality with his counsel.

Mr. Wainwright had a right to counsel who would protect and advocate for his best interests. *ABA Model Code of Professional Responsibility*, at 33, EC 4-1 ("Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of [his client]."); *Strickland*, 466 U.S. at 656 (describing "the duty of loyalty [as] perhaps the most basic of counsel's duties").

Counsel then indicated to the court that, not having seen the bug device himself, he had not believed Mr. Wainwright's report. "The first I was aware that there was in fact a device there was today, prior to Mr. Wainwright coming into court, when I was advised that there, in fact, had been a device placed in there." R. at 2397-98. With this, defense counsel informed the court that he did not believe Mr. Wainwright to be trustworthy or reliable.

Later, in a discussion regarding the listening amplification device that the victim's mother had in her purse and used during the trial, trial counsel again denigrated Mr. Wainwright.

> Now the problem that my client has with [the victim's mother using a listening device], based on everything that's gone on so far, *real, perceived or otherwise*, is if that has the ability to pick up communications at this voice level sitting up here, . . . then it has the ability to pick up communication at counsel table for both Mr. Wainwright, communications that would be privileged.

R. at 2880-81 (emphasis added).

Trial counsel subsequently told the court that he was having "problems with client communication and relationship. There has been no doubt client paranoia in this case." Referring to the bug in Mr. Wainwright's cell and the listening amplification device of the victim's mother, trial counsel suggested that Mr. Wainwright was a difficult client.

> And as a result of all of this, my client has been concerned with procedures that have gone on, and we been asked and have had to check into and spend time looking at various aspects of other civil rights'

> violations, *possible, real or imagined* that I can't summarily dismiss anymore, when I should be focusing on the trial. I think it's unfortunate. . . . And I do not believe at this point in time we can continue to obtain the semblance of a fair trial with the grounds stated, and I move for a mistrial on behalf of my client. And I appreciate the Court's indulgence in making this claim, giving me the time to do that.

R. at 3010 (emphasis added). In this motion, trial counsel, asking for the court's indulgence, undermined the merits of the motion and sent the signal that he was requesting a continuance at the urging of Mr. Wainwright. And he continued to cast aspersions on Mr. Wainwright, suggesting he "imagined" wrongs against him.[33]

Counsel's portrayal of Mr. Wainwright was a betrayal of his duties of advocacy and loyalty. *Anders v. California*, 386 U.S. 738, 744 (1967) (explaining that the Constitution requires that defense counsel function as an advocate for the defendant as opposed to a friend of the court); *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("[C]ounsel owes the client a duty of loyalty.")

Mr. Wainwright's counsel did not appreciate that the court, the ultimate sentencer, could consider all of the comments counsel made about his client. This is inexcusable. "[E]mphasizing to the ultimate sentencer that the defendant is a bad person" and volunteering a negative portrayal of one's client is tantamount to ineffectiveness. *Douglas v. Wainwright*, 714 F.2d 1532, 1557 (11th Cir. 1983)

---

[33] The prosecution joined in the criticism of Mr. Wainwright, saying the parties had "spent a great deal of time during the course of this trial arguing extraneous matters, most of them occasioned by Mr. Taylor's client's paranoia about certain things." R. 3011.

(finding trial counsel to be ineffective when, "failing to appreciate that the trial judge was the ultimate sentence," counsel told the judge in chamber that the defendant had "not been a good boy" and that client's mother would not be testifying), certiorari granted, judgment vacated, and remanded for further consideration on unrelated grounds by *Douglas v. Wainwright*, 468 U.S. 1212 (1984), judgment reinstated by *Douglas v. Wainwright*, 739 F.2d 531 (11th Cir. 1984) (explaining that, when trial counsel disparages his client to the trial judge, the ultimate sentence, "prejudice is evident on the face of the record" and greatly likely to affect the defendant's sentence). *See also King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir. 1984) (holding counsel to be ineffective for emphasizing the reprehensible nature of his client's actions).

While the relationship between Mr. Wainwright and his counsel was likely frustrating to trial counsel, that did not excuse his attorney from criticizing his client and volunteering to the court that he did not trust his client. In situations where a client becomes "suspicious of the motives of his attorneys, and their efforts were frustrated by the differing and disparate demands made upon them by the court and their client" or where the client's "distrust cause[s] counsel to become defensive," trial counsel is still not permitted "to volunteer inappropriate information to the trial court." *Blanco v. Singletary*, 943 F.2d 1477, 1499 (11th Cir. 1991).

The negative portrayal of Mr. Wainwright's character as an untrustworthy, unreliable, and difficult client amounted to nonstatutory aggravation, which is not admissible in Florida capital cases under the death penalty scheme in place at Mr. Wainwright's trial.

> Section 921.141, Florida Statutes, governs capital sentencing procedures. After the jury issues an advisory sentence, the judge must independently weigh the aggravating and mitigating circumstances before a sentence is ordered. The capital sentencing statute expressly constrains the aggravating circumstances a trial judge may consider to fifteen enumerated factors. It also provides seven specific factors for a court to consider as possible mitigating circumstances, along with an eighth "catch-all" provision that expands the realm of mitigating circumstances to "any other factors in the defendant's background that would mitigate against imposition of the death penalty." Thus, while the statute governs both aggravating and mitigating factors, the statutory scheme allows a court to consider nonstatutory mitigating factors, but limits consideration of aggravating factors to only those listed . . . .

*Oyola v. State*, 158 So. 3d 504, 509 (Fla. 2015) (citations omitted).

When the ultimate sentencer is the judge, error occurs when the court is exposed to inadmissible evidence of nonstatutory aggravation. "[N]onstatutory aggravating circumstances are not permitted in the sentencing evaluation process. . . . Just as a jury should not be exposed to evidence of impermissible aggravating factors, a judge should not be permitted to consider them as part of the evaluation process." *Id.* at 509-10.

Mr. Wainwright's right to counsel who would act as a loyal advocate and with whom he could communicate in confidence was violated when trial counsel made a

series of disparaging comments about his character, and these comments—amounting to nonstatutory aggravation—deprived Mr. Wainwright of a fair sentencing.

> ### v.   Mr. Wainwright's Fifth Amendment Rights Were Violated When His Trial Counsel Failed to Advise Him of His Right to Testify

A defendant has two categories of constitutional rights: (1) those which are primarily strategic and can by waived by defense counsel on the defendant's behalf, and (2) those which are "fundamental" and personal, and only the defendant himself can waive. *U.S. v. Teague*, 953 F.2d 1525 (11th Cir. 1992). The right to testify is a fundamental constitutional right, *Id.* at 1532, and is "[e]ven more fundamental to a personal defense than the right of self-representation." *Rock v. Arkansas*, 483 U.S. 44, 52 (1987); *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (explaining that a criminal defendant "has the ultimate authority to make certain fundamental decisions regarding the case" including whether to testify); *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975) ("It is now accepted . . . that an accused has a right . . . to testify on his own behalf.").

The right to testify flows from the Fifth Amendment's guarantee against compelled testimony and the Sixth Amendment right of self-representation. *Rock*, 483 U.S. at 52 ("A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness."). "[T]here can

be no effective waiver of a fundamental constitutional right unless there is an 'intentional relinquishment or abandonment of a *known* right or privilege.'" *Teague*, 953 F.2d 1525 at 1533 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Mr. Wainwright never waived his right to testify, because counsel did not advise Mr. Wainwright that he had such a right.

A client represented by counsel is still the master of his defense. *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985); *see also Faretta*, 422 U.S. at 819-20 (discussing that the Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant"). Defense counsel has a "crucial" duty to advise the defendant "of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Teague*, 953 F.2d at 1533. Counsel fails to protect a defendant's right to testify when counsel overbears a defendant's will with regard to deciding whether to testify, or when he fails to advise a defendant of the right at all. *Id.* at 1529.

Because counsel has a duty "to advise the defendant of his right to testify and thereby to ensure that the right is protected," *Strickland* is the appropriate vehicle for a claim that a defendant was not advised of his right to testify. *Teague*, 953 F.2d at 1534 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)):

> Where the defendant claims a violation of his right to testify by defense
> counsel, the essence of the claim is that the action or inaction of the
> attorney deprived the defendant of the ability to choose whether or not
> to testify in his own behalf. In other words, by not protecting the

defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the *Strickland* test . . . [I]f defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary. Under such circumstances, defense counsel has not acted "'within the range of competence demanded of attorneys in criminal cases,'" and the defendant clearly has not received reasonably effective assistance of counsel.

*Teague*, 953 F.2d at 1534 (citations omitted).

Counsel's duty to advise a defendant of his right to testify is not lessened simply because counsel believes exercise of that right to be unwise. A defendant's exercise of his right to the assistance of counsel "does not relinquish his right to set the parameters of that representation." *Teague*, 953 F.2d at 1533; *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 ("The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel."). Counsel must inform a defendant of his options regarding testimony, so the defendant "can then make the choice of whether to take the stand with the advice of competent counsel." *Id.* at 1533. In Mr. Wainwright's case, counsel failed to inform Mr. Wainwright of his right to testify. This satisfies deficient performance under *Strickland*.

Counsel's deficient performance prejudiced Mr. Wainwright. "The testimony of a criminal defendant at his own trial is unique and inherently significant." *Nichols*

*v. Butler*, 953 F.2d 1550, 1553 (11th Cir. 1992). Often, a defendant is "the most important witness for the defense," *Rock*, 483 U.S. at 52, and "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States*, 365 U.S. 301, 304 (1961). "To deny a defendant the right to tell his story from the stand dehumanizes the administration of justice" and "allows a jury to condemn to death or imprisonment a defendant who desires to speak, without ever having heard the sound of his voice." *Wright v. Estelle*, 549 F.2d 971, 1078 (5th Cir. 1977) (Godbold, J., dissenting).

The prejudice is particularly pronounced in a case, such as Mr. Wainwright's, where a crime has unquestionably taken place but there is dispute over the defendant's role in its commission. In such a case, the defendant's testimony "takes on even greater importance. *Nichols*, 953 F.2d at 1553-54. There is a reasonable likelihood that, but for counsel's unprofessional conduct, the result of Mr. Wainwright's trial would have been different.

      vi.     **Mr. Wainwright's Trial Rights Were Violated When He Was Convicted and Sentenced to Death By a Jury That Included One Juror Who Was Functionally Illiterate and Three Jurors Who Had Family Members Who Were Victims of Crimes**

      a.     **Mr. Wainwright's Trial Counsel Was Ineffective in Failing to Individually Voir Dire Jurors Who Indicated Potential Bias**

When a biased juror is impaneled, "prejudice under *Strickland* is presumed, and a new trial is required." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Questions on voir dire must be sufficient to identify prospective jurors whose views would substantially impair them from performing the duties required of jurors. *Morgan*, 504 U.S. at 734-35. The fact that the defendant bears the burden of establishing juror partiality, *see Wainwright v. Witt*, 469 U.S. 412, 423 (1985), makes it all the more imperative that a defendant be entitled to meaningful examination at voir dire in order to elicit potential biases held by prospective jurors. *Mu'Min v. Virginia*, 500 U.S. 415, 441 (1991) (Marshall, J., dissenting).

"Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury through questions that permit the intelligent exercise of challenges by counsel." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). "Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel." *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992).

In this case, Mr. Taylor failed to adequately question three jurors,—jurors Wetzel, Hurt, and Springman, who indicated that they or their family members had been the victims of crime. Juror Hurt noted on her questionnaire that her son had been stabbed several times by a neighbor, App. at 2-3, Juror Wetzel indicated that his wife had been robbed, App. at 18-19, and Juror Springman indicated that his home had been invaded and robbed. App. at 13-14. One of the offenses charged in this case was armed robbery, and the other charges were violent crimes. Mr. Wainwright's trial counsel had this information on these jurors' potential bias at his disposal, in their questionnaires, and failed to ask them any questions about it. This made very little sense, as other jurors were questioned on the basis of knowing someone that was the victim of a crime and indicating it on their questionnaire—the very same thing that these three jurors who ended up on Mr. Wainwright's jury had done. *See* R. 1792; 1794. Juror Wetzel had been in a four-person panel that was questioned by the State on other issues within his questionnaire, including pretrial

publicity, and Mr. Taylor even questioned him about some other issues. R. at 1801. Mr. Wainwright's counsel failed to question him then or individually about this very concerning potential bias. *See* R. at 1787. Likewise, juror Springman was questioned by the State about his feelings on the death penalty, R. 1720, and his occupation, R. 1753, but never questioned by Mr. Taylor on this potential bias. Juror Hurt was questioned by the State on her thoughts on the change of venue, R. 1817, views on the death penalty, R. 1823, and occupation, R. 1828, but never questioned by Mr. Taylor on her potential bias as a result of her son being a victim of violent crime.

> **b.    Mr. Wainwright's Trial Counsel was Ineffective, and his Due Process Rights Were Violated, When His Trial Counsel Allowed a Potentially Functionally Illiterate Juror Onto His Jury**

"This Court has recognized that a defendant has a right to 'a tribunal both impartial and mentally competent to afford a hearing.'" *Tanner v. United States*, 483 U.S. 107, 126 (1987) (quoting *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912)). A criminal defendant likewise has "Sixth Amendment interests in an unimpaired jury." *Id*. at 127. Although not binding here, to illustrate how important literacy is to the ability to serve as a juror, it is relevant that illiterate jurors cannot serve on a federal jury, *see* 28 U.S.C. § 1865(b)(2) (providing that a person who is "unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form" is not qualified to serve as a juror in federal cases).

Of additional concern, another juror, Juror Watson, filled out only a couple of questions on his questionnaire that required a check-yes-or-no response, and did not fill out any of the portions of the questionnaire with more complicated questions— such as the entire section that asked about the death penalty. App. at 7-11. He also struggled to spell some basic words, listing his occupation as "supper visser" working for a "home bilder." App. at 8.

Juror Watson was questioned about his feelings on the death penalty, R. at 1846, and his occupation, R. 1856, by the State and the court. Mr. Taylor even asked juror Watson questions about how long he had lived in Clay County and his occupation, R. 1846-47, but failed in any way to discover whether Mr. Watson could adequately serve as a juror on this jury due to his apparent functional illiteracy. Mr. Taylor was aware of this fact, as he even wrote in his own handwritten notes from jury selection that Mr. Watson "can't read or spell." App. at 12.

That one juror potentially could not read, to the point that he could not spell "supervisor" or "builder," is of great concern in this case. Mr. Wainwright had a trial that stretched from May 15 to June 1, 1995. It included dozens of pieces of evidence, and many things that were published to the jury that required the ability to read to understand. Further, an illiterate juror could not have read the jury instructions for himself and made a decision based on what they said.

Simply put, due to his apparent illiteracy, juror Watson could not function fully as a juror in this case, and Mr. Wainwright was thus deprived of the consideration of a full twelve jurors in his conviction and death sentence. This renders those proceedings fundamentally unreliable.

Perplexingly, Mr. Taylor did not even use all of his peremptory strikes in this case; he only used six out of his ten strikes. *See* R. at 1677 (noting both State and defense had 10 peremptory strikes each); R. at 1778 (two defense strikes used); R. at 1783 (one defense strike used); R. at 1809 (three defense strikes used); R. at 1871 (defense noting no further strikes). Mr. Taylor could have – but did not – strike all four of the jurors complained of above. He did not, which resulted in Mr. Wainwright having jurors who were potentially biased, and one juror who could not fully function as a juror in this case because of his apparent illiteracy. This violated Mr. Wainwright's trial rights.

### vii. Mr. Wainwright's Conviction and Death Sentence are Unreliable Due to the Presentation of False Testimony Regarding DNA to His Jury and Judge

Due process requires that a conviction and sentence not be obtained through the use of false evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This is because, as the United States Supreme Court held in *Giglio v. United States*, the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United*

*States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). "'The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Id*. (quoting *Napue*, 360 U.S. at 269). This is true regardless of whether the prosecution acted in bad faith. *Id*. (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).

Further, *Giglio* violations do not require proof that a prosecutor have actual knowledge that the testimony was false as it occurs, but instead that "the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, *or should have known*, of the perjury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added); *see also United States v. Cargill*, 17 Fed. App'x 214, 224 (4th Cir. 2001) ("Prosecutorial misconduct occurs 'not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows *creates a false impression* of a material fact.'") (quoting *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir.1967)) (emphasis added).

A habeas petitioner asserting a *Giglio* violation must demonstrate "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material[,] *i.e*., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008); *see also Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 271. "This 'could have' materiality standard

'requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt.'" *Locascio v. Sec'y, Fla. Dep't of Corr.*, 685 Fed. App'x 837, 845 (11th Cir. 2017) (quoting *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011)). The materiality standard for *Giglio* violations is "less onerous than the *Brady* one." *Cargill*, 17 Fed. App'x at 227; *see e.g., United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (distinguishing *Giglio* materiality from *Brady* materiality: "A different and more defense-friendly standard of materiality applies where the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony.").

"*Brady* and *Giglio* impose active duties on prosecutors prior to trial." *United States v. Lyons*, 352 F. Supp. 2d 1231, 1243 (11th Cir. 2004). *Giglio* imposes a duty on prosecutors to ascertain what a witness they will call to trial will testify to, and whether or not that testimony will be accurate. *See, e.g., Lyons*, 352 F. Supp. 2d at 1243 n. 16 ("Proper and verifiable vetting should be performed on every witness the Government sees fit to call at trial."). Thus, for the purposes of the *Giglio* requirement that a prosecutor knew testimony was false or failed to subsequently correct it, *see Ford*, 546 F.3d at 1332, a state agent's knowledge of the falsity is imputed to the prosecutor, as with the *Brady* standard. *See, e.g., Sargent v. McNeil,* No. 4:08-cv-175, 2010 WL 6618542, *28 (N.D. Fla. Nov. 17, 2010) ("This is not a case where the prosecutor personally knew that she had elicited perjured testimony,

but neither was *Giglio*. 'Knowing' in this context is not specific intent. It is a term of art for the collective 'knowledge' of the State."); *Gorham v. State*, 597 So. 2d 782, 784 (Fla. 1992) ("Even though the police did not reveal Johnson's informant status to the state attorney who prosecuted Gorham's case, the state attorney is charged with constructive knowledge and possession of evidence withheld by other state agents, such as law enforcement officers.") (internal citations omitted). Thus, as in *Brady*, "[a] prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him – those variously referred to as an 'arm of the prosecutor' or part of the 'prosecution team.'" *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D. N.Y. 2005) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).

In this case, the prosecution presented false testimony concerning the DNA testing results obtained from both FDLE and Genetic Designs, a private lab that contracted with by FDLE for testing in this case. At trial, FDLE lab examiner James Pollock testified that the RFLP analysis he conducted on a portion of the rear seat cover from the Bronco (Exhibit 75-B), in which he analyzed 6 loci/probes, meant that "[t]aken as a whole, the six probes are all consistent with semen having come from Anthony Wainwright on Exhibit 75-B." R. at 3155. Michael DeGuglielmo of Genetic Designs testified that his lab conducted PCR analysis on "mixed stains, [of] seminal and vaginal fluid stains that were found on the evidence" from the Bronco

(Exhibit 75-B). R. at 3086. When Genetic Designs tested this same exhibit, it excluded Mr. Wainwright, and was consistent with Mr. Hamilton. *See* R. at 3221. DeGuglielmo then reported this finding to FDLE examiner Pollock, R. 3147, and Pollock gave him another portion of the backseat, R. 3250, which Pollock told him before he even conducted testing on it that Pollock had concluded that Mr. Wainwright's cells were present. R. at 3259. From this second round of testing at Pollock's direction, only then did DeGuglielmo conclude: "[I]n my opinion, what we've got is a stain which is fairly confluent throughout the DNA from Ricky Hamilton, and the portion to the left on the larger sample indicating DNA from sperm that came from Mr. Wainwright." R. at 3260. Thus, critically, both Pollock and DeGuglielmo represented that Mr. Wainwright's DNA was present on the backseat cover of the Bronco, that the cells that were present were sperm/semen, and that those occurred in "mixed stains" that included the victim's DNA as well.

This allowed the State to promote the narrative that DNA evidence linked Mr. Wainwright conclusively to the sexual assault of the victim. The State argued in closing argument in Mr. Wainwright's case, for example:

> And we know [Mr. Wainwright's] guilt of sexual battery, even without his statements, and even without Richard Hamilton's statements. And the reason that we know he's guilty of sexual battery is we have his semen in the back of that Bronco. Not only do we have his semen in the back of that Bronco, but you heard the testimony that the odds of anyone else being responsible for that semen in the back of the Bronco, anyone else having the same genetic profile as this defendant, is one in six billion. If you want to be a real sport about it, and use the more

conservative measure which everyone agrees gives all benefit to the defendant, then the odds are reduced to one in thirteen million, it's hard to imagine a stronger rape case than has been presented to this jury over the last few days here.

R. at 3564-65.

However, these representations were not accurate. Review from DNA expert Candy Zuleger in this case revealed that the cells Pollock testified were "semen" that allegedly belonged to Mr. Wainwright cannot be said to be sperm/semen. App. at 263 ("Because of the lack of a critical component of sperm cell extraction, DTT, [in Pollock's testing] I cannot conclude that the cells Pollock analyzed were in fact sperm cells."). At no point was any alleged DNA of Mr. Wainwright—sperm or not—determined to be in the same sample as the victim's DNA in a manner that indicates a sexual assault took place that included Mr. Wainwright. App. at 262-63. Ms. Zuleger wrote: "The sample analyzed by Pollock does not contain any scientific evidence that Mr. Wainwright participated in a sexual assault of the victim." App. at 263. Concerning the testing from Genetic Designs, Ms. Zuleger wrote: "My review concludes that, pertaining to DNA, there is no scientific or physical evidence to support that there was a sexual assault Mr. Wainwright participated in." App. at 264. Instead, Genetic Designs' PCR analysis only "tie[d] together the victim's epithelial cells and Mr. Hamilton's sperm cells." *Id*.

Further, the results of both Pollock and DeGuglielmo are derived from testing that is concerning. For example, there were a number of changes made to FDLE

protocol by Pollock that were not verified by a validation study, and the changes Pollock made make his testing scientifically unreliable. App. at 266-67. Thus, even Pollock's statistical conclusions, in which he claimed that there was a probability of "one in six billion," or more conservatively, "one in thirteen million," R. at 3160, that Mr. Wainwright's sperm/semen was found in the Bronco with the victim's cells was a false representation. Mr. Pollock could not conclude that those cells related to Mr. Wainwright were sperm/semen. App. at 263. Pollock's testing procedures, which differed from the FBI protocol and the FBI models on which he based these statistics, R. 2893-94 (Pollock testimony during *Frye* inquiry), were unvalidated and are not scientifically reliable. App. at 263.

Likewise, the testing at Genetic Designs, to which DeGuglielmo testified,[34] is not only facially concerning because of the collusion that existed between he and

---

[34]   DeGuglielmo testified to the results of the testing done at Genetic Designs, but he was not the analyst who actually performed the testing. App. at 266. The testing was done by someone with the initials AMR. *Id.* This was improper and in violation of Mr. Wainwright's Sixth Amendment right to be confronted with the witnesses against him.

"The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. . . . [I]t guarantees a defendant's right to confront those who bear testimony against him. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial . . . ." " *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (citations, internal quotation marks, alterations omitted) (holding that results from testing performed by a forensic science analyst cannot be admitted against a criminal defendant at trial unless that specific analyst testifies at the trial). *See also Crawford v. Washington*, 541 U.S. 36 (2004).

Pollock—in which, for example, Pollock told him what sample he concluded had

Mr. Wainwright in it before he even tested it, R. at 3250[35]—but is further concerning

---

> Forensic evidence is not uniquely immune from the risk of manipulation. . . . [B]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency. A forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution.

> Confrontation is one means of assuring accurate forensic analysis. . . . Like the eyewitness who has fabricated his account to the police, the analyst who provides false results may, under oath in open court, reconsider his false testimony. And, of course, the prospect of confrontation will deter fraudulent analysis in the first place.

> Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well. Serious deficiencies have been found in the forensic evidence used in criminal trials.

*Melendez-Diaz*, 557 U.S. at 318-19 (citations, internal quotation marks omitted).

[35]   That Pollock and DeGugliemo consulted with each other, repeatedly, during the separate testing of these materials, should concern this Court. As Ms. Zuleger observed:

> Independent analysis is fundamental to the scientific method. A foundational aspect of the scientific method related to the objectivity and reliability of the testing and analysis. In scientific processes, objectivity and reliability is supported by practices centering on the independence of analysts and laboratories, such as double-blind testing, peer reviewed research, and independent on-site laboratory inspections.

App. at 265.

because in no way does it reflect the information that he testified to. Specifically, the statistics that DeGuglielmo testified to concluded that Mr. Wainwright "could not be excluded" from the second sample he was given (R. at 3251) were misleading and false. DeGuglielmo purported that Mr. Wainwright could not be excluded from this second sample and gave statistical probabilities that were misleading. DeGuglielmo testified that "[i]n looking at Mr. Wainwright's types, they occur with a frequency of one in seven thousand, six hundred and eighty-nine." R. at 3236. This statistic was inaccurate and false because it was based statistical probabilities for a single-source sample, not a mixed sample, as DeGuglielmo acknowledged he was dealing with in this case. *See, e.g*., R. at 3260. Of this, Ms. Zuleger concluded:

> DeGuglielmo analyzed two samples – both were mixture samples. (This is apparent from the bench notes from Genetic Design but is not included in the reported data.) When DeGuglielmo did his calculations, however, he did them as if he had extracted a single-source sample and not a mixture sample. It is well-known that mixture samples yield lower statistics. Additionally, Pollock would not have been able to give a statistic on a mixture sample because, at that time, FDLE didn't deal with mixture samples. In all likelihood, DeGuglielmo knew – and certainly should have known – that the sample he analyzed was a mixture, that a proper statistical calculation accounting for the sample's mixture status would lower the statistical result, and that using statistics for a single-source sample would have been improper and misleading. However, he only testified to a statistics that assumed a single-source sample. Thus, his testimony on this point was misleading and clouded the issues, and it is unlikely lay jurors could have discerned these errors in his testimony.

App. at 266.

177

DeGuglielmo never made a statistical probability determination regarding Mr. Wainwright in his report, and did not give any measure of how he was getting these statistics—his report does not contain his procedures for statistical calculations or application, nor does it contain the database or source for those figures. Thus, DeGuglielmo's testimony intentionally created the false impression that there was some statistical probability of Mr. Wainwright being "not excluded" from his testing, but DeGuglielmo's report and testing do not support that testimony. App. at 264-65. DeGuglielmo and Pollock, professionals in their fields, should both have known their testimony was false and misleading, as Mr. Wainwright's DNA expert, who worked at FDLE shortly after the events in this case occurred, supports. App. at 264-68.

This false testimony by these two state experts led to the false representations to the jury in Mr. Wainwright's closing arguments. Ms. Zuleger noted: "The arguments by the prosecutor and by defense counsel – that there is a 1 in 6158 or 1 in 7000 statistical probability that the sample matched Mr. Wainwright – are simply incorrect. No expert gave a reliable and accurate statistic matching the sample DeGuglielmo analyzed to Wainwright." App. at 268. The sum total of the misrepresentations and falsities in the testimonies of both Pollock and DeGugliemo, which are imputed to the prosecution in this case, led directly to the false

representations in the State's closing argument to the jury, and amounts to the knowing presentation of false evidence in violation of *Giglio* and progeny.

In summary, Ms. Zuleger concluded:

> At Wainwright's trial, the expert testimony regarding DNA samples was unreliable, inaccurate, and misleading. The attorneys for both parties then repeated inaccuracies in their arguments to the jury. Scientific testimony is complicated and sophisticated, and Mr. Wainwright's jury did not have the information necessary to sift through the experts' testimony and identify the errors. There is no reliable scientific or DNA evidence that Mr. Wainwright participated in a sexual assault of the victim; further there is no reliable scientific or DNA evidence that ties Mr. Wainwright intimately to the victim in this case. The analysts, Pollock and DeGuglielmo specifically, inappropriately consulted with one another about their initial analyses, testified to matters that were not contained in their reports or notes, offered opinions that were not supported by statistics, and offered opinions that were not supported by reliable and verifiable testing. The attorneys then confused statistics that applied to Mr. Hamilton and argued to the jury that the statistics applied to Mr. Wainwright when there was no support for such.

App. at 268.

The review and report by Mr. Wainwright's DNA expert reveal that the testimony at trial was false, and Mr. Wainwright meets the *Giglio* materiality standard of "any reasonable likelihood that the false testimony could have affected the judgment." *Ford,* 546 F.3d at 1332. Mr. Wainwright adamantly denied ever sexually assaulting or murdering the victim. There was no other physical evidence in this case that supported that Mr. Wainwright was anything more than an unknowing bystander to Mr. Hamilton's actions in sexually assaulting and killing

the victim in this case. *See supra* section (VI)(A)(iii) (discussing Mr. Wainwright's case in the context of actual innocence). That Mr. Wainwright sexually assaulted the victim, and thus was likely a knowing participant in her murder, was supported directly only by the alleged DNA evidence linking him to the sexual assault, and the statement of his co-defendant, Mr. Hamilton. However, because the DNA evidence presented was false, no physical evidence linked Mr. Wainwright to this self-serving narrative by Mr. Hamilton or the State. That this was a fabrication is further supported by the fact that Mr. Hamilton later signed a statement indicating that he lied about this. App. at 62-64. This reasonably "could have affected the judgment" in this case, which relied heavily on Mr. Hamilton's statements and this supposedly corroborating DNA evidence. Thus, Mr. Wainwright has established a *Giglio* violation occurred, and his conviction is defective as a result.

**D.   Even if This Court Does Not Apply the Actual Innocence Gateway and Limits Consideration of This Rule 60(b)(6) Motion to the Time-Bar Issue, the Above Grounds Show That Mr. Wainwright has Meritorious Issues to Raise in a Reopened § 2254 Proceeding**

Even if this Court does not apply the actual innocence gateway to review the above grounds for relief on their merits, and instead limits its consideration of this Rule 60(b)(6) motion to the time-bar issue, *see supra* section (V)(A-B), those same grounds show that Mr. Wainwright has meritorious issues to raise in a reopened § 2254 proceeding. These grounds show that granting Mr. Wainwright's current counsel permission to argue tolling would not be an exercise in futility. In a reopened

§ 2254 proceeding, Mr. Wainwright could be granted relief from his conviction or death sentence based on one or more of the grounds described above. Such is in line with the principle purpose of Rule 60(b) and the broad powers of the federal courts, which have long recognized that "where the occasion had demanded, where enforcement of the judgment is 'manifestly unconscionable,' [federal courts] have wielded the power [to grant relief from judgments] without hesitation." *Hazel-Atlas Glass Co. v. Hartford-Empire Co*, 322 U.S. 238, 244-45 (1944)) (quoting *Pickford v. Talbott*, 225 U.S. 651, 657 (1912)).

## VII.   MR. WAINWRIGHT'S 60(B) MOTION IS TIMELY

Rule 60(b)(4)-(6) motions must be filed "within a reasonable time." Rule 60(c)(1). "A determination of what constitutes a reasonable time depends on the facts in an individual case, and in making the determination, courts should consider whether the movant had a good reason for the delay in filing and whether the non-movant would be prejudiced by the delay." *Ramsey*, 304 F. App'x at 828 (citing *Lairsey v. Advance Abrasives Co*., 542 F.2d 928, 930 (5th Cir. 1976)). Because of the fact-specific nature of the reasonable time inquiry, there is no amount of time that necessarily bars relief.

In some cases, even years after the judgment that is attacked can be a reasonable time for Rule 60(b) purposes. *See, e.g., Buck v. Davis*, 137 S. Ct. 759 (2017) (finding Rule 60(b)(6) relief appropriate where judgment was nearly eight

years before the filing of the motion); *Christeson v. Roper*, 135 S.Ct. 891, 895 (2015) (noting petitioner "might properly raise a claim for relief pursuant to Rule 60(b)" more than seven years after the judgment in question); *see also Turner v. Howerton*, 196 F. App'x 848, 852 (11th Cir. 2006) ("The Eleventh Circuit has 'approved of the principle that virtually any amount of time is a 'reasonable time' for making a Rule 60(b)(4) claim.'") (internal citation omitted).

In this case, Mr. Wainwright has presented this motion in a reasonable time, and he could not have presented it before now. Mr. Wainwright has not had any other federal counsel apart from Mr. Hobson, whose misconduct necessitated this filing, and he actively tried to remove Mr. Hobson from his case for years, being denied by courts at every turn. *See, e.g.*, App. 101 (January 3, 2011, Order Denying Defendant's Pro Se Motions); 106 (December 10, 2012, Order Denying Defendant's Pro Se Motion Seeking to Discharge Counsel and Appoint Competent, Conflict-Free Counsel). Because Mr. Wainwright was represented by counsel postconviction courts routinely struck Mr. Wainwright's pro se pleadings.

Mr. Wainwright was diligent in pursuing his federal rights prior to Mr. Hobson missing his federal deadline, *see infra* section (V)(A)(iv), and even after, he implored Mr. Hobson to file specific postconviction claims and pleadings on his behalf, even providing him drafts. *See, e.g.*, App. at 65 (Letter to Mr. Hobson dated September 22, 2007, asking multiple questions about state and federal

postconviction); 67 (Letter dated March 26, 2007: "Mr. Hobson please don't forget to file that actual innocence claim and the motion to the 11th Circuit Court . . ."); 68-69 (Letter dated May 18, 2007, imploring Mr. Hobson to hire an investigator, and noting: "You've been telling me for months you were going to prepare a Rule 3.851 . . ."); 70 (Letter dated May 25, 2007: "I'm enclosing a brief I had prepared concerning the affidavit."). Other individuals also wrote Mr. Hobson on Mr. Wainwright's behalf, inquiring about the status of his legal case. *See, e.g.*, App. at 72 (Letter dated June 25, 2007, from Annarita Magri).

After Mr. Hobson's failure to timely file his federal petition, and his total lack of communication with Mr. Wainwright and lack of any meaningful work on Mr. Wainwright's case, Mr. Wainwright even tried to file complaints with the Florida Bar. *See, e.g.*, App. at 73 ("Petitioner is in the end stages of process. These numerous and consistent, negligent/incompetent deficiencies to petitioner's detriment are inexcusable and have created irreconcilable conflict between counsel and petitioner."). However, Mr. Wainwright tried again and again to work with Mr. Hobson, diligent in his pursuit of legal process.[36] Even while he was represented by

---

[36]    Mr. Wainwright has written hundreds of pages in letters to Mr. Hobson concerning his legal case. Included in the appendix and cited here are a fraction of the letters Mr. Wainwright has written, all of which evidence his diligence even after his federal deadline was missed, and up until this point. *See, e.g.*, App. at 92 (Letter dated March 28, 2008: "I received the Florida Supreme Court's decision yesterday. I have until April 9, 2008 to file my initial brief. I need to speak with you on the telephone before you file the initial brief."); 93 (Letter dated May 23, 2008: "I

Mr. Hobson, Mr. Wainwright also wrote to a number of organizations seeking help with his case, as Mr. Hobson would not pursue the potentially meritorious claims he desired. *See, e.g.,* App. at 119 (Letter dated January 16, 2013 to the Innocence Project of Florida).

Once Mr. Wainwright finally rid himself of Mr. Hobson in October 2013, his new state counsel, Mr. Harrison, did not appear in his case until February 2014. Once Mr. Harrison was appointed to his case, Mr. Wainwright was likewise diligent in attempting to pursue legal process with the help of Mr. Harrison, writing him numerous times. *See, e.g.,* App. at 144 (Letter dated June 30, 2014, discussing his postconviction litigation and sending Mr. Harrison additional cases); 145 (Letter dated July 30, 2014, requesting copies of transcripts and discussing a forensic

---

haven't heard from you in over (3) weeks, so I wanted to write and find out if there was any new developments in my case.") 94 (Letter dated May 31, 2008: "Please forgive me for not believing you when you tell me 'I am prodigiously preparing to put this successor motion in litigation' . . . I want a deadline in writing when this successor motion will be prepared and filed with the Court."); 96 (Letter dated September 2, 2008: "I disagree with your opinion that filing a petition for rehearing is a waste of time . . ."); 99 (Letter dated December 5, 2008, discussing Florida Supreme Court ruling); 100 (Letter dated February 1, 2009: "Please focus your attention on our upcoming federal appeal"); 121 (Letter dated January 30, 2013, discussing scientific evidence and noting: "[a]s for the grievance I filed with the Florida bar, I did not do it only to get you off my case. I did it in the hopes of having you disciplined for your negligence and incompetency. You have no business representing anyone on death-row."); 123 (Letter dated February 25, 2013, discussing DNA evidence); 125 (Letter dated April 22, 2013, discussing his postconviction filings); 133 (Letter dated August 23, 2013, requesting copies of records from his file).

scientist); 151 (Letter dated April 23, 2015, discussing particular claim to raise in state postconviction, and informing Mr. Harrison: "I really do believe I'll win equitable tolling if I'm allowed to file a Rule 60(b)" and discussing potential federal litigation). Additionally, Mr. Harrison was not, under his funding contract, authorized to appear in federal court on Mr. Wainwright's behalf.[37] Effectively, since Mr. Wainwright's federal deadline was missed by Mr. Hobson, he has had only conflicted counsel, or no counsel, in federal court, and conflicted counsel or no counsel in state court. Further, Mr. Wainwright could not have filed the instant petition as an indigent, death-sentenced prisoner, which required the services of expert psychologists, an investigator, a prison expert, and a DNA expert – the same kind of experts that Mr. Wainwright repeatedly wrote to his counsel and asked them to retain, though they never did.

---

[37]     That Mr. Harrison was not authorized to appear in federal court was not the only impediment to his representation of Mr. Wainwright – indeed, it appears that Mr. Harrison has been laboring under a conflict for the entirety of his representation, as he worked at the public defender's office that represented Mr. Wainwright's co-defendant, Richard Hamilton, at the time of their trials, and further possibly served as counsel for one of the jail inmates who later testified against Mr. Wainwright at his trial. App. at 170-71 (public records response received from the Office of the Public Defender for the Third Circuit listing Baya Harrison as an attorney employed between 1994-1995); R. at 2763 (testimony of Gary Gunter: "Q: "[Y]ou were looking at being sentenced to the Department of Corrections as a habitual offender; isn't that correct? A: That's what they said. . . . Q: Did you have a lawyer? A: Public defender. Q: Okay. That would have been Baya Harrison? A: Yes, sir.").

## VIII.  RULE 60(B)(6) RELIEF SHOULD BE GRANTED

Relief should be granted pursuant to Rule 60(b)(6) from the Court's March 2006 order granting summary judgment and dismissing the § 2254 petition as time-barred. Mr. Wainwright's federal habeas proceedings should be reopened under Rule 60(b)(6) based on new information regarding defects in the prior proceeding that were not available to the Court at the time of the original judgment denying equitable tolling and dismissing the petition. The Court should grant Mr. Wainwright relief from his conviction and death sentence based on the independent grounds described in this motion. Alternatively, the Court should reinstate Mr. Wainwright's § 2254 proceedings and grant his counsel time to amend.

Respectfully submitted,

/s/ Terri Backhus
Terri Backhus, Fla. Bar No. 946427
     Chief, Capital Habeas Unit
Kimberly Sharkey, Fla. Bar No. 505978
Kelsey Peregoy, Va. Bar No. 89478
Office of the Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301-1300
(850) 942-8818
Terri_Backhus@fd.org
Kimberly_Sharkey@fd.org
Kelsey_Peregoy@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of June 2019, I served the foregoing motion by electronic transmission to Assistant Attorney General, Jennifer Donahue at jennifer.donahue@myfloridalegal.com and capapp@myfloridalegal.com.


/s/ Terri Backhus
Terri Backhus